UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEIJER, INC. and MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WARNER CHILCOTT HOLDINGS COMPANY III, LTD.; WARNER CHILCOTT CORPORATION; WARNER CHILCOTT (US) INC.; GALEN (CHEMICALS), LTD.; and BARR PHARMACEUTICALS, INC.,<br><br>Defendants. | Civil Action No. _____<br><br><u>CLASS ACTION COMPLAINT</u><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs, by and through their undersigned attorneys, on their own behalf and on behalf of a class of similarly situated direct purchasers, as defined below, bring this action for treble damages under the United States antitrust laws against Defendants Warner Chilcott Holdings Company III, Ltd.; Warner Chilcott Corporation; Warner Chilcott (US), Inc.; Galen (Chemicals) Limited (collectively "Warner Chilcott"); and Barr Pharmaceuticals, Inc. ("Barr") and make the following allegations:

## NATURE OF THIS ACTION

1. This case concerns a horizontal agreement between Warner Chilcott and Barr (collectively, "Defendants") not to compete in the sales of Ovcon 35 ("Ovcon"), an oral contraceptive product used to prevent pregnancy, and its AB-rated generic equivalents. As a result of this restraint of trade, Plaintiffs and the class of purchasers defined below have paid supracompetitive prices for Ovcon.

2.      Warner Chilcott is a pharmaceutical company that develops, manufactures, and markets proprietary women's healthcare and dermatology prescription pharmaceutical products. Warner Chilcott sells Ovcon, a proprietary prescription pharmaceutical product that contains norethindrone and ethinyl estradiol as its active pharmaceutical ingredients. Warner Chilcott is the exclusive marketer of Ovcon, pursuant to an agreement with Bristol-Myers Squibb Company.

3.      Barr is a pharmaceutical company that develops, manufactures, and markets generic and proprietary prescription pharmaceutical products. Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell a generic version of Ovcon in competition with Warner Chilcott's branded Ovcon.

4.      On or about March 24, 2004, Warner Chilcott and Barr entered into an Option and License Agreement (the "Agreement") not to compete in the sale of brand and generic Ovcon in the United States. Warner Chilcott exercised that option on May 6, 2004.

5.      Prior to the Defendants' Agreement, Barr planned to compete with Warner Chilcott by selling Barr's lower-priced generic Ovcon once Barr received FDA approval. Both Warner Chilcott and Barr predicted that entry of Barr's lower-priced generic into the market would reduce Warner Chilcott's higher-priced branded Ovcon sales, by capturing approximately 50% of Ovcon's business in the first year alone.

6.      Barr was ready to come to market by the end of 2003 with a cheaper generic version of Ovcon and received FDA approval to do so in April, 2004.

7.      To forestall Barr's competitive threat and to protect its Ovcon sales, Warner Chilcott paid Barr $20 million, pursuant to the Agreement, in exchange for Barr's agreement to refrain from selling generic Ovcon in the United States for five years.

8.  The Agreement denied Plaintiffs and other purchasers of Ovcon the benefits of competition and of cheaper generic versions of Ovcon. Defendants' conduct, thus, led to supracompetitive prices for Ovcon, causing antitrust injury to its purchasers.

## JURISDICTION AND VENUE

9.  This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover threefold damages and the costs of suit, including reasonable attorneys' fees, for injuries to Plaintiffs and members of the class in the form of overcharges resulting from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

10. This Court has jurisdiction over the subject matter of this civil action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

11. Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26 and under 28 U.S.C. §§ 1391, because: (1) Warner Chilcott and Barr transact business and are found within this District; and (2) a substantial portion of the affected trade and commerce described below has been carried out in this District.

## PARTIES

12. Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer" or "Plaintiffs") are corporations organized under the laws of Michigan, with their principal places of business in Grand Rapids, Michigan. During the period of time covered by this Complaint, Plaintiffs purchased Ovcon directly from one or more of the named Defendants and suffered antitrust injury as a result of Defendants' anticompetitive conduct.

13. Defendant Warner Chilcott Holdings Company III, Ltd., is a privately-owned, for-profit enterprise organized under the laws of Bermuda, with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129. Warner Chilcott Holdings

Company III, Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacturing, and distribution of pharmaceutical products, including Ovcon, in the United States.

14.   Defendant Warner Chilcott Corporation is a for-profit Delaware corporation with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129. Warner Chilcott Corporation is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd., and is the direct 100% shareholder of Warner Chilcott (U.S.) Inc.

15.   Defendant Warner Chilcott (US), Inc., is a for-profit Delaware corporation with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129. Defendant Warner Chilcott (US), Inc., is a direct wholly-owned subsidiary of Defendant Warner Chilcott Corporation.

16.   Defendant Galen (Chemicals) Limited ("Galen") is a for-profit enterprise organized under the laws of the Republic of Ireland. Galen is owned or controlled by Warner Chilcott Holdings Company III, Ltd. Galen is the entity that executed the Agreement with Barr.

17.   Unless otherwise specified, Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US), Inc., and Galen (Chemicals) Limited are referred to herein collectively as "Warner Chilcott." Warner Chilcott develops, manufactures, and markets proprietary women's healthcare and dermatology prescription pharmaceutical products. For the fiscal quarter ending March 31, 2005, Warner Chilcott Holdings Company III, Ltd. reported net revenue of approximately $133.7 million. During that period, sales of Ovcon increased 30.8% to approximately $22,900,000 for the quarter. During the twelve month period ending September 30, 2004, Warner Chilcott's gross profit margin on product net sales was approximately 89%.

18.     Defendant Barr Pharmaceuticals, Inc. ("Barr") is a Delaware corporation with a principal place of business at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519. Barr Laboratories, Inc. is a wholly-owned subsidiary of Barr Pharmaceuticals, Inc. Barr develops, manufactures, and markets generic and proprietary prescription pharmaceutical products. In the twelve months ending June 30, 2004, Barr had net revenues of approximately $349 million and net income of approximately $123 million.

## INTERSTATE TRADE AND COMMERCE

19.     During the relevant period, Ovcon was sold throughout the United States. Ovcon was manufactured and sold in a continuous and uninterrupted flow of commerce across state and national lines. Defendants' unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon interstate commerce.

20.     Defendants employed, in furtherance of their unlawful conduct, the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

## FACTUAL BACKGROUND

### A.     The Regulatory System Governing Pharmaceuticals in the United States

21.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), and the Medicare Prescription Drug, Improvement and Modernization Act of 2003, codified at 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (2005), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

22. A drug manufacturer must obtain approval from the U.S. Food and Drug Administration ("FDA") before the manufacturer may lawfully introduce a new drug in the United States.

23. To have one of its new drugs considered for approval, a manufacturer must file a New Drug Application ("NDA") with the FDA. The NDA must contain information demonstrating that the drug is safe and effective for its intended use. 21 U.S.C. § 355(b) (2005).

24. A drug that is approved through the NDA process may be listed by the FDA as a "Reference Listed Drug" in an FDA publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly referred to as the "Orange Book."

25. An "AB-rated" generic drug is one that the FDA has determined to be bioequivalent to its corresponding Reference Listed Drug. A generic drug contains the same active pharmaceutical ingredient(s) (or contains the same therapeutic moiety, but may be a different salt, ester, or complex of that moiety) as the corresponding Reference Listed Drug, but may contain other ingredients (such as colors and flavors) that are different. A generic drug is comparable to a Reference Listed Drug in dosage form, strength, route of administration, quality, performance characteristics, and intended use. 21 U.S.C. § 355(j)(8)(B) (2005).

26. The Hatch-Waxman Act established a procedure that has often allowed generic drugs to enter the market earlier than had been possible in the past. The resulting competition benefits purchasers of drugs by leading to cheaper prices.

27. The Hatch-Waxman Act allows a company to seek FDA approval to market a generic version of a Reference Listed Drug by filing an Abbreviated New Drug Application ("ANDA"). 21 U.S.C. § 355(j) (2005). An ANDA is generally not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness.

28.  Because the FDA has already determined that a Reference Listed Drug is safe and effective for use, an ANDA filer may rely on the safety and efficacy data previously provided for a specific Reference Listed Drug, so long as the ANDA filer sufficiently demonstrates to the FDA that its generic drug is bioequivalent to the Reference Listed Drug.

29.  Generic drugs invariably cost substantially less than the branded drugs to which they are bioequivalent. Typically, the first generic version of a brand name drug is sold at a substantial discount to the brand, followed by increasingly steeper discounts as more generics enter the market.

30.  Generic drugs, after their introduction, promptly capture a significant share of their branded counterparts' sales, causing a significant reduction of the branded drug's unit and dollar sales.

31.  Competition from generic drugs generates large savings on purchases of pharmaceutical products. A 1998 Congressional Budget Office Report estimates that in 1994 alone, consumers saved $8-10 billion on prescriptions at retail pharmacies by purchasing generic drugs instead of their equivalent brand name drugs.

**B.    Warner Chilcott's Ovcon Products**

32.  Ovcon has been available to the general public as a prescription pharmaceutical product since approximately 1976. It is not subject to patent protection.

33.  Prior to January 26, 2000, Bristol-Myers Squibb Company ("BMS") manufactured, distributed, and marketed Ovcon in the United States.

34.  On January 26, 2000, Warner Chilcott purchased from BMS certain rights, title, and interest in Ovcon products. Warner Chilcott entered into a supply agreement with Bristol Myers-Squibb Laboratories Company ("BMSLC"), a wholly owned subsidiary of BMS. The

supply agreement states the terms and conditions associated with the supply of Ovcon product by BMSLC to Warner Chilcott.

35.    Warner Chilcott then began marketing Ovcon manufactured by BMSLC and continues to be the exclusive marketer of Ovcon at the present time.

36.    Warner Chilcott's sales of Ovcon have continued to increase. Ovcon's net sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price.

37.    Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products, and Ovcon is highly profitable. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million.

**C.    The Threat of Competition From Barr's Generic Ovcon**

38.    In September of 2001, Barr filed ANDAs with the FDA for approval to market AB-rated generic versions of Ovcon.

39.    In January of 2003, Barr publicly announced its intention to launch a generic version of Ovcon by the end of 2003.

40.    Barr planned to offer its generic version of Ovcon for sale at a price approximately 30% less than the price charged by Warner Chilcott.

41.    Barr projected that its generic Ovcon would capture approximately 50% of Warner Chilcott's branded Ovcon sales within the first year of introduction.

42.    Warner Chilcott expected that Barr would price its generic Ovcon at approximately 30% less than the price Warner Chilcott charges for branded Ovcon.

43.    Warner Chilcott projected that generic Ovcon would capture at least 50% of Ovcon's new prescriptions within the first year of introduction. Warner Chilcott calculated that,

as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three year period.

44. Warner Chilcott's first attempt to combat the threat posed by the entry of a generic version of Ovcon was the development of a line extension to Ovcon. Specifically, its strategy was to replace Ovcon with a chewable form of Ovcon prior to the generic entry of Ovcon.

45. Warner Chilcott planned to convert its Ovcon customers to Ovcon Chewable and to stop selling Ovcon. Warner Chilcott planned to engage in various practices that would ultimately result in the replacement of prescriptions for (and supply of) non-chewable Ovcon with chewable Ovcon, despite the fact that the change to a chewable form of Ovcon brought no benefit to patients or purchasers of the drug but was only sought by Warner Chilcott to preserve its monopoly profits on Ovcon. Prescriptions for Ovcon Chewable would not be able to be filled at pharmacies with a generic Ovcon product (absent express approval of the patient's physician) because any generic version of Ovcon would not be AB-rated to Ovcon Chewable.

46. By mid-2003, however, Warner Chilcott's "switch" strategy to protect its Ovcon revenues was in jeapordy. Barr's generic Ovcon entry appeared imminent, and Ovcon Chewable had not obtained FDA approval.

47. In May of 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

### DEFENDANTS' HORIZONTAL AGREEMENT NOT TO COMPETE

48. By the summer of 2003, Warner Chilcott believed that Barr's generic Ovcon entry could occur as early as September of that year.

49. In August of 2003, Warner Chilcott and Barr engaged in discussions regarding an arrangement by which Barr would refrain from selling its generic Ovcon product in the United States.

50. On September 10, 2003, Warner Chilcott and Barr signed a letter of intent to enter into an agreement that gave Warner Chilcott the exclusive option to market all products produced pursuant to Barr's ANDAs for generic versions of Ovcon. Pursuant to the letter of intent, Warner Chilcott would pay Barr $20 million and Barr would not compete in the United States for five years with its generic Ovcon product when Barr received final FDA approval.

51. On March 24, 2004, Defendants signed the Agreement, as contemplated by their letter of intent, and Warner Chilcott paid Barr $1,000,000.

52. Under the Agreement, within 45 days after FDA approval of Barr's Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon in the United States, either by itself or through a licensee for five years.

53. On April 22, 2004, the FDA approved Barr's ANDAs to produce and market generic Ovcon.

54. On April 23, 2004, Barr publicly announced its intention to begin marketing its generic version of Ovcon in the event that Warner Chilcott chose not to exercise its option under the Agreement.

55. On May 6, 2004, Warner Chilcott exercised its option under the Agreement. Pursuant to the terms of the Agreement, Warner Chilcott paid Barr $19,000,000 in exchange for Barr's promise not to compete with Warner Chilcott by introducing a generic version of Ovcon.

56. As a consequence of the anticompetitive Agreement, no generic version of Ovcon was ever launched, and Barr has agreed not to launch a generic version of Ovcon until at least May, 2009.

57. In the absence of the anticompetitive Agreement, Barr would have begun marketing its product shortly after obtaining FDA approval.

58. In the absence of the competitive threat that Barr would have provided in a free marketplace, purchasers of Ovcon were required to continue purchasing the brand-name Ovcon product when a less expensive generic version would have otherwise been available.

59. If Barr had introduced its generic product into the market, the prices paid by purchasers for Ovcon products would have decreased rapidly and substantially.

60. Barr has abided by its agreement not to sell generic Ovcon in the United States. No company, other than Barr, has received FDA approval for a generic version of Ovcon.

61. The Agreement between Warner Chilcott and Barr destroyed the competition that is intrinsic to our market-based economy.

## CLASS ACTION ALLEGATIONS

62. Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class:

> All persons and entities in the United States who purchased Ovcon directly from Defendants or their subsidiaries at any time from April 22, 2004 through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased (the "Class Period"). Excluded from the class are Defendants, their parents, employees, subsidiaries and affiliates, and all government entities (the "Class").

63. The Class is so numerous that joinder of all members is impracticable. Plaintiffs believe that the Class numbers one hundred or more.

64. There are questions of law or fact common to the Class, including:

    (a) whether Defendants entered into an agreement not to compete in the sales of Ovcon and its generic equivalents;

    (b) whether Defendants' agreement not to compete was unlawful;

    (c) whether Defendants' unlawful conduct caused Plaintiffs and the other members of the Class to pay more for Ovcon than they would have paid absent Defendants' conduct; and

    (d) whether Defendants' conduct caused antitrust injury to the business or property of their direct purchaser customers and, if so, the appropriate measure of damages.

65. These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting only individual members.

66. Plaintiffs' claims are typical of the claims of the Class because all Class members, including Plaintiffs, suffered antitrust injury in the same way as a result of Defendants' conduct, and the claims of each Class member arise out of the same nucleus of operative facts and are based on the same legal theories.

67. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel experienced in class action and antitrust litigation, and Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

68. A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

**ANTICOMPETITIVE EFFECTS OF DEFENDANTS' ILLEGAL CONDUCT**

69. Warner Chilcott and Barr's Agreement not to compete is a naked restraint of trade. On its face it eliminates competition, and it has no plausible procompetitive justification.

70. The Agreement is anticompetitive pursuant to every relevant legal analysis.

71. Defendants' conduct had the purpose and effect of unreasonably and illegally restraining trade and preventing competition.

72. Defendants' horizontal agreement not to compete is not ancillary to any procompetitive undertaking: Preventing competition from Barr's generic Ovcon for five years is not subordinate to any procompetitive undertaking, but is rather the primary purpose of the Agreement. Preventing competition from Barr's generic Ovcon for five years is not reasonably necessary to accomplish any undertaking that enhances competition.

73. Defendants could have accomplished any of the purported competitive benefits of the Agreement by other less-restrictive means that would not have destroyed competition.

74. As a direct and proximate result of the illegal conduct alleged in this complaint, Plaintiffs and other purchasers of Ovcon were forced to pay more for Ovcon than they otherwise would have paid. Defendants' unlawful conduct deprived Plaintiffs of the benefits of competition that the antitrust laws were designed to secure.

## COUNT ONE

## CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

75. Plaintiffs incorporate all preceding paragraphs as if fully stated herein.

76. The Agreement between Warner Chilcott and Barr constitutes a restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

77. As a direct and proximate result of the unlawful conduct of Defendants in restraining competition in the sale of Ovcon and its generic equivalents, Plaintiffs and other

members of the Class have been injured in their business and property, in that they paid more for Ovcon than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the other members of the Class, respectfully request:

A. That the Court certify the Class, defined herein, certify Plaintiffs as representatives of the Class, and designate its counsel as counsel for the Class;

B. Judgment in their favor and against Defendants for the damages representing the overcharge damages incurred by Plaintiffs and the other members of the Class defined herein, trebled;

B. Pre- and post-judgment interest;

C. Costs of suit, including reasonable attorneys' fees; and

D. Such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: November 9, 2005                    By: _____
                                           Michael D. Hausfeld, D.C. Bar No. 153742
                                           **COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
                                           1100 New York Avenue, N.W.
                                           Washington, D.C. 20005-3964
                                           Tel: (202) 408-4600
                                           Fax: (202 408-4699

                                           Linda P. Nussbaum, D.C. Bar No. 483254
                                           Steig D. Olson
                                           **COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
                                           150 East 52nd Street, Thirtieth Floor
                                           New York, NY 10022
                                           Tel: (212) 838-7797
                                           Fax: (212) 838-7745

                                           Joseph M. Vanek
                                           **DAAR & VANEK, P.C.**
                                           225 W. Washington, 18th Floor
                                           Chicago, IL 60606
                                           Tel: (312) 224-1500
                                           Fax: (312) 224-1510

                                           Paul E. Slater
                                           **Sperling & Slater, P.C.**
                                           55 W. Monroe Street, Suite 3300
                                           Chicago, IL 60603
                                           Tel: (312) 641-3200
                                           Fax: (312) 641-6492

                                           *Attorneys for Plaintiffs*