**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:05-CV-2182-CKK |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., and BARR PHARMACEUTICALS, INC., | Judge Colleen Kollar-Kotelly |
| Defendants. | |

**DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF-STATES'
MOTION FOR LEAVE TO FILE PER SE MOTION FOR SUMMARY JUDGMENT**

Peter C. Thomas (D.C. Bar # 495928)
SIMPSON THACHER & BARTLETT LLP
555 11th Street, N.W.
Suite 725
Washington, D.C. 20004
(202) 220-7700
(202) 220-7702 (fax)

Charles E. Koob, *pro hac vice*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2000
(212) 455-2502 (fax)

*Counsel for Warner Chilcott Holdings
Company III, Ltd., Warner Chilcott
Corporation, Warner Chilcott (US) Inc., and
Warner Chilcott Company, Inc.*

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Chong S. Park (D.C. Bar # 463050)
Patrick M. Bryan (D.C. Bar # 490177)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, District of Columbia 20005
(202) 879-5000
(202) 879-5200 (fax)

*Counsel for Barr Pharmaceuticals, Inc.*

**Table of Contents**

**Page**

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................4

     I.      The License And Supply Agreement Between Warner Chilcott And Barr. ...........4

     II.     Government Plaintiffs' And Related Cases Before This Court. .............................6

     III.    The Court's April 4th Scheduling Conference. .....................................................7

ARGUMENT ....................................................................................................................7

     I.      Plaintiff-States' Motion Is Inconsistent With The Court's Plain
           Instructions..........................................................................................................8

     II.     A Motion For Summary Judgment Would Be Premature Because Ongoing
           Discovery Will Be Highly Relevant To The Court's Analysis Of The
           Agreements In Question. ....................................................................................10

     III.    The *Per Se* Rule Does Not Apply Or, At A Minimum, There Are Material
           Fact Disputes Regarding Whether It Or The Rule of Reason Will Be
           Applicable To The Facts Of This Case...............................................................11

          A.      The "*Per Se*" Rule Is Limited To Certain Narrow Forms Of
                 Conclusively Anti-Competitive Conduct Not At Issue Here....................13

          B.      Determining Whether Conduct Is *Per Se* Unlawful Requires
                 Factual Inquiry Into Market Conditions. ...................................................17

          C.      When The Defendants Offer Plausible Evidence Of The Pro-
                 Competitive Effects Of Their Conduct, Rule Of Reason Analysis Is
                 Required As A Matter Of Law....................................................................18

     IV.    Any Motion For Summary Judgment Would Have To Be Deferred
           Pursuant To Federal Rule of Civil Procedure 56(f) So That Discovery
           Regarding The Competitive Effects of Defendants' Agreements May Be
           Pursued................................................................................................................20

CONCLUSION................................................................................................................22

i

## Table of Authorities

**Page(s)**

**Cases**

*Anesthesia Advantage, Inc. v. Metz Group,*
        759 F. Supp. 638 (D. Colo. 1991) ................................................................. 15

*Barry v. U.S. Capitol Guide Bd.,*
        No. Civ.A. 04-0168, 2005 WL 10267034 (D.D.C. May 2, 2005) .................................. 20

*Berkeley v. Home Ins. Co.,*
        68 F.3d 1409 (D.C. Cir. 1995) ....................................................................... 20

*Black v. Nat'l Football League Players Ass'n,*
        87 F. Supp. 2d 1 (D.D.C. 2000) .................................................................... 20

*Board of Trade of City of Chicago v. United States,*
        246 U.S. 231 (1918) ................................................................................... 14

\* *Broadcast Music, Inc. v. CBS, Inc.,*
        441 U.S. 1 (1979) ...................................................................... 11, 12, 15, 16

*Business Elecs. Corp. v. Sharp Elecs. Corp.,*
        485 U.S. 717 (1988) .................................................................................. 14

\* *California Dental Ass'n v. FTC,*
        526 U.S. 756 (1999) .................................................................. 17, 18, 19, 21

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
        433 U.S. 36 (1977) .................................................................................... 16

*FTC v. Ind. Fed'n of Dentists,*
        476 U.S. 447 (1986) .............................................................................. 14, 15

*Generac Corp. v. Caterpillar Inc.,*
        172 F.3d 971 (7th Cir. 1999) ....................................................................... 15

*Greenbrier Cinemas, Inc. v. Attorney Gen'l of United States,*
        511 F. Supp. 1046 (W.D. Va. 1981) ............................................................... 16

*In re Cardizem CD Antitrust Litig.,*
        332 F.3d 896 (6th Cir. 2003) ....................................................................... 12

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
        363 F. Supp. 2d 514 (E.D.N.Y. 2005) ............................................................ 15

*Law Office of Azita Mojarad v. Aguirre,*
        No. CIV-A 05-0038; 2006 WL 785415 (D.D.C. Mar. 27, 2006) ......................................... 9

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
    468 F. Supp. 154 (C.D. Cal. 1979) ............................................................... 16

*Mason Tenders Dist. Council Pension Fund v. Messera*,
    958 F. Supp. 869 (S.D.N.Y. 1997) ............................................................ 9, 11

*Messina v. Krakower*,
    439 F. 3d 755 (D.C. Cir. 2006) ..................................................................... 9

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ....................................................................................... 14

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984) ......................................................................................... 18

*Northern Pac. Ry. v. United States*,
    356 U.S. 1 (1958) ........................................................................................... 12

*Oetiker v. Jurid Werke*,
    556 F.2d 1 (D.C. Cir. 1977) ........................................................................ 18

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ....................................................................... 18

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911) ........................................................................................... 13

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ........................................................................................... 14

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
    373 F.3d 57 (1st Cir. 2004) ....................................................................... 9, 15

*Texaco Inc. v. Dagher*,
    126 S.Ct. 1276 (2006) ................................................................................... 12

*Valley Drug Co. v. Geneva Pharm. Co.*,
    344 F. 3d 1294 (11th Cir. 2003) ................................................................. 12

*Walters v. City of Ocean Springs*,
    626 F.2d 1317 (5th Cir. 1980) ..................................................................... 11

*Wichita Falls Office Assoc. v. Banc One Corp.*,
    978 F.2d 915 (5th Cir. 1992) ....................................................................... 20

iii

**Other Authorities**

11 Herbert Hovenkamp, ANTITRUST LAW
¶ 1910(b) at 281 (1998) ................................................................................................. 18

**Rules**

Fed. R. Civ. P. 56(f) ................................................................................................................ 20

## <u>INTRODUCTION</u>

Two months into an already abbreviated discovery schedule, plaintiff-States urge this Court to allow them to file a *per se* motion for summary judgment before the close of discovery and before Defendants have an opportunity to develop the factual record supporting their defenses to plaintiffs' claims. The plaintiff-States and the FTC (collectively the "Government Plaintiffs") are pursuing consolidated cases for violation of the antitrust laws. Tellingly, despite the fact that the FTC and States agreed to have their cases ***consolidated*** for pretrial purposes, the FTC has not joined the motion. Just as the Court denied the Government Plaintiffs' previous request to file an early summary judgment motion, it should deny this request.

*First*, the motion directly contravenes the Court's instructions to the Government Plaintiffs at the April 4th status conference in this case, wherein the Court instructed that summary judgment motions should be filed ***after*** the close of discovery. (Apr. Tr. at 51.) ***Second***, a motion for summary judgment would be premature now, while ongoing discovery (scheduled to close in October) will be highly relevant to the Court's analysis of the agreements in question (including ***whether*** the agreements should be subject to *per se* or "Rule of Reason" treatment). ***Third***, the *per se* rule does not apply or, at a very minimum, there are disputed issues of material fact that will need to be resolved prior to determining whether a *per se* or Rule of Reason framework applies to this case. ***Fourth***, any summary judgment motion would have to be deferred pursuant to Rule 56(f) so that discovery may be pursued and evidence presented to demonstrate whether the challenged agreements are anti-competitive and unlawful.

Plaintiff-States offer no reasoned, much less compelling, justification for the Court to reconsider its prior ruling that all dispositive motions are to be filed only ***after*** the close of discovery. But also missing from plaintiff-States' motion is any explanation why either a motion

for summary judgment or *per se* treatment is appropriate here.  The reason for this omission is clear:  the facts and the law indicate that neither is justified in the case at hand.

Defendants contend that the agreements reached between Warner Chilcott and Barr concerning Ovcon were lawful license and supply agreements imposing no restraint of trade whatsoever or whose pro-competitive benefits outweigh any potential adverse effects.  The plaintiff-States contend otherwise and, in fact, entirely omit any reference in their opening brief to the supply agreement simultaneously entered into by Barr and Warner Chilcott.  But whether the Defendants' supply arrangement was, in fact, a restraint of trade and whether the pro-competitive benefits of the supply arrangement outweigh any potential adverse effects require highly fact-specific inquiries into, among other things, the relevant market, competitive products, the availability of supply and, most importantly, the absence of competitive harm to consumers. None of these inquiries can be made on the basis of, or short-circuited by — as plaintiff-States contend — a review of just one aspect of the Warner Chilcott-Barr arrangement (that is, the license agreement) and the status of the parties.

Plaintiff-States attempt to side-step these factual issues and corresponding factual disputes by arguing that any analysis of the pro-competitive effects of the Defendants' supply arrangement can be ignored because the Court need only "review the terms of" the Defendants' license agreement to determine that it is *per se* illegal.  Notably, not even the FTC claimed in its complaint that *per se* treatment should be accorded to the supply arrangement at issue.  And no wonder:  after reviewing the proposed transaction in September 2003 and discussing it with Defendants, the FTC's Merger Division declined even to challenge the proposed arrangement.  It then took the FTC another two years before it made the decision to bring this lawsuit.  While the FTC's original determination and the length of its investigation are not dispositive, they strongly

suggest that *per se* treatment is entirely inappropriate in this case.  At a minimum, such facts should give the Court significant pause before accepting the plaintiff-States' belated invitation to short-circuit a more searching examination of the business justification for the transaction and the resulting pro-competitive effects.

Plaintiff-States' argument for *per se* treatment is belied by their own statements.  Indeed, they indicate that their summary judgment motion would necessitate consideration of evidence well outside of the Defendants' license and supply agreement, including ***other*** agreements between Warner Chilcott and another pharmaceutical company, public filings, Board of Directors' minutes, and press releases, in order to assess the competitive effects of the supply arrangement at issue.  (*See* Ex. B to Pls.' Mot. at 1.)  Not only would the terms and interpretation of this evidence create additional material factual disputes that preclude summary judgment, but plaintiff-States' acknowledgement of the relevance of these other materials to the issues at hand underscores that additional discovery will be necessary before a dispositive motion can be properly assessed by the Court or rebutted by the Defendants.

Contrary to plaintiff-States' "belie[f]" that the Court need only "review the terms of" the Defendants' license agreement, the facts and law indicate otherwise.  In short, the States have not demonstrated any reason — much less a compelling reason — to burden the Court and the parties in the midst of intensive discovery with rounds of premature briefing and Rule 56(f) motion practice.  Accordingly, plaintiff-States' motion for leave to file a *per se* motion for summary judgment prior to the close of discovery should be denied.[1]

---

[1]    Unless otherwise noted, all ***emphasis*** herein has been added and all internal citations and quotation marks omitted.

## BACKGROUND

### I.    The License And Supply Agreement Between Warner Chilcott And Barr.

Warner Chilcott is a specialty pharmaceutical company that markets and sells women's health and dermatology products, including Ovcon, a combined hormonal contraceptive. Until recently, Warner Chilcott did not manufacture, or have the ability to manufacture, any of the products it sold. For that reason, it was wholly reliant on third parties for supply.

In January 2000, Warner Chilcott purchased Ovcon from Bristol-Myers Squibb ("BMS"). At the time of purchase, Ovcon had been off patent since approximately 1976 and sales had been declining. As Warner Chilcott lacked manufacturing capabilities of its own, it simultaneously entered into a supply agreement with BMS for Ovcon.

From the outset, BMS was unable to adequately supply Warner Chilcott with Ovcon, and supply problems only worsened over time. All the while, Warner Chilcott expended significant resources to become a self-reliant manufacturer, attempting to develop a facility in Ireland in 2002 and eventually purchasing a plant from Pfizer in 2004. Meanwhile Barr — an accomplished manufacturer of pharmaceutical products, including many combined hormonal contraceptive products — had filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration seeking approval to produce a generic version of Ovcon.[2]

Supply problems with BMS persisted, but Warner Chilcott was forced to rely on BMS for its supply of Ovcon until an alternative source was found — that alternative source was Barr. In September 2003, Warner Chilcott and Barr negotiated two letters of intent. The first expressed the intent of the parties to negotiate agreements allowing Barr to acquire rights to market and sell

---

[2]    Manufacturers must file a New Drug Application ("NDA") with the FDA to market a new drug. Manufacturers may file an ANDA to obtain approval to market generic versions of "Reference Listed Drugs," that is, drugs for which an NDA has been approved.

certain oral contraceptive products and settling certain patent disputes.  The second, at issue here, sought to alleviate the significant and continuous supply problems Warner Chilcott had been experiencing with BMS.  Specifically, it contemplated that Barr would grant Warner Chilcott an option to acquire a five-year exclusive license to its Ovcon ANDA as well as a supply of that product.[3]  Both letters of intent were publicized in a press release dated September 10, 2003.

Before the parties could enter into definitive agreements, the United States was notified of the letters of intent in compliance with the Hart-Scott-Rodino Act.  While the Ovcon letter of intent did not trigger reporting obligations itself, the material terms of the Ovcon license and supply agreements were disclosed to, and discussed with, the Federal Trade Commission nonetheless.  The letters of intent met with no objections from the FTC's Merger Division and the Hart-Scott-Rodino waiting period expired in October 2003.

The outcome of the FTC's review was not surprising:  Ovcon is one of **65** branded and generic combined hormonal contraceptive products in the marketplace today, all of which — according to the Food and Drug Administration, doctors, and patients — are virtually identical and equally effective.[4]  In this crowded and undifferentiated market, manufacturers compete by educating doctors and patients about their products and providing free samples.  To the benefit of consumers, Warner Chilcott's sampling of Ovcon has been especially substantial, with as much as half of the Ovcon in the marketplace being distributed to patients for free through Warner Chilcott's sampling efforts, thereby reducing the effective price paid for Ovcon.

---

[3]    Importantly, at the time the letters of intent were signed, Barr was experiencing delays obtaining FDA approval for its Ovcon ANDA and faced the imminent launch of Ovcon Chewable, an innovative new product being developed by Warner Chilcott.

[4]    No one product has more than a 10% share of annual sales within this market and Ovcon, specifically, accounts for only about 2%.

With every reason to believe their conduct was legal and pro-competitive — given the FTC Merger Division's review — the parties entered into the option and supply agreements contemplated in the letter of intent in March 2004, both of which were announced in a corresponding press release. In April 2004, Barr received FDA approval for its Ovcon ANDA (also publicly announced), and as Warner Chilcott's supply problems with BMS had not ceased, Warner Chilcott exercised the option in May 2004. Despite months of notice about the contemplated agreements, an HSR filing, and no less than four press releases announcing them, no party at any time sought to enjoin Warner Chilcott and Barr from entering into the Ovcon license and supply agreements. Again, this is not surprising: a generic Ovcon could be introduced by any manufacturer today.

After Warner Chilcott exercised its option, Barr was not in a position to immediately manufacture Ovcon for Warner Chilcott, as the regulatory approval of its manufacturing process was not yet complete. For that reason, Warner Chilcott continued to rely on BMS for its Ovcon supply until the spring of 2005, when BMS announced it could no longer produce Ovcon under its current manufacturing process. Barr now produces Ovcon for Warner Chilcott pursuant to the parties' license and supply agreements. As a result, Ovcon remains on the market and patients continue to receive direct, significant price discounts from Warner Chilcott's sampling of Ovcon.

## II.    Government Plaintiffs' And Related Cases Before This Court.

On December 2, 2005, the Government Plaintiffs filed their First Amended Complaints challenging this agreement as anticompetitive and alleging that Defendants' license and supply agreement prevented generic competition. (*E.g*., Plaintiff-States' First Amended Complaint ("States' Compl.") ¶¶ 57-61.) Both complaints allege that the Defendants' agreement constitutes an unreasonable restraint of trade in violation of the federal antitrust laws. (*See*, *e.g.*, FTC Compl. ¶¶ 62-67.) The plaintiff-States' Complaint also alleges that the Defendants' agreement

violates over fifty different state antitrust and consumer protection laws. (*See* States' Compl.

¶¶ 72-142.) The FTC and the plaintiff-States agreed to have their cases *consolidated* for pretrial

purposes. Despite this consolidation, the FTC did not join in this motion.

Shortly after the Government Plaintiffs filed suit, ***twelve*** follow-on suits were filed,

including putative class actions on behalf of direct- and indirect-purchasers and third-party

payors, as well as individual actions on behalf of so-called opt-out plaintiffs — all challenging

the same agreements and the same underlying conduct.

## III. The Court's April 4th Scheduling Conference.

On April 4, 2006, the Court held a status conference in the related cases and set a

schedule for pretrial proceedings. The Court specifically stated that summary judgment motions

would be briefed *after* discovery was completed. (Apr. 4, 2006 Hr'g Tr. ("Apr. Tr.") at 51.)

Although the Government Plaintiffs raised the issue again at the end of the status conference, the

Court did not authorize plaintiffs to file a motion for summary judgment unless Defendants were

willing to stipulate to the necessary facts. (*Id*. at 56.) Specifically, the Court instructed the

Government Plaintiffs that "if you have a discussion with [the Defendants] and they agree with

you that, based on the record you've got, there's not going to be a factual dispute, fine. If there

is, then forget it . . . ." (*Id*.) The Defendants do not agree that there is any pure legal issue that

can be determined, and in fact assert that there are a myriad of factual disputes and relevant

factual issues to be pursued in discovery.

## <u>ARGUMENT</u>

Plaintiff-States' motion is contrary to this Court's plain instructions at the April 4, 2006

hearing that all dispositive motions are to be filed ***after*** the close of discovery. Moreover,

plaintiff-States' motion ignores both the very limited application of the *per se* standard in

antitrust cases and the numerous material factual issues in dispute among the parties. Because

plaintiff-States have offered no reason — much less a compelling reason — to disregard the Court's ruling that dispositive motions be filed after the close of discovery, the States' motion should be denied.

**I.    Plaintiff-States' Motion Is Inconsistent With The Court's Plain Instructions.**

The Court's instruction to all parties during the April 4, 2006 scheduling conference could not have been more clear.  The Court specifically stated that summary judgment motions would be briefed only ***after*** discovery was completed.  (*Id*. at 51.)  The Court expressed concern that "[t]here's too many people and it's going to take too long" and unnecessarily delay the proceedings if the parties filed dispositive motions prior to the close of discovery.  (*Id*. at 52.) Thus, the Court advised the parties to "get all your discovery done" before seeking to file dispositive motions.  (*Id*. at 51.)

Disregarding the Court's plain ruling, the plaintiff-States waited for ***almost two months*** following the Court conference before seeking leave to file a *per se* motion for summary judgment ***before*** the close of discovery.  The States contend that "[p]rinciples of judicial economy favor" granting the instant motion; that is, granting the motion would allow the plaintiff-States to avoid undertaking "burdensome" and "needless discovery."  (Pls.' Mot. at 5.) This purported justification, however, is far from compelling.

Quite simply, the States are ***plaintiffs*** and chose to file this suit.  Surely, the plaintiff-States contemplated the need for discovery to prosecute ***their*** claims.  It is unsurprising, however, that the plaintiff-States do not believe discovery is necessary for the parties to brief a summary judgment motion at this stage, as the plaintiff-States are in possession of the investigative materials acquired by the FTC during its nearly two-year review of the transaction. The plaintiff-States' strategy is obvious:  while they have piggybacked on two years of discovery

conducted by the FTC, they unfairly seek to deprive the defendants of the opportunity, albeit over a much more accelerated period of time, to develop their defenses.

Notably, although the plaintiff-States seek to brief a dispositive motion without affording the Defendants the opportunity to take *any* discovery, many of the cases the plaintiff-States cite were decided only after some discovery was conducted by the parties.[5]

Moreover, plaintiff-States' protest regarding the burdens of discovery is belied by their own conduct. For example, in response to Defendants' request for the production of documents, plaintiff-States produced a sum total of thirty-two pages of documents. (*See* May 26, 2006 Letter from Devin Laiho to Charles E. Koob and Karen N. Walker (attached hereto as "Exhibit A").) Production of such a paucity of documents responsive to Defendants' discovery requests can hardly be characterized as "burdensome."

At bottom, plaintiff-States' contention that denying their motion would require them to engage in protracted discovery (for a mere five months) — or would disserve the interests of "judicial economy" — is neither well-founded nor a compelling justification to disregard the Court's plain ruling that summary judgment motions are to be filed only after the close of discovery. Because plaintiff-States have presented no reasoned justification to disregard the Court's ruling, plaintiff-States' motion should be denied.[6]

---

[5]    *See Messina v. Krakower*, 439 F. 3d 755, 763 (D.C. Cir. 2006) ("district court did not abuse its discretion in granting summary judgment without allowing ***additional*** discovery pursuant to Rule 56(f)") (emphasis added); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57, 60 (1st Cir. 2004) (expert reports filed prior to the District Court's grant of partial summary judgment); *Law Office of Azita Mojarad v. Aguirre*, No. CIV-A 05-0038; 2006 WL 785415, at *12 n. 11 (D.D.C. Mar. 27, 2006) ("determin[ing] if ***further*** discovery would be futile") (emphasis added); *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp. 869, 894-95 (S.D.N.Y. 1997) (denying Plaintiff's Rule 56(f) motion for a continuance to conduct ***further*** discovery).

[6]    Plaintiff-States erroneously contend that it is "Defendants' view" that the parties must "agree on a set of undisputed, material facts before Plaintiffs could seek summary judgment." (Pls.' Mot. at 3.) Defendants do not contend that the parties must agree that there are no material factual issues in dispute before any party may

(Continued…)

## II.     A Motion For Summary Judgment Would Be Premature Because Ongoing Discovery Will Be Highly Relevant To The Court's Analysis Of The Agreements In Question.

Defendants contend that the agreements reached between Warner Chilcott and Barr concerning Ovcon were lawful license and exclusive supply arrangements imposing no restraint of trade whatsoever or whose pro-competitive benefits outweigh any potential adverse effects. Thus, several factual inquiries, including, *inter alia*, the background of the parties' license and supply agreements, the supply circumstances faced by Warner Chilcott, definition of the relevant market, the availability of competitive products, and the pro-competitive effects and benefits for consumers of the arrangements are pertinent to Barr and Warner Chilcott's defenses.

Plaintiff-States themselves indicate that their summary judgment motion would necessitate consideration of some of these issues. Plaintiff-States indicate that agreements between Warner Chilcott and BMS (Warner Chilcott's previous Ovcon supplier) and the Defendants' Board of Directors' meeting minutes would be relevant in support of their motion for summary judgment. (*See* Ex. B to Pls.' Mot. at 1.) Thus, plaintiff-States apparently concede that evidence outside of the Defendants supply agreements — including evidence regarding supply circumstances faced by Warner Chilcott — is relevant to determine whether the agreements were, in fact, anticompetitive.[7]

---

file a dispositive motion. Rather, Defendants contend — consistent with the Court's prior ruling — that the proper time to file dispositive motions in the present case is ***after*** the close of discovery—less than five months hence.

[7]     Plaintiff-States' contention that because "[i]nformation concerning the agreement's background and the parties' supply circumstances is already within the Defendants' control," Rule 56(f) is rendered inapplicable is simply without basis in fact or law. (Pls.' Mot. at 4-5.) ***First***, information regarding the availability of supply and other manufacturing issues is largely in the hands of a non-party, BMS, a fact plaintiff-States acknowledge. (*See* Pls.' Mot. Ex. B at 1.) ***Second***, the fact that some information may be in the control of Defendants has no bearing on what other information or evidence is available to Defendants from non-parties through discovery.

(Continued…)

Nevertheless, plaintiff-States argue *in their motion* that the Court need only consider the terms of Defendants' agreement and need not engage in any analysis of the pro-competitive effects of Defendants' supply arrangement or any applicable defenses to plaintiffs' claims. (Pls.' Mot. at 2.) Plaintiff-States, however, simply assume their conclusion; that is, plaintiff-States argue that "*[o]nce*" the Court "correctly conclude[s], as a matter of law, that the Barr-Warner Chilcott agreement is per se illegal" no further inquiry is required. (*Id*. at 4.)

But as discussed further below, plaintiff-States offer no support for their contention that Defendants' supply arrangement is "facially" anticompetitive or lacking "any redeeming virtue" such that *per se* treatment would be appropriate here. Indeed, merely determining whether Defendants' supply arrangements fall within or without the narrow exception to the Rule of Reason analysis would require analysis of a factual record that has yet to be developed here.

### III. The *Per Se* Rule Does Not Apply Or, At A Minimum, There Are Material Fact Disputes Regarding Whether It Or The Rule of Reason Will Be Applicable To The Facts Of This Case.

To find a *per se* violation of Section 1, the court must determine that "the practice *facially appears to be one that would always or almost always tend to restrict competition and decrease output*." *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979) ("*BMI*"). Thus,

---

Thus, plaintiff-States' reliance on *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp. 869 (S.D.N.Y. 1997), is wholly misplaced. There, the **only** issue before the court was whether an attorney-client relationship existed between the parties — an issue that could be conclusively determined based on information within the plaintiffs' control. *See id*. at 895. Here, in contrast, the pro-competitive effects of Defendants' supply agreement cannot be conclusively determined on the basis of evidence within Defendants' exclusive control. Rather, the availability of other means of supply, the availability of competitive products, and the impact of product sampling (among other things) are all issues pertinent to an assessment of the competitive effects of the agreements at issue and are issues that require discovery from **non**-parties. *Walters v. City of Ocean Springs*, 626 F.2d 1317 (5th Cir. 1980), is similarly inapposite. There, the Fifth Circuit declined to vacate the district court's denial of plaintiffs' Rule 56(f) motion where the plaintiffs had "failed to use the devices available" and did not timely seek discovery. *See id*. at 1322. Plaintiff-States cite no authority suggesting that the availability of some evidence in the hands of Defendants precludes application of Rule 56(f) to obtain other evidence relevant to their defenses. *Cf*. Fed. R. Civ. P. 26(b)(1).

11

*per se* treatment applies only if the agreement in question constitutes a "naked restraint of trade with no purpose except stifling of competition," *id.*, and has a "pernicious effect on competition and lack[s] any redeeming virtue." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).

But only narrow classes of conduct that are always or almost always anti-competitive may be declared illegal without a full examination of the various competitive factors involved. *See BMI*, 441 U.S. at 20. In the Supreme Court's most recent declaration on the subject, the Court rejected the application of the *per se* standard to a horizontal agreement between competitors and, in doing so, reiterated that "[p]er se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 126 S.Ct. 1276, 1279 (2006).

The type of exclusive supply agreement presented here has never been characterized as such a clearly naked restraint, lacking any "redeeming virtue" and serving no purpose but the "stifling of competition." *Id.* **Nor have plaintiff-States cited any authority supporting such a conclusion.**[8] Thus, plaintiff-States' suggestion that Defendants' supply arrangements may be simply labeled *per se* illegal ignores the limited application of *per se* treatment in antitrust cases and the factual analysis necessary to determine whether *per se* treatment is appropriate in the first instance.

---

[8]  Rather, the plaintiff-States cite two inapposite cases. (Pls.' Mot. at 2, n.2. (citing *Valley Drug Co. v. Geneva Pharm. Co.*, 344 F. 3d 1294, 1304 (11th Cir. 2003); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 n.14 (6th Cir. 2003)). Plaintiff-States' reliance on these cases wholly misses the mark, as these cases involve "reverse payment" patent settlements that did not involve a vertical supply relationship of the type that exists in the Barr-Warner Chilcott agreement. Moreover, the agreement at issue in *Cardizem*, the case cited by plaintiff-States in which the *per se* standard was applied, resulted in the inability of ***any*** generic manufacturer to enter the market. *See In re Cardizem*, 332 F.3d at 907-08. To the contrary, any manufacturer is free to enter with a generic version of Ovcon at any time. Finally, the plaintiff-States fail to mention that the defendants in *Cardizem*, in stark contrast to the Defendants here, made no demand for further discovery on the partial summary judgment issue before the court.

Indeed, any contention that Defendants' supply arrangement is "facially" anticompetitive, or lacking any "redeeming virtue" and is thus subject to *per se* treatment is belied by the undisputed fact that the FTC needed **two years** to investigate the conduct at issue before finally deciding to file suit.  (*See* FTC Compl. ¶ 45.)  Had the FTC or plaintiff-States believed Defendants' supply arrangement was a "naked restraint" or "facially" anticompetitive, surely they would not have sat idle for nearly two years before taking any action.  Thus, plaintiff-States' suggestion that "public policy strongly favors" *per se* treatment because the "sooner th[e] [Defendants'] agreement is held to be per se illegal, the sooner consumers . . . will be able to purchase generic Ovcon without further unnecessary delay," (Pls.' Mot. at 5), is, at best, disingenuous in light of the undisputed fact that neither the plaintiff-States through their Attorneys General nor the FTC — the very parties charged with enforcement of the antitrust laws — took any action for nearly two years.

Moreover, prior to the execution of Warner Chilcott's option to acquire Barr's ANDA and enter into a supply agreement, in September through October 2003, attorneys in the FTC division charged with reviewing merger agreements reviewed the Barr-Warner Chilcott transaction in detail and declined to take any enforcement action whatsoever.  It simply defies logic that the FTC's Merger Division would take no action if this arrangement truly was of the kind that merits *per se* condemnation, *i.e.*, a naked restraint of trade with no other redeeming virtues.

### A. The "*Per Se*" Rule Is Limited To Certain Narrow Forms Of Conclusively Anti-Competitive Conduct Not At Issue Here.

Tracing at least as far back as the Supreme Court's landmark decision in *Standard Oil Co. v. United States*, 221 U.S. 1 (1911), the preferred approach for analyzing conduct under the antitrust laws has been the Rule of Reason.  The Rule of Reason approach takes into account a

number of relevant factors such as the nature of the restraint, the history of the conduct, the

purpose or intent of the conduct, and, most importantly, its overall effect on competition, *e.g.*, an

assessment of the pro- and anti-competitive effects of the conduct, condemning only those types

of agreements that necessarily have an overall adverse effect on competition. *See Board of

Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918).

      Although certain activities, including horizontal price fixing and some types of horizontal

market division, have been subject to *per se* treatment, the Supreme Court has made clear that

the conduct that falls into these categories is limited and that these exceptions to the presumptive

Rule of Reason approach should be applied carefully, narrowly, and infrequently.  The Court has

repeatedly stressed that "[o]rdinarily, whether particular concerted action violates § 1 of the

Sherman Act is determined through case-by-case application of the so-called Rule of Reason"

and that "*per se* rules are appropriate only for conduct that is manifestly anticompetitive."

*Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988).

      As the Court warned in *Business Electronics*, "'we have been slow . . . to extend *per se*

analysis to restraints imposed in the context of business relationships where the economic impact

of certain practices is not immediately obvious.'"  *Id.* (quoting *FTC v. Ind. Fed'n of Dentists*,

476 U.S. 447, 458-59 (1986)).  "[A]greements are *per se* illegal only if their 'nature and

necessary effect are so ***plainly anticompetitive*** that no elaborate study of the industry is needed

to establish their illegality.'"  *Id.* at 724 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*,

435 U.S. 679, 692 (1978)); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (noting that

"most antitrust claims are analyzed under a 'rule of reason'").

      These cases all reflect a common theme: applying a *per se* approach is a drastic step that

cannot and should not be taken absent long judicial experience demonstrating that the conduct in

question will always or almost always restrict competition, decrease output, and have a manifestly anti-competitive effect.[9]

Faced with the Supreme Court's overwhelming presumption *against* the application of *per se* treatment, plaintiff-States offer nothing more than their "belie[f] that, were the Court to review the Barr-Warner Chilcott agreement, it would conclude that the agreement constitutes an illegal horizontal market allocation," (Pls.' Mot. at 2), and "constitutes a *per se* violation of the Sherman Act and state antitrust laws." (*Id.* at 1.)  Plaintiff-States, however, cite no authority in support of this proposition.[10]

This is not surprising because numerous cases have *required* Rule of Reason analysis, even for conduct facially characterized as a horizontal market division.  *See, e.g.*, *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 976-77 (7th Cir. 1999) (refusing to apply *per se* treatment to arrangement whereby plaintiff and defendant, who were selling same product, each had exclusivity over certain territories); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005) (applying Rule of Reason to brand-generic supply agreement despite plaintiffs' attempt to characterize it as a "market allocation"); *Anesthesia Advantage, Inc. v. Metz Group*, 759 F. Supp. 638, 646 (D. Colo. 1991) ("Plaintiffs' market allocation allegation likewise does not require *per se* analysis."); *Greenbrier Cinemas, Inc. v. Attorney Gen'l of*

---

[9]  *See also Ind. Fed'n*, 476 U.S. at 458-59 ("[W]e have been slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious."); *BMI*, 441 U.S. at 20 n.33 ("[T]he *per se* rule is not employed until after considerable experience with the type of challenged restraint.").

[10]  To the contrary, plaintiff-States cite authority observing that exclusive dealing arrangements are generally not subject to *per se* treatment.  (*See* Pls.' Mot at 2 (citing *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57, 62 (1st Cir. 2004) (affirming the district court's ruling that *per se* treatment was inappropriate in exclusive dealing case and noting that an "exclusive dealing arrangement [] is not a *per se* violation of the antitrust laws.").

*United States*, 511 F. Supp. 1046, 1059-60 (W.D. Va. 1981) (concluding that motion picture product allocation agreement was not so likely to stifle competition as to deserve *per se* condemnation); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 468 F. Supp. 154, 165-66 (C.D. Cal. 1979) (applying Rule of Reason rather than *per se* approach, despite fact that athletic league's bylaws controlling franchise locations allocated territories among member teams).

On many occasions, the Supreme Court has cautioned against a simplistic, categorical approach to the antitrust laws, or labeling conduct *per se* illegal without any reasoned inquiry. *See BMI*, 441 U.S. at 9, 19-20; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977) (any "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing."). As the *BMI* decision makes clear, "it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se* price fixing.'"  *BMI*, 441 U.S. at 9. That process of "characterization" requires an initial understanding of the history, nature, purpose, and competitive effect of a challenged agreement.  *See id.* at 19 (inquiring into the purpose and effect of the challenged restraint to ultimately determine that the *per se* rule does not apply).

When the limited application of the *per se* rule is properly understood from this perspective, it simply will not suffice for plaintiff-States to simply label Defendants' behavior a *per se* illegal "horizontal market division," and suggest no discovery is necessary.  Rather, as next explained, simply determining whether Defendants' supply arrangements fall within or without the narrow exception to the Rule of Reason analysis would require a factual record that has yet to be developed here.  Therefore, any motion for summary judgment at this stage – or for that matter, before the close of discovery – would simply be premature.

16

**B.    Determining Whether Conduct Is *Per Se* Unlawful Requires Factual Inquiry Into Market Conditions.**

As noted above, an essential threshold step in every antitrust inquiry is a determination of the nature of the restraint.  Because the characterization of behavior that is alleged to allocate markets is often ambiguous, the antitrust laws require, at a minimum, that courts conduct a threshold examination of that behavior to understand its implications.

The Supreme Court's discussion of the proper application of the Rule of Reason analysis in *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), highlights why plaintiff-States' cursory approach simply misses the mark.  In *California Dental* the respondent association had issued advisory opinions and guidelines limiting advertising by its member dentists.  After conducting hearings, the Commission concluded that these restrictions were, alternatively, illegal *per se* or unlawful under an abbreviated Rule of Reason.  The Ninth Circuit upheld the finding of a violation under the latter approach, although it concluded that the Commission erred in applying *per se* analysis to the price advertising restrictions.

On appeal, the Supreme Court rejected both *per se* treatment and even the Commission's abbreviated Rule of Reason approach.  In so doing, the Court expressly held that a more expansive analysis of the respondent's pro-competitive explanations for its conduct was required. The Court began by emphasizing that the choice of a *per se* versus Rule of Reason approach itself requires an examination of the competitive impact of the conduct in question, noting that "considerable inquiry into market conditions may be required ***before*** the application of any so-

17

called *per se* condemnation is justified."[11]  *Id*. at 779; *see also Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005).

Thus, determining whether Defendants' supply arrangements falls within or without the narrow exception to the Rule of Reason analysis would require analysis of the facts surrounding the agreement, market conditions, and its probable effects.  Such an analysis, however, cannot be undertaken by review of Defendants' agreement alone.[12]  Accordingly, any motion for summary judgment at this stage would simply be premature.

### C.  When The Defendants Offer Plausible Evidence Of The Pro-Competitive Effects Of Their Conduct, Rule Of Reason Analysis Is Required As A Matter Of Law.

Equally important here, the Supreme Court in *California Dental* held that as long as defendants could proffer plausible arguments that their conduct might have pro-competitive effects, the antitrust laws demanded Rule of Reason analysis rather than a more abbreviated inquiry.  *See id.* at 775.  As the Court expressly stated in its opinion:  "As a matter of economics [the respondent's] view may or may not be correct, ***but it is not implausible***, and neither a court nor the Commission may initially dismiss it as presumptively wrong."  *Id.* at 775.

---

[11]  *See also NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) ("*Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct."); *Oetiker v. Jurid Werke*, 556 F.2d 1, 7 (D.C. Cir. 1977) ("[T]he area of per se illegality is carefully limited.  We are reluctant to extend it on the bare pleadings and absent examination of market effect and economic consequences." ).

[12]  Plaintiff-States cite the Hovenkamp treatise, *see* 11 Herbert Hovenkamp, ANTITRUST LAW ¶ 1910(b) at 281 (1998), for the proposition that "once the tribunal concludes that the restraint at issue is within the class [of *per se* illegal restraints], further inquiry into the merits of that particular restraint is unwarranted."  (Pls.' Mot. at 4.)  But the first portion of that statement is critical: a court must actually examine the conduct in question, to determine what it does, what effects it might have, and thus whether it falls within the narrow ambit of the *per se* approach.  It is only ***after*** that critical first step that, in a few limited instances, further analysis is foreclosed.  Such an analysis, however, cannot be conducted without adequate discovery and a factual record.

*California Dental* thus squarely prohibits the blind application of *per se* treatment in the face of evidence of plausible pro-competitive effects. That is, *California Dental* requires courts to conduct a Rule of Reason inquiry into the competitive effects of an agreement if, based on a preliminary analysis, it appears that the defendants have offered pro-competitive explanations for their conduct which are "not implausible." *Id.*

Here, there are several pro-competitive justifications for the Barr-Warner Chilcott supply arrangement, including:

- The agreement ensured a stable and reliable supply of Ovcon for consumers;

- The agreement ensured continued, substantial sampling of Ovcon by Warner Chilcott, resulting in low net prices to consumers;

- The agreement enabled Ovcon to aggressively compete against the numerous other hormonal contraceptives in the marketplace;

- The agreement enabled Barr to produce Ovcon in the face of a possible line extension contemplated by Warner Chilcott that would have moved patients away from the Ovcon tablet Barr was able to produce;

- The agreement removed the potential that Ovcon would exit from the market altogether, and;

- The agreement resulted in an overall increase in market share for Ovcon, relative to what would have occurred in the absence of the arrangement, to the benefit of both Barr and consumers.

Consistent with *California Dental* the Defendants must be allowed to develop a factual record supporting these and other plausible, pro-competitive effects of the supply agreements at issue, and the Court should, ultimately, employ the presumptive Rule of Reason analysis in considering dispositive motions ***after*** the close of discovery. Because discovery has only recently begun in this case (and thus Defendants have not been permitted to develop an adequate record in support to their defenses), granting leave to file a motion for summary judgment prior

to the close of discovery would — as discussed below — merely burden the parties and the Court with rounds of premature briefing and corresponding Fed. R. Civ. P. 56(f) motions.

**IV.     Any Motion For Summary Judgment Would Have To Be Deferred Pursuant To Federal Rule of Civil Procedure 56(f) So That Discovery Regarding The Competitive Effects of Defendants' Agreements May Be Pursued.**

Rule 56(f) states that if it "appears from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had . . . ."  Fed. R. Civ. P. 56(f).  Such motions "should be granted 'almost as a matter of course unless the nonmoving party has not diligently pursued discovery of the evidence.'" *Barry v. U.S. Capitol Guide Bd.*, No. Civ.A. 04-0168, 2005 WL 1026703, at *4 (D.D.C. May 2, 2005) (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)).  "The purpose of 56(f) is to provide non-movants with a much needed tool to keep open the doors of discovery in order to adequately combat a summary judgment motion," *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992), and thus should be "liberally construed."  *Black v. Nat'l Football League Players Ass'n*, 87 F. Supp. 2d 1, 4 (D.D.C. 2000).

As described herein, the Government Plaintiffs' claims raise numerous factual issues regarding the whether the Defendants' supply arrangement concerning Ovcon were lawful license and supply arrangements imposing no restraint of trade whatsoever or whose pro-competitive benefits outweigh any potential adverse effects.  Thus, evidence regarding, among other things: (1) whether the supply agreement was reasonable in relation to the development and preservation of Defendants' businesses; (2) whether Defendants' supply agreements injured competition in any relevant market; (3) whether Defendants' supply agreements have pro-competitive effects that benefit competition as a whole in any relevant market, and; (4) whether

Defendants' supply agreements have harmed competition and/or consumers are pertinent to Barr and Warner Chilcott's defenses.  Consistent with *California Dental*, Defendants must be allowed to conduct discovery (over only the next five months) into these and other issues in order to respond to any dispositive motion — regardless of the legal framework (*per se* or Rule of Reason).  That is, evidence of plausible pro-competitive effects is relevant both to any analysis of whether *per se* treatment should apply, and to any assessment of whether the agreements are anticompetitive under the Rule of Reason.

For that reason, any motion for summary judgment filed before the opportunity to conduct adequate discovery would necessitate that Defendants seek a continuance pursuant to Rule 56(f).  Plaintiff-States have offered no justification to burden both the Court and the parties with such unnecessary rounds of briefing and motion practice.  Accordingly, plaintiff-States' motion for leave to file a dispositive motion before the close of discovery should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that plaintiff-States' motion for leave to file a *per se* motion for summary judgment before the close of discovery should be denied.


Date:   June 8, 2006                              Respectfully submitted,


_/s/ Peter C. Thomas_                             _/s/  Karen N. Walker_
Peter C. Thomas (D.C. Bar # 495928)              Karen N. Walker (D.C. Bar # 412137)
SIMPSON THACHER & BARTLETT LLP                   Mark L. Kovner (D.C. Bar #  430431)
555 11th Street, N.W.                            Chong S. Park (D.C. Bar # 463050)
Suite 725                                        Patrick M. Bryan (D.C. Bar # 490177)
Washington, D.C.  20004                          KIRKLAND & ELLIS LLP
(202) 220-7700                                   655 Fifteenth Street, N.W.
(202) 220-7702 (fax)                             Washington, D.C.  20005
                                                 (202) 879-5000
                                                 (202) 879-5200 (fax)
Charles E. Koob, *pro hac vice*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017-3954
(212) 455-2000
(212) 455-2502 (fax)


*Counsel for Warner Chilcott Holdings*            *Counsel for Barr Pharmaceuticals, Inc.*
*Company III, Ltd., Warner Chilcott*
*Corporation, Warner Chilcott (US) Inc., and*
*Warner Chilcott Company, Inc.*