IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF COLORADO, *et. al.*,   )<br>  )<br>  Plaintiffs,   )<br>  )<br>v.   )<br>  )<br>WARNER CHILCOTT HOLDINGS COMPANY  )<br>III, LTD., *et. al.*,   )<br>  )<br>  Defendants.   )<br>  )<br>  ) | Civil Action No: 1:05CV02182 (CKK)<br>Jury Trial Demanded<br><br>ORAL ARGUMENT REQUESTED |

### DEFENDANTS' JOINT MOTION TO COMPEL
### ANSWERS TO INTERROGATORIES AND
### THE PRODUCTION OF DOCUMENTS

Peter C. Thomas (D.C. Bar # 495928)
SIMPSON THACHER & BARTLETT LLP
555 11th Street, N.W.
Suite 725
Washington, D.C. 20004
(202) 220-7700
(202) 220-7702 (fax)

Charles E. Koob, *pro hac vice*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2000
(212) 455-2502 (fax)

*Counsel for Warner Chilcott Holdings
Company III, Ltd., Warner Chilcott
Corporation, Warner Chilcott (US) Inc., and
Warner Chilcott Company, Inc.*

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Chong S. Park (D.C. Bar # 463050)
Patrick M. Bryan (D.C. Bar # 490177)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, District of Columbia 20005
(202) 879-5000
(202) 879-5200 (fax)

*Counsel for Barr Pharmaceuticals, Inc.*

Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc. (together "Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr") (collectively "Defendants"), bring this motion to compel the Plaintiff States[1] to produce Medicaid reimbursement data that are relevant to establishing Defendants' defenses.

## INTRODUCTION

The Plaintiff States refuse to produce (or even to cooperate with Defendants in seeking to obtain) certain Medicaid data that will enable Defendants to show whether the Plaintiff States were, in fact, damaged by the Option and License Agreement (the "Agreement") between Barr and Warner Chilcott.[2] That is, Plaintiff States refuse to produce pricing and other data regarding all combined hormonal contraceptive products, both brands and generics, for which each Plaintiff State has either purchased or has been reimbursed some or all of the costs of purchase by third parties. These data are necessary and relevant to Defendants' defenses and the central issues of this case, *i.e.*, what impact, if any, does entry of a generic product have on the prices of competing branded and generic alternatives in the combined hormonal contraceptive market? The requested data, among other things, may show that many, if not most, of the Plaintiff States' Medicaid agencies would actually have paid *more* for an AB-rated generic equivalent of Ovcon 35 than for Ovcon 35 had Defendants not entered into the Agreement. At a minimum, the Medicaid data are directly relevant to showing that the Plaintiff States' arguments in favor of applying *per se* treatment to the

---

[1]   The Plaintiff States are the sovereign States of Colorado, Maryland, Alaska, Arizona, Arkansas, California, Delaware, Florida, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, Missouri, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, and Vermont, the Commonwealths of Kentucky, Massachusetts, and Virginia, and the District of Columbia.

[2]   Notably, to date, only the District of Columbia has produced documents — a mere *32 pages* — that are only partially responsive to Defendants' discovery requests.

2

Agreement are entirely wrongheaded because the combined hormonal contraceptive market posits unique, complex economic circumstances that should be closely examined by the Court.

Nevertheless, Plaintiff States have refused to negotiate any compromise offered by Defendants regarding the production of this data.[3] The Plaintiff States claim that the Medicaid data are no longer relevant in light of their proposal to amend their First Amended Complaint to delete specific allegations that the Agreement "prevented Plaintiff States … from purchasing a less-expensive generic version of Ovcon." (Plaintiff States' First Amended Complaint ("FAC") ¶ 9; *see also* ¶ 68 (relevant excerpts attached hereto as "Ex. 2".) But the Plaintiff States' attempt to avoid discovery of this material plainly fails: even if Plaintiff States were to amend their complaint as proposed, the evidence sought by Defendants remains relevant to a determination of the effect of the Agreement on a huge class of consumers (namely, the Plaintiff States themselves). Plaintiff States themselves recognize the relevance of this material (notwithstanding their proposed amendment to their complaint) because they, together with the FTC, have demanded that Defendants and third party drug manufacturers produce voluminous Medicaid data in this action. (*See, e.g.*, Plaintiff Federal Trade Commission's and Plaintiff States' First Request for the Production of Documents from Defendant Warner Chilcott at Req. No. 26; Plaintiff Federal Trade Commission's Notice of Subpoena Duces Tecum to Teva Pharmaceutical Industries, Ltd. at Req. No. 2 (relevant excerpts attached hereto as "Ex. 3" and "Ex. 4," respectively).) Quite

---

[3]   During the meet and confer process, Defendants sought to avoid the need for any Medicaid-related discovery or this motion to compel by offering to agree to a stipulation or, in the alternative, to accept limited categories of specific Medicaid reimbursement data. (*See* Letter from Annette Rizzi to Devin Laiho (June 21, 2006) (relevant excerpts attached hereto as "Ex. 1").) The Plaintiff States refused to accept either alternative.

3

simply, Plaintiff States' facile attempt to amend their complaint to avoid discovery changes nothing.

The Plaintiff States also resort to the contention that the State Attorneys General representing them do not also represent the State Medicaid agencies, and that any discovery directed to the Plaintiff States should be strictly limited to those documents contained *within the offices of the Attorneys General*. (*See* Plaintiff States' Objections and Responses to Defendants' First Request for Production of Documents and Defendants' First Set of Interrogatories at General Objection No. 13; Request Nos. 11-13; Interrogatory No. 6 (attached hereto as "Ex. 5").) This hyper-technical objection is both unsupported and fails on the face of the Plaintiff States' pleadings and interrogatory responses — all of which make clear that each Attorney General purports to bring this action *on behalf* of his or her respective sovereign State, Commonwealth, or the District of Columbia. (*See* FAC at p. 5-6 (Ex. 2).) Moreover, even if one or more of the State Attorneys General could show that they do not have possession, custody or control over the requested data, a cursory glance at the Plaintiff States' privilege log shows that the Attorneys General have been in frequent contact with, and obtained various data from, the Medicaid agencies in their respective States. (*See* Plaintiff States' Privilege Log (attached hereto as "Ex. 6"); *see, e.g., id.* at 4 (transmitting "print screen pages of Medicaid database" to Kansas Attorney General's office).) At the very least, the Plaintiff States have no excuse for refusing to cooperate with Defendants in requesting and obtaining relevant Medicaid information in a timely and efficient manner and instead seeking to force Defendants to subpoena 34 different State agencies and the District of Columbia, causing months of unnecessary, expensive delay.

Accordingly, Defendants request that the Court compel the Plaintiff States to produce the requested Medicaid reimbursement information, or, at a bare minimum, order the

Plaintiff States to cooperate with Defendants in requesting and obtaining such data from their respective Medicaid agencies in a timely manner under the accelerated discovery schedule.

### BACKGROUND

#### A. The Pleadings Put the Requested Data at Issue

In December 2005, the Plaintiff States filed their First Amended Complaint against Defendants, seeking civil penalties and fines under the Sherman Act and various state laws on the grounds that the Agreement is an anticompetitive *per se* "naked restraint of trade with the purpose of stifling competition...." (*See* FAC ¶ 63 (Ex. 2).) The Plaintiff States alleged that:

- "The Agreement prevented Plaintiff States and other persons from purchasing a less-expensive version of Ovcon." (FAC ¶ 9.)

- "Generic ... [d]rugs are usually sold at prices substantially below the prices charged for the [Brand-name] [d]rugs. Plaintiff States and other persons save significant amounts of money by purchasing generic drugs." (FAC ¶ 28.)

- "As a direct and proximate result of the illegal conduct alleged in this complaint, the Plaintiff States and other persons have not been and are not able to purchase generic versions of Ovcon, which would have been available at prices lower than those paid for Ovcon." (FAC ¶ 68.)

In their Answers, Defendants denied the allegations of anticompetitive effects and interposed several affirmative defenses, including that the Agreement does not injure competition, that it has procompetitive effects, that consumers are not harmed, and that no State has been injured. (*See* Warner Chilcott's Answer to the First Amended Complaint, Affirmative Defenses 8, 9, 10 and 11) (relevant excerpts attached hereto as "Ex. 7"); Barr Pharmaceutical's Answer to Plaintiffs' First Amended Complaint, Affirmative Defenses 7, 8, 9, and 10) (relevant excerpts attached hereto as "Ex. 8").)

#### B. Both Defendants And The Plaintiff States Demand Medicaid Data

To contest the Plaintiff States' allegations and prove that the Agreement is not anticompetitive, Defendants served document requests and interrogatories on each of the

5

Plaintiff States seeking, among other things, data pertaining to the Plaintiff States' payments under Medicaid for combined hormonal contraceptives, including Ovcon 35. Specifically, Defendants requested:

> All documents and data compilations, including reports, recommendations, memoranda, studies and analyses, prepared by, used by, prepared for or received by the Plaintiff State relating to government programs, including, but not limited to, Medicaid, relating to: (a) any payments made by the Plaintiff State for oral contraceptives or combined hormonal contraceptives, or (b) the reimbursement of third parties by the Plaintiff State for the purchase of oral contraceptives or combined hormonal contraceptives.

(Defendants' First Request for Production of Documents to the State of Colorado at Req. No. 13. (relevant excerpts attached hereto as "Ex. 9"); *see also id.* at Req. Nos. 11-12.) In addition, Defendants also requested that the Plaintiff States:

> Identify by month, if possible, and if not, by quarter or year, from 2000 to date: (a) all combined hormonal contraceptive products, both brands and generics, for which your state has either purchased or for which your state has reimbursed some or all of the costs of purchase by third-parties; (b) the number purchased or reimbursed of each of the combined hormonal contraceptives identified in response to subsection (a) of this Interrogatory; (c) the price per unit paid by your state for each of the combined hormonal contraceptives identified in response to subsection (a) of this Interrogatory; and (d) the total dollars paid for each of the combined hormonal contraceptives identified in response to subsection (a) of this Interrogatory.

(Defendants' First Set of Interrogatories to the State of Colorado at Interrogatory No. 6 (relevant excerpts attached hereto as "Ex. 10").) The Plaintiff States have refused to produce any Medicaid-related documents in response to any of Defendants' interrogatories or document requests, claiming that the requested data are neither relevant to the claims or defenses in this action nor likely to lead to the discovery of admissible evidence, and that, in any event, the State Attorneys General purportedly have custody, control or possession only of documents physically within their offices and not the Medicaid agencies of the States

(notwithstanding their having brought this case on the States' behalf). (*See* Pls.' Obj. and Resp. at General Objection No. 13; Request Nos. 11-13; Interrogatory No. 6 (Ex. 5).)[4]

While refusing to respond to Defendants' requests, the Plaintiff States proceeded to serve their own discovery requests on both Defendants and several non-party pharmaceutical manufacturers, demanding the production of a variety of Medicaid-related data. For example, the Plaintiff States insisted that Warner Chilcott produce "all documents that relate in any way to the Medicaid Rebate program . . . ." (Joint First Request for the Production of Documents from Warner Chilcott at Req. No. 26 (emphasis added) (Ex. 3); *see also* Plaintiff Federal Trade Commission's and Plaintiff States' Joint First Request for the Production of Documents from Defendant Barr Pharmaceuticals, Inc. at Req. No. 13 (broadly demanding the same Medicaid data for "any Barr Contraceptive Product") (relevant excerpts attached hereto as "Ex. 11").) The Plaintiff States and the FTC also issued at least six subpoenas to third-party drug manufacturers, all of which request Medicaid data on all contraceptive products marketed by those companies. (*See, e.g.*, Pls.' Notice of Subpoena Duces Tecum to Teva Pharmaceutical Industries, Ltd. at Req. No. 2 (demanding, "with respect to the sales of Teva Contraceptive Products, all documents relating to the Medicaid Rebate Program") (Ex. 4).)

### C. The Plaintiff States Reject Defendants' Proposed Compromise

In an attempt to resolve the Plaintiff States' objections to producing Medicaid data without resorting to motion practice and to avoid any burden whatsoever on the Plaintiff States and their respective Medicaid agencies, Defendants offered on June 21, 2006 to

---

[4] The Plaintiff States also objected based on a federal statute, 42 U.S.C. § 1396r-8(b)(3)(D), which protects against disclosure of Medicaid pricing data in a form that identifies specific pharmaceutical manufacturers or wholesalers. (*See* Pls.' Obj. and Resp. at General Objection No. 13 (Ex. 5).) Defendants, however, have agreed to accept the Medicaid data on a blinded basis to comply with any such statutory limitations. (*See* Letter from Annette Rizzi to Devin Laiho (June 21, 2006) (Ex. 1).)

7

withdraw their Medicaid discovery requests if the Plaintiff States agreed to stipulate that: (1) the Agreement did not prevent the Plaintiff States from purchasing a less expensive generic version of Ovcon 35; (2) had Barr introduced its generic version of Ovcon 35 on or after April 2004 the cost per unit of its generic to the Medicaid programs of the Plaintiff States would have been higher than for Ovcon 35; and (3) the Plaintiff States have not been harmed by the Agreement. (*See* Letter from Annette Rizzi to Devin Laiho (June 21, 2006) (Ex. 1).) Alternatively, Defendants offered to accept limited raw data from the Plaintiff States that would allow Defendants to make the necessary calculations themselves and to accept redacted versions of the Medicaid data in such a way as to vitiate any purported confidentiality concerns. *See id*. To avoid litigating whether the requested data was in the possession of the Plaintiff States, Defendants requested that the Attorneys General make informal requests for the responsive data to the relevant State Medicaid agencies.[5] The Plaintiff States rejected all of Defendants' compromise offers.

### D. The Plaintiff States Seek To Thwart Discovery By Artful Pleading

Rather than agree to Defendants' stipulation or compromise offers, the Plaintiff States notified Defendants that they would be moving to amend their complaint "to obviate any need Defendants might have for that [Medicaid] discovery." (Letter from Devin Laiho to Annette Rizzi (June 22, 2006) (attached hereto as "Ex. 12").) Specifically, the Plaintiff States proposed to amend their complaint to delete the specific claim that the Plaintiff States have been actually harmed by the Agreement and to bolster the legal fiction that the requested documents are not within their custody, control or possession.[6] The

---

[5] The Plaintiff States' privilege log shows that many of the Plaintiff States are in contact with their respective Medicaid agencies and have already obtained responsive Medicaid documents from them. (*See, e.g.,* Plaintiff States' Privilege Log at 4 (transmitting Medicaid reimbursement reports to Missouri Attorney General's office.) (Ex. 6).)

[6] For example, the Plaintiff States proposed changing paragraph 9 of their complaint as follows: "The Agreement prevented [persons in the] Plaintiff States and other persons from

8

proposed changes speak for themselves. They are a transparent attempt to deny Defendants' right to adduce relevant evidence that may undermine the essential contention of the Plaintiff States that the Agreement is anticompetitive and should be adjudicated under a *per se* standard.

Notwithstanding the Plaintiff States' proposed amendments, the Medicaid reimbursement data are still relevant. The proposed Second Amended Complaint ("SAC") continues to allege that the Agreement is anticompetitive and should be subjected to *per se* treatment. (*See, e.g.*, SAC ¶ 63 ("Warner Chilcott and Barr's Agreement not to compete was a naked restraint of trade with the purpose of stifling competition, and is anticompetitive); SAC ¶ 64 ("The Agreement is anticompetitive pursuant to every relevant legal analysis.") (Ex. 12); *see also* Plaintiffs' Motion for Leave to File *Per Se* Motion for Summary Judgment at 1 ("Plaintiff States intend to show that [the Agreement] constitutes a *per se* violation of the Sherman Act …") (relevant excerpts attached hereto as "Ex. 13").) These allegations, standing alone, are sufficient to bring the Medicaid data within the broad ambit of discoverability.

## ARGUMENT

### I. THE MEDICAID DATA ARE INDISPUTABLY DISCOVERABLE

The Federal Rules of Civil Procedure provide that discovery may be had, "regarding any matter, not privileged, that is relevant to the claim or defense of any party," and that "relevant information" includes discovery "reasonably calculated to lead to the discovery of admissible evidence." Fed R. Civ. P. 26(b)(1). "Relevance" is broadly

---

purchasing a less-expensive version of Ovcon." (Pls.' Proposed Second Am. Compl. at ¶¶ 9; *see also id.* at ¶¶ 28, 68, 69. (Ex. 12).) The Plaintiff States also propose changing paragraph 21 of their complaint as follows: "The Plaintiff States bring this action [through their Attorneys General,] 1) in their proprietary and/or sovereign capacities, which may include state departments, agencies, political subdivisions, and other instrumentalities as purchasers (either directly, indirectly, or as assignees); and 2) as [the Plaintiff States' chief civil law enforcement officials,] as a civil law enforcement action." *Id.* at ¶ 21.

9

construed and "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Anton v. Prospect Cafe Milano, Inc.*, 233 F.R.D. 216, 218 (D.D.C. 2006); *see Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F.Supp.2d 83, 86 (D.D.C. 2005) (same); *University of Massachusetts v. Roslin Institute*, Nos. 05-353, 05-706, 2006 U.S. Dist. LEXIS 40466, *11 (D.D.C. Jun. 20, 2006) ("[T]he standard of relevance in discovery is a liberal one . . ."). The Medicaid reimbursement data requested here not only bears on Defendants' defenses, but also to issues central to this case, namely, what impact, if any, the entry of a generic oral contraceptive has on the pricing of branded and generic combined hormonal contraceptive alternatives. At a minimum, the use of this data to illustrate the unique and complex nature of the combined hormonal contraceptive market pertains to the inappropriateness of *per se* treatment to this Agreement.

The Plaintiff States, however, appear to operate under the belief that because they have alleged that the Agreement is *per se* illegal, it is irrefutably so. The Federal Rules of Civil Procedure, however, permit Defendants not only to contest such allegations but also to obtain discovery that will prove that the Plaintiff States are wrong. Defendants have denied that the Agreement is subject to *per se* rules or that it is otherwise anticompetitive and have interposed several affirmative defenses that put harm to competition or consumers directly at issue. The Plaintiff States cannot usurp the role of the Court and summarily decree that those defenses are invalid and that discovery cannot be had to establish them.

Despite their misguided attempt to avoid discovery by amending their complaint, the Plaintiff States cannot seriously suggest that evidence that may show that many, if not most, of the Plaintiff States would have actually paid more for a generic version of Ovcon 35 than for Ovcon 35 itself had Barr introduced a generic version, is irrelevant. Such evidence bears directly on whether (as is still alleged by the Plaintiff States in their

proposed Second Amended Complaint) the Agreement is anticompetitive and should be assessed under a *per se* standard. Plaintiff States' contention to the contrary is belied by their own discovery requests relating to the very same data.

## II. THE PLAINTIFF STATES CANNOT BLOCK DISCOVERY OF RELEVANT EVIDENCE BY LIMITING THEIR SEARCHES TO OFFICES OF THE STATE ATTORNEYS GENERAL

In asserting their technical objection, the Plaintiff States again want to have it both ways. The State Attorneys General should not be allowed to invoke the power of their respective sovereign States for the purposes of filing suit and seeking monetary relief, but then deny any connection with those same States for the purposes of discovery.

In the federal context, a similar attempt by the Department of Justice to limit discovery to its office was soundly rejected. *See United States v. AT&T*, 461 F. Supp. 1314, 1333-34 (D.D.C. 1978). In *AT&T*, the Justice Department brought a Sherman Act claim against AT&T and other telecommunications companies. The Justice Department refused to produce documents that were in the possession of other government agencies under the theory that only the Justice Department was a party to the suit. Recognizing the inequity that arises if an Attorney General brings a law enforcement action in the name of the sovereign, but limits discovery to what is contained in his or her office, the court held that discovery could be compelled from other government agencies. *See id.* The court observed: "This action, as its caption indicates, was brought not on behalf of the Department of Justice but on behalf of the United States of America." *Id.* at 1333. As such, "it simply makes no sense to hold that the Department of Justice, which essentially is a law office, alone comprises the United States." *Id.* The court further noted that though the Attorney General is the government's chief law enforcement officer, "neither he, nor the department he heads (much

less the Antitrust Division), is the United States." *Id.* at 1334. The circumstances presented to the *AT&T* court are directly analogous to those at issue in this case.[7]

Like the Department of Justice in *AT&T*, the State Attorneys General claim that they represent only themselves for discovery purposes, and that discovery must be limited to their respective offices. However, as evidenced by the caption and allegations, the parties in interest in this action are not the Attorneys General, but rather the sovereign States. (*See, e.g.*, FAC at 5-6 ("The *states* . . . bring this action") (emphasis added) (Ex. 2); *see also* SAC at 5-6 (same) (Ex. 12).) Moreover, while claiming in one breath not to represent departments, agencies or other instrumentalities of State governments, each of the Plaintiff States has made clear in their responses to Defendants' discovery requests that their respective State Attorney General brings the action "on behalf of" their respective sovereign State, Commonwealth, or District. (*See* Pls.' Obj. and Resp. at General Objection No. 13 (Ex. 5).) Indeed, every pleading filed to date by the Plaintiff States invokes the name and power of the sovereign States.[8]

---

[7] One recent decision distinguished *AT&T* in denying a motion to compel compliance with a Rule 45 subpoena served on the FDA. *See SEC v. Biopure Corp.*, No. 05-00506, 2006 U.S. Dist. LEXIS 12889, *13, n.7 (D.D.C. Jan. 20, 2006). That decision, however, concerned non-party rather than party discovery and turned on the holding that Rule 45 applies only to "persons," not "agencies" of the Federal government. *Id.* at *15. Although the *Biopure* court suggested in *dicta* that *AT&T* presented "unique circumstances and peculiar facts, which involved massive and wide-ranging allegations, and . . . many departments and their evidence," those same circumstances exist here. Namely, this is a wide-ranging antitrust action brought by the State Attorneys General on behalf of the sovereign Plaintiff States (just as in *AT&T* the Department of Justice brought its action on behalf of the sovereign United States). Like *AT&T*, the allegations in this case deal with broad economic policies affecting the interests of persons throughout the United States. Moreover, Defendants in this action, like the defendants in *AT&T*, "will need access to the records of many government agencies, and that fairness to them requires that such access be as unencumbered as the Federal Rules will allow." *AT&T*, 461 F. Supp. at 1334.

[8] Furthermore, the Plaintiff States seek fines and civil penalties in the name of the sovereign States that will be paid into the state treasury. (*See, e.g.* FAC at ¶ 82, Request for Relief at ¶¶ 2, 5 (*citing* Colo. Rev. Stat. § 6-4-112(1)) ("The court upon finding a violation of this article, shall impose a civil penalty to be paid <u>to the general fund of the state</u> …"))

12

By choosing to bring a civil action in federal court in the name of the sovereign States, the Plaintiff States, like the Department of Justice in *AT&T*, purposely avail themselves of the sovereign power of their States for offensive purposes and should not be allowed to do an "about-face" for discovery purposes, thereby blocking the production of relevant evidence.[9]

CONCLUSION

Regardless of any pleading refinements by the Plaintiff States, the fact remains that Defendants are entitled to seek and present evidence that the Agreement is not properly subject to *per se* treatment and is not an unreasonable restraint of trade because, among other reasons, many if not most of the Plaintiff States themselves may have paid *more* for a generic version of Ovcon 35 than for Ovcon 35 had Defendants not entered into the Agreement at issue.

For the reasons stated above, Defendants respectfully request that this Court compel the Plaintiff States to produce the data requested by Defendants in Interrogatory No. 6 of the Defendants' First Set of Interrogatories and Document Requests Nos. 11-13 of the

---

(emphasis added) (Ex. 2); SAC at ¶ 82, Request for Relief at ¶¶ 2, 5 (same) (Ex. 12); FAC at ¶ 114, Request for Relief at ¶¶ 2, 5 (*citing* Mo. Ann. Stat. §407.100(6)) ("The court may award to the state a civil penalty . . .")) (emphasis added) (Ex. 2); SAC at ¶ 114, Request for Relief at ¶¶ 2, 5 (same) (Ex. 12).)

[9]    In the alternative, this Court should, for the sake of judicial economy, order such State Attorneys General to cooperate with Defendants by making requests for the Medicaid data to the relevant agencies. Indeed, setting aside the inequity of the Plaintiff States' position or whether they have custody, control or possession of the requested documents, it is clear that the State Attorneys General can easily obtain, and indeed have obtained, responsive data from their State Medicaid agencies. (*See* Pls.' Privilege Log at 1 (spreadsheet transmitted to Alaska Attorney General's office "describing Alaska Medicaid Utilization of Ovcon 1/1/04 to 7/31/05; *id*. at 7 (Utah Medicaid Ovcon reimbursement data sent to Utah Attorney General's office) (Ex. 6).) Absent such reasonable cooperation, Defendants will be forced to serve 34 separate subpoenas on the individual State Medicaid agencies and the District of Columbia to obtain the data.

13

Defendants' First Request for the Production of Documents, or in the alternative, cooperate in good faith with Defendants to obtain the requested data in a timely manner.

Dated: July 10, 2006

SIMPSON THACHER & BARTLETT LLP

By: /s/ Peter C. Thomas

Peter C. Thomas D.C. Bar #495928
Charles E. Koob, *pro hac vice*
555 11th Street, N.W.
Washington, D.C. 20004
(202) 220-7700
(202) 270-7702 (fax)

*Counsel for Warner Chilcott Holdings Company, III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., and Warner Chilcott Company, Inc.*

KIRKLAND & ELLIS LLP

By: /s/ Karen N. Walker

Karen N. Walker, D.C. Bar #412137
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5129
(202) 879-5200 (fax)

*Counsel for Barr Pharmaceuticals, Inc.*