# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action Nos. 1:05-cv-2179-CKK |
| ) | |
| BARR PHARMACEUTICALS, INC., ) | |
| ) | |
| Defendant. ) | |

|  |  |
|---|---|
| STATE OF COLORADO, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action Nos. 1:05-cv-2182-CKK |
| ) | |
| WARNER CHILCOTT HOLDINGS ) | |
| COMPANY III, LTD., *et al.,* ) | |
| ) | |
| Defendants. ) | |

**Highly Confidential - Subject to Protective Order**

**Expert Report of Professor Daniel L. Rubinfeld**

**December 11, 2006**

# TABLE OF CONTENTS

I.     Qualifications ................................................................................................ 2

II.    Scope of Assignment ...................................................................................... 3

III.   Summary of Expert Opinions ......................................................................... 5

IV.    Analytical Framework .................................................................................... 7
       A. Market Power ........................................................................................... 7
       B. Entry ........................................................................................................ 8
       C. Application of This Framework to the Facts of This Case ...................... 9

V.     Background on the Pharmaceutical Industry and Oral Contraceptives ......... 11
       A. General Background on the Pharmaceutical Industry ............................ 11
       B. General Background Related to Oral Contraceptives ............................ 14
       C. General Background on Warner Chilcott's Acquisition and Experience with
          Ovcon Prior to the Agreement ............................................................... 16

VI.    Background on the Agreement ....................................................................... 17
       A. Summary of the Agreement .................................................................... 17
       B. Context of the Agreement ....................................................................... 18

VII.   Relevant Market and Market Power ............................................................. 20
       A. Did Warner Chilcott Possess Market Power at the Time of the Agreement? .... 20
       B. Conclusions Regarding Market Power .................................................... 26

VIII.  Effect on Consumers of Exclusion from the Market of Barr's A-Rated Generic
       Version of Ovcon ......................................................................................... 27

IX.    Evaluation of Possible Justifications for the Agreement .............................. 28
       A. The Agreement Does Not Provide Pro-competitive Benefits ................ 28
       B. The Exclusive Was Not Necessary to Address Supply Difficulties ....... 31

       APPENDIX 1 ................................................................................................ 33

       APPENDIX 2 ................................................................................................ 36

### I.    Qualifications

1.    I am the Robert L. Bridges Professor of Law and Professor of Economics at the University of California, Berkeley.  I am also Visiting Professor of Law at New York University School of Law.  I served as Deputy Assistant Attorney General at the Antitrust Division of the U.S. Department of Justice from June 1992 through December 1998.  In that position I was responsible for supervising a staff of approximately 70 Ph.D. economists, financial analysts, and research assistants in regard to a wide range of civil matters, many of which related to health care as well as antitrust.

2.    I received my A.B. degree in mathematics from Princeton University in 1967 and my Ph.D. in economics from M.I.T. in 1972.  I have previously taught at the University of Michigan and have been a visiting professor at the law schools of Stanford University, the University of Geneva, and N.Y.U.  I am the author of two textbooks, *Microeconomics*, and *Econometric Models and Economic Forecasts* (both with Robert Pindyck).  I have received fellowships from the National Bureau of Economic Research, the John M. Guggenheim Foundation, and the Center for Advanced Studies in the Behavioral Sciences.  I am a Fellow of the American Academy of Arts and Sciences.  I previously served as Associate Dean of the School of Law (as Chair of the U.C. Berkeley Program in Jurisprudence and Social Policy) and as Chair of the Law School's Program in Law, Economics, and Institutions.  I am past President of the American Law and Economics Association and I am currently a research fellow of the National Bureau of Economic Research.

3.    My research interests span a broad range of subject matters, including the economics of legal rules and institutions, industrial organization and competition policy, and law and statistics.  I have published or edited six books and over 100 articles.  I have consulted and testified extensively in cases involving antitrust, intellectual property, public regulation, and damages, for private parties and for the U.S. Department of Justice, the Federal Trade Commission, the U.S. Treasury,

and the California Attorney General's Office. My public and private consulting experience includes substantial work relating to the pharmaceutical industry.

4.  My teaching interests include antitrust, the economics of legal rules and institutions, antitrust, economics and public policy, and law and statistics. I have frequently served as a lecturer for the Federal Judicial Center concerning the use of statistical methods by the courts. In 2003, I taught a short course on antitrust economics to attorneys at the Federal Trade Commission.

5.  A copy of my curriculum vitae is attached hereto as Exhibit 1. A list of my prior testifying experience is attached hereto as Exhibit 2.

**II.    Scope of Assignment**

6.  I have been asked by the Federal Trade Commission and the Plaintiff States to conduct an economic analysis of two agreements entered into between Warner Chilcott and Barr Pharmaceuticals in March 2004, known as the "Option and License Agreement" and the associated "Finished Product Supply Agreement,"[1] and to provide my expert opinion about the competitive effects of these agreements. Because these agreements are closely related, I refer to them collectively as "the Agreement" unless otherwise noted.

7.  In summary, the Agreement gave Warner Chilcott an option to obtain a five year exclusive license to Barr's Abbreviated New Drug Application ("ANDA") for a generic version of Warner Chilcott's branded oral contraceptive Ovcon 35. Warner Chilcott paid $1 million for this option, which it exercised after Barr obtained FDA approval for its ANDA in April 2004. In accordance with the Agreement, Warner Chilcott paid Barr $19 million when it exercised the option.

---

[1] See Government Exhibit 1, the "Option and License Agreement," Bates number Barr-29-00011-Barr-29-00030, and Government Exhibit 2, the "Finished Product Supply Agreement," Bates number Barr-29-00040-Barr-29-00067.

The supply provisions of the Agreement allowed Warner Chilcott to obtain a supply of Barr's product to sell as branded Ovcon 35.[2]

8.    Because the Agreement gave Warner Chilcott an exclusive license even as to Barr, Barr itself was prohibited from selling its own generic version of Ovcon. In early September 2006, Warner Chilcott announced that its line extension for Ovcon, a chewable product called Ovcon 35 Fe, was available.[3] On September 25, 2006, Warner Chilcott released Barr from the exclusivity provisions in the Agreement.[4] At that time, Barr announced that it would launch its generic Ovcon, Balziva, in October 2006. Barr launched Balziva in October 2006.[5]

9.    I have been asked to consider the following economic questions. First, at the time of entering into the Agreement, did Warner Chilcott possess market power? Second, does the Agreement prevent the entry of a competing product that would erode Warner Chilcott's market power related to Ovcon and, hence, the profit it earns from the sale of this product? Third, what are the effects, if any, of the restriction on Barr's entry with generic Ovcon on competition and consumers? Fourth, what are the effects, if any, of the Agreement's supply provisions, and do these effects justify the restriction on Barr's entry?

10.    As part of my analysis in this report, I have considered transcripts and exhibits from the depositions and investigational hearings of employees of Warner Chilcott, Barr, and third parties; internal documents from Warner Chilcott, Barr, and from other firms; published reports and articles; data provided by parties to the litigation and others; expert reports from other experts retained by the Federal

---

[2] Note that in addition to Ovcon 35, Warner Chilcott also markets Ovcon 50, which contains a higher dose of the estrogen found in Ovcon 35. The agreement between Warner Chilcott and Barr concerned only Ovcon 35. For brevity, the report will simply refer to Ovcon 35 as Ovcon unless otherwise noted.
[3] See Affidavit of David Vucurevich, R.Ph., September 21, 2006 (hereafter "Vucurevich Affidavit"), Attachment 1; "Warner Chilcott Reports Operating Results for the Quarter Ended September 30, 2006," Warner Chilcott Press Release, November 14, 2006, http://ir.wcrx.com/releasedetail.cfm?ReleaseID=218570
[4] See "The FTC Files a New Motion in Connection with Ongoing Ovcon Litigation," Warner Chilcott Press Release, September 26, 2006, http://ir.wcrx.com/releasedetail.cfm?ReleaseID=212210; "Barr Announces Warner Chilcott Waives Exclusive License for OVCON® 35," Barr Pharmaceuticals Press Release, September 26, 2006, http://phx.corporate-ir.net/phoenix.zhtml?c=60908&p=irol-newsArticle_print&ID=909303&highlight=.
[5] See Deposition of Bruce Downey, October 17, 2006, p. 25.

4

Trade Commission; and other related documents and information, including the results of my own research.[6] Exhibit 3 contains a list of the materials I have considered. New and additional information, documents, and data are being made available to me, and I understand that more evidence and data will become available as discovery in this case progresses. When and if new data and evidence relevant to my opinion become available, I will include them in my analysis and supplement my report as appropriate.

11. I am being compensated for my work in this case at the hourly rate of $550.

### III.     Summary of Expert Opinions

12.    The economic evidence supports the conclusion that (1) Warner Chilcott possessed market power with respect to Ovcon, and (2) because of the Agreement, Warner Chilcott was able to maintain its market power to the detriment of consumers of Ovcon. With regard to Warner Chilcott's market power, I note that established economic research indicates that generic products typically enter at a substantial discount relative to their brand-name counterparts. A similar pattern is apparent for oral contraceptives: in past cases in which brand-name oral contraceptives faced generic entry, those generics entered at substantial price discounts to their brand-name counterparts, and the generics quickly captured substantial market share. The evidence suggests that the same would be true for Ovcon.

13.     In addition, if Ovcon was a close competitor with other branded oral contraceptives, one would expect that generic entry for other oral contraceptives would have a substantial effect on Ovcon sales. However, my analysis indicates that generic entry for other oral contraceptives has not had any discernable impact on Ovcon sales. Similarly, generic entry for other oral contraceptives and the attendant lower prices has caused virtually no statistically significant changes in the degree to which Ovcon users switch to those products. Instead, it appears that

---

[6] I previously submitted an affidavit in this matter. See Affidavit of Daniel L. Rubinfeld, Ph.D., September 22, 2006. Portions of that affidavit are reiterated in this report.

5

patients switch out of Ovcon and into other oral contraceptives primarily for clinical reasons. This indicates that these other products are not close economic substitutes and do not provide the same constraint on the exercise of market power as would a generic Ovcon.

14. Had Barr introduced its generic Ovcon, it likely would have done so at a wholesale price about 30 percent less than branded Ovcon.

15. The parties state that the Agreement was designed to address supply difficulties that Warner Chilcott faced with Bristol Myers Squibb ("BMS"), its existing supplier. Assuming Warner Chilcott did have supply difficulties with BMS, this does not appear to provide a valid rationale for the restriction on Barr's entry, for a number of reasons. First, at the time the parties entered into the letter of intent that resulted in the Agreement, Barr did not have FDA approval for its generic Ovcon, and there could be no assurance that it would obtain that approval. Second, any supply difficulties that Warner Chilcott faced would have been substantially alleviated with Barr's generic entry. With generic entry, as is commonplace in the pharmaceutical industry, Warner Chilcott's sales would have fallen and it would have ceased distributing samples to physicians. As a result, the amount of supply that Warner Chilcott would have needed after generic entry would have been substantially less than it needed prior to generic entry. Third, the evidence indicates that Warner Chilcott did not attempt to pursue any other solution to its supply difficulties besides Barr. Fourth, after Warner Chilcott waived the exclusivity provisions of the Agreement, the parties' actions indicate that the exclusive was not necessary. I understand that Barr continues to supply Warner Chilcott on a non-exclusive basis, while selling its own generic. In addition, I understand that Warner Chilcott recently asked Barr to supply Watson, which will sell an authorized generic Ovcon.

16. Thus, while exclusive supply arrangements can provide pro-competitive benefits, this Agreement does not appear to do so. Instead, the Agreement was principally

6

designed to forestall generic entry until Warner Chilcott could introduce its
product line extension—chewable Ovcon.

IV.    **Analytical Framework**

        *A. Market Power*

17.    From my perspective as an economist, it is necessary for a firm to have some
      degree of market power (or the ability to attain market power) for any of its
      strategic behavior to have the ability to lessen competition.  Market power is the
      ability of a firm to increase its price above a competitive level for some period of
      time.[7]

18.    A firm's market power depends, among other things, on the structure of the
      market in which the firm competes.  Economic theory posits a range of possible
      market structures that can exist within a particular industry, from perfect
      competition to oligopoly to monopoly.  Conditions of competition, and thus
      market power, vary along this continuum.  Under perfect competition, firms have
      no market power—firms cannot profitably raise prices above competitive levels
      because consumers can and would easily shift their purchases to other suppliers
      that continue to supply at competitive prices.  Under monopoly, a single firm
      supplies the good in question, and the firm is generally able to maintain prices
      above competitive levels because consumers cannot readily turn to alternative
      suppliers.  Between the extremes of monopoly and perfect competition are other
      market structures, such as oligopoly.  In oligopoly, there are a relatively few
      significant suppliers, although there may be a "competitive fringe," and the
      products may be imperfect substitutes for each other.  The small number of
      suppliers creates a mutual interdependence among the firms, meaning that each
      firm must account for the response of others when deciding price and output.[8]
      Recognition of this interdependence may cause firms to compete less aggressively
      than in the case of perfect competition, although they may be unable to achieve

---

[7] See Federal Trade Commission and Department of Justice *1992 Horizontal Merger Guidelines*, §0.1.
[8] See Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics,* 6th Edition, 2005, pp. 441-442.

the monopoly outcome. Thus, the different market structures differ in the degree to which firms can possess and exercise market power.

19. All else equal, consumers generally benefit from a reduction in market power, because they are better off if they are able to obtain goods and services at lower prices.

### B. Entry

20. The market power enjoyed by successful firms may only be temporary, because the resulting profits may create an incentive for other firms to develop competing versions of the product in question.[9] The evidence that I discuss in more detail below demonstrates that Barr responded to such an incentive when it chose to develop a generic version of Ovcon, just as it did when it developed its numerous other generic versions of different oral contraceptives.

21. Consumers generally benefit from the entry of new products, and preventing this entry harms consumers. The entry of new products increases the number of choices consumers have available. Consumers can benefit from increased variety—innovative new products offering unique value to consumers. Even if the new offerings are similar or identical to existing offerings, the entry of such products would benefit consumers if the increased competition results in lower prices.

22. Producers of competing products generally lose sales or revenue when new firms enter because some consumers will switch to the new product and because new competition can cause prices to fall. The degree to which sales of an existing product decline following entry of a new product depends on the interchangeability between the two products. If the two products are distant substitutes, the effect may be small or even negligible. If the two products are close substitutes, the effect would be more significant.

---

[9] See Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics,* 6th Edition, 2005, pp. 283-285.

23.     Unless the new product offers some feature that increases demand or willingness-to-pay (i.e., greater convenience, efficacy, or quality), or is produced at sufficiently lower cost than existing products, the entry of the new product causes the sum of producers' profits to decline.[10]  If entry causes producer profits to decline, the existing firms and potential new entrants have an incentive to attempt to reach an agreement to forestall this entry.  The amount of profit that would be lost as a result of entry is available for division among the firms.  A division, to be mutually agreeable, would have to leave each firm at least as well off as it would expect to be in the absence of an agreement.  The potential entrant would need to receive at least as much money as it expected to earn from selling the product.  If the potential entrant can obtain at least as much in an agreement to delay entry as it expected to earn from entering and selling the product, then absent legal impediments it should be willing to enter such an agreement.  Because consumers generally benefit from the entry of competing products, an agreement that delays entry, absent sufficient countervailing benefits, can be expected to be harmful to consumers.

### C.  Application of This Framework to the Facts of This Case

24.     The standard economic framework described above guides my analysis of the Agreement between Barr and Warner Chilcott.  The existence of market power is necessary for a conclusion that the Agreement is likely to harm consumers.[11]  Market power can be demonstrated in different ways.  Often, assessing market power begins with an analysis of the market within which the product in question competes.  To conduct this analysis, one must identify the products that compete most closely with the product in question and, therefore constrain the exercise of

---

[10] An exception would be if the industry in question were perfectly competitive both before and after entry, in which case entry would leave economic profits unchanged at zero.

[11] In health care, some or all of the payment is often made by third parties through public or private insurance.  Furthermore, pharmaceutical manufacturers' direct customers are typically wholesalers, retail pharmacy chains, and other dispensers.  The interests of all of these parties, subsumed as "consumers" in this report, are relevant to the analysis of the effect of the Agreement on consumers.

9

market power.[12]   After identifying the relevant market, the next step is to assess whether the producer of the product in question has market power in that market.

25.     While often useful, delineation of the exact scope of the product market is not necessary if there exists sufficient direct evidence that the Agreement harmed consumers.  Market definition is an exercise whose primary purpose is to aid in an analysis of possible anticompetitive effects.  If such effects have been independently demonstrated, the market definition exercise is not necessary as a matter of economics.[13]  As one recent article states:

> "From the perspective of economic theory, antitrust law's preoccupation with market definition has always seemed somewhat peculiar.  Arguments for and against a merger that turn upon distinctions between broad and narrow market definitions are, to an economic purist, an inadequate substitute for, and a diversion from, sound direct assessment of a merger's effects."[14]

26.     This statement applies to non-merger conduct such as the behavior alleged in this case.  Thus, evidence of competitive harm would independently demonstrate that Warner Chilcott possessed market power at the time it entered into the Agreement.

27.     If Warner Chilcott possesses market power with respect to Ovcon, I assess whether Barr's generic version of Ovcon would have competed with Warner Chilcott's version, and whether Barr's entry with a generic version would diminish Warner Chilcott's market power.  Further, I assess whether the exclusion of Barr's generic Ovcon from the market harms competition, and therefore consumers.  Finally, I assess whether any of the provisions of the Agreement

---

[12] See Horizontal Merger Guidelines, §1.11.
[13] See Edlin and Rubinfeld, "Exclusion or Efficient Pricing? The 'Big Deal' Bundling of Academic Journals," *Antitrust Law Journal,* August 2004, p. 140; Baker, "Contemporary Empirical Merger Analysis," *George Mason Law Review*, 1997, pp. 341-361; Katz and Shelanski, "Merger Analysis and the Treatment of Uncertainty:  Should We Expect Better?" Working Paper, University of California, Berkeley, September 20, 2006, http://economix.u-paris10.fr/pdf/sem_economix/2006-11-09_Shelanski.pdf, pp. 36-41.
[14] Ordover and Wall, "Understanding Econometric Methods of Market Definition," *Antitrust,* 1989, pp. 20-21.

plausibly yield benefits to competition that would offset any anticompetitive effects.

V.    **Background on the Pharmaceutical Industry and Oral Contraceptives**

   *A.  General Background on the Pharmaceutical Industry*

28.    "Brand-name" pharmaceutical firms specialize in developing new and innovative products that are marketed under brand names. In order to gain regulatory approval to market a new brand-name product, a manufacturer must file a "New Drug Application" (or "NDA") with the Food and Drug Administration. In the filing the manufacturer must submit to the FDA sufficient data to demonstrate the safety and efficacy of the product in its intended use. This approval process can take years, and the cost of developing a new brand-name product can be substantial.[15]

29.    While consumers have an interest in the development of new and innovative products, consumers also have an interest in lower prices that can be brought about by generic competition. Generic manufacturers make products that are copies of existing pharmaceutical products. In order to encourage the dual goals of new product development and the entry of new generic competitors, Congress passed the Hatch-Waxman Act in 1984. Prior to the Hatch-Waxman Act, a firm wanting to gain FDA approval for a generic version had to perform the same safety and efficacy tests that the producer of the original branded product had performed. The Hatch-Waxman Act changed that by allowing generic manufacturers to submit an "Abbreviated New Drug Application" ("ANDA") when seeking approval for a product. To obtain approval for an ANDA, the generic company must only show that its product is pharmaceutically equivalent and bioequivalent to the brand-name product. Pharmaceutically equivalent means that the generic product has the same active ingredient, dosage form, strength, and

---

[15] See Cockburn and Henderson, "The Economics of Drug Discovery," in *Pharmaceutical Innovation*, Landau, Achilladelis, and Scriabine, eds., 1999; DiMasi, "New Drug Development in the United States from 1963 to 1999," *Clinical Pharmacological Therapy*, 2001, pp. 286-296; DiMasi, Hansen, and Grabowski, "The Price of Innovation: New Estimates of Drug Development Costs," *Journal of Health Economics*, 2003, pp. 151-185.

route of administration as the brand-name product. The generic version must also be "bioequivalent" to the original branded product. Two drugs are bioequivalent if they are absorbed by the body at approximately the same rate.

30.     After concluding that a generic drug is pharmaceutically equivalent and bioequivalent to a brand-name drug, the FDA denotes the generic drug as A-rated to the brand-name drug.[16] An A-rating provides valuable information to consumers, physicians, and pharmacists, since it signals to them that the FDA has concluded that the generic drug can be used interchangeably with the associated brand-name drug.

31.     The dimensions of competition often differ between brand-name and generic products as well. Even within relatively narrow product categories, different brand-name pharmaceuticals generally exhibit some degree of product differentiation. Thus, while branded products compete to some degree along price dimensions, they also compete along non-price dimensions, such as product sampling, promotions, and marketing that emphasizes superior product characteristics (side effects, increased efficacy, etc). Producers of generic products compete primarily by offering discounts off the price of the corresponding brand-name drugs. That generics compete primarily on the basis of price is consistent with the economics of the pharmaceutical industry. Generic products are therapeutically equivalent to associated brand-name products. In all 50 states and the District of Columbia, generic substitution laws allow pharmacists and patients to substitute an A-rated generic product in place of a branded product without physician intervention.[17] As a result, generic competitors, who sell products that are therapeutically equivalent to existing products, compete primarily on the basis of price. To successfully sell their products, generic suppliers generally must offer prices that are lower than their brand-name counterparts.[18]

---

[16] See Vucurevich Affidavit, ¶ 7.
[17] See Vucurevich Affidavit, ¶ 7.
[18] See Carlton, Dennis W. and Jeffery M. Perloff, *Modern Industrial Organization*, 3rd Edition, pp. 56-65.

32.  The response of managed care and other actors in the health care system to the price competition from generic products is to encourage switching from a brand-name product to its A-rated equivalent.[19]  Health plans have put in place mechanisms to encourage their members to use generic drugs.  For example, generic drugs typically occupy a preferred tier in health plans' formularies, which are the lists of drugs that are covered by plans.[20]  Consumers generally pay lower co-payments for drugs that are on the preferred tier, enabling them to directly claim part of the cost savings associated with choosing a generic rather than the brand-name version of the drug.[21]  Consumers also indirectly benefit from the cost savings from generic drugs to the extent that health plans are able to pass on their lower costs in the form of lower insurance premiums.[22]

33.  The discounts offered by generic manufacturers and the reimbursement terms of third-party payers also give pharmacies an incentive to stock generic drugs.  Pharmacies earn higher profit margins dispensing generics rather than brand-name products.[23]  Therefore, pharmacists have an incentive to inform patients about the availability of lower priced generics.

34.  Given the incentives for pharmacists and patients to favor generic products over therapeutically equivalent branded products, it is not surprising that many studies have found that a significant number of consumers shift to generic drugs when they are introduced.  There is a well-respected economics literature that examines the effects of competition between brand-name and generic drugs made possible by the Hatch-Waxman regulatory framework.[24]  I have reviewed a substantial

---

[19] See Deposition of Alex Krikorian, Vice President of Pharmaceutical Contracting, Cigna, November 16, 2006, p. 16.

[20] See Deposition of Alex Krikorian, November 16, 2006, p. 21.

[21] See Deposition of Alex Krikorian, November 16, 2006, p. 24.

[22] See Deposition of Alex Krikorian, November 16, 2006, p. 75.

[23] See Investigational Hearing Transcript of Bruce Downey , January 14, 2005, pp. 61-64.

[24] See, in particular, Caves, Richard, Michael Whinston, and Mark Hurwitz, "Patent expiration, entry, and competition in the U.S. pharmaceutical industry," *Brookings Papers on Economic Activity: Microeconomics*, 1991, pp. 1 – 48; Grabowski, Henry and John Vernon, "Brand loyalty, entry, and price competition in pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 1992, 35:331 – 350; Grabowski and Vernon, "Longer patents for increased generic competition in the US: The Waxman-Hatch Act after one decade," *Pharmacoeconomics*, 1996, 10 Suppl.2: 110 – 123; Frank, Richard and David Salkever, "Generic entry and the pricing of pharmaceuticals," *Journal of Economics & Management*

portion of this literature. The literature reaches several broad conclusions. First, generic drugs are typically offered at a price that represents a substantial discount off the price of the associated brand-name drugs. Second, the discount offered by a generic version is typically greater when there is more than a single generic that is A-rated to a particular brand-name drug. Third, a substantial number of consumers switch from the brand-name drug to the generic version when the latter becomes available. Given the incentives for patients, payers, and pharmacists to favor the dispensing of generic products where possible, it is not surprising that these studies have found that a significant number of consumers shift to generic drugs when introduced.

### B. General Background Related to Oral Contraceptives

35.     Ovcon is a combined hormonal contraceptive that uses two hormones—a progesterone compound (norethindrone) and an estrogen compound (ethinyl estradiol) to prevent pregnancy.[25] In addition to Ovcon, there are numerous other related oral contraceptive and other combined hormonal contraceptive products that contain various combinations of estrogen and one of several synthetic forms of progesterone. While these products may be chemically similar to Ovcon, and they all have a common indication (i.e., the prevention of pregnancy), the FDA does not consider these products bioequivalent, and there is variation in the dosage of the active ingredients.[26]

36.     Ovcon is a monophasic oral contraceptive that delivers 35 micrograms of ethinyl estradiol and 0.4 mg of norethindrone acetate.[27] Monophasic means it delivers the same dosage of the active ingredients in all of the pills that contain active ingredients. It also contains a 7-day course of placebo pills. Some other products

---

*Strategy*, 1997, 6:75 – 90; Ellison, Sara, Iain Cockburn, Zvi Griliches, and Jerry Hausman, "Characteristics of demand for pharmaceutical products: an examination of four cephalosporins," *RAND Journal of Economics*, 1997, 28:426 – 446; Wiggins, Steven and Robert Maness, "Price competition in pharmaceuticals: the case of anti-infectives," *Economic Inquiry*, 2004, 42: 247 – 263; Reiffen, David and Michael Ward, "Generic Drug Industry Dynamics," *Review of Economics and Statistics*, 2005, 87: 37 – 49.

[25] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., p. 89.
[26] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., pp. 12, 16-19, 90-91, 98-99.
[27] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., p. 89.

are multiphasic oral contraceptives, meaning that the dosage of active ingredients varies over the course of a cycle.[28]

37.     Ovcon is a pill; there are many other oral contraceptives, and there are some hormonal contraceptives that rely on other delivery mechanisms, e.g., patches and rings.[29]

38.     Many of the brand-name oral contraceptives have lost patent protection, and there has been substantial entry of A-rated generic alternatives. These generic versions typically are given brand names – and do not just use the generic name – in order to more easily identify products.[30]

39.     Different women experience side effects on the different drugs.[31] Nausea, breakthrough bleeding, weight gain, mood swings, breast tenderness, and headaches are examples of side effects.[32]

40.     Because of the differences among the various oral contraceptive products, a patient may need several "trials" before finding the appropriate product.[33] The need for trials and preference by doctors to demonstrate to patients how to use the product create a demand for samples. Branded oral contraceptive manufacturers routinely provide samples to physicians for this reason.[34] Once the appropriate product is identified, doctors typically prescribe year-long prescriptions, and women may remain on the same product for long periods of time.[35]

---

[28] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., pp. 12-13.
[29] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., pp. 143-163.
[30] See Deposition of Tim Sawyer, Vice President of Sales for Generic Products, Barr Laboratories, Inc., September 11, 2006, p. 83.
[31] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., pp, 20-23, 36-81, 102-103.
[32] Dickey, Richard P., MD, PhD, *Managing Contraceptive Pill Patients*, 11th ed., pp, 20-23, 36-81, 102-105; WC00106051.
[33] See WC00459579-80.
[34] See Deposition of Jeffrey Frick, Vice President of Marketing in Female Healthcare, Berlex, September 29, 2006, pp. 22, 29-30; See also, Deposition of David Lin, Director of Marketing, Ortho Women's Health & Urology, October 16, 2006, pp. 60-63; Deposition of Roger Boissonneault, November 29, 2006, pp. 46-47.
[35] See WC00218305. See also, Deposition of Jeffrey Frick, Berlex, September 29, 2006, pp. 93-94.

41.    The evidence discussed in this section indicates that oral contraceptives are differentiated products, and that the generic counterparts to a given branded product are much closer competitors than are other branded products or their generic counterparts (if any).

### C. General Background on Warner Chilcott's Acquisition and Experience with Ovcon Prior to the Agreement

42.    Warner Chilcott acquired Ovcon from Bristol Myers Squibb in February 2000.[36] From the time of the acquisition until May 2005, BMS supplied Warner Chilcott with the product, which Warner Chilcott distributed to both trade customers and as samples. By the time Warner Chilcott acquired the product, BMS had ceased actively promoting Ovcon. Warner Chilcott resumed promotion of Ovcon, and sales have increased significantly since Warner Chilcott acquired the product. (See Exhibit 4)

43.    In addition to resuming promotion of Ovcon, Warner Chilcott began developing plans to introduce a product line extension.[37] The product line extension that Warner Chilcott sought was a chewable version of Ovcon. After significant delays in developing the product, Warner Chilcott launched chewable Ovcon (Called Ovcon 35 Fe) in September 2006.[38] Ovcon 35 Fe contains the same active ingredients in the same dosages as old Ovcon, and also contains spearmint flavoring and iron in the placebo pills.[39] Nevertheless, because of FDA regulations, the chewable version of Ovcon is not A-rated to regular Ovcon, and a generic version that is A-rated to regular Ovcon cannot be substituted for Ovcon 35 Fe without the prescribing physician's permission.

---

[36] See Government Exhibit 55, Galen Holdings SEC Form 20-F, Annual Report for Fiscal Year ended September 30, 2003, p. 13.

[37] See WC00104239. A product line extension is a modification of an existing product, such as a new dosage form or a new delivery route. Product line extensions are relatively common in oral contraceptives. Examples of line extensions include Ortho's introduction of Tri-Cyclen Lo once Tri-Cyclen went generic and Warner Chilcott's introduction of Loestrin 24 earlier this year after it sold regular Loestrin - which had gone generic - to Barr.

[38] See Vucurevich Affidavit, Attachment 1.

[39] See WC00142878; Vucurevich Affidavit, Attachment 1.

44.    The evidence in this case makes it clear that Warner Chilcott began the development of chewable Ovcon to mitigate the effect of competition from potential generic versions of regular Ovcon, by switching patients to the chewable product before entry of a generic A-rated to regular Ovcon.[40]  While Warner Chilcott received FDA approval to market chewable Ovcon in November 2003,[41] there were significant delays in the development of chewable Ovcon that postponed its introduction until September 2006.  By 2003, Warner Chilcott became concerned that delays in the development of chewable Ovcon would result in generics entering the market before the product line extension was launched.  (See discussion below).

## VI.    Background on the Agreement

45.    Sometime prior to 2003, Barr began to develop the ANDA that upon FDA approval would enable it to sell a generic version of Ovcon.  Barr announced in January 2003 that it would launch a generic version of Ovcon by the end of the year.[42]  Warner Chilcott had been aware that this was a possibility, since Ovcon was no longer patent protected.  By July 2003, Warner Chilcott believed that it was likely that Barr would launch a generic version of Ovcon before it could convert patients to chewable Ovcon, and perhaps before chewable Ovcon could even make it to market.[43]  In September 2003, before Barr received FDA approval to market generic Ovcon, Barr and Warner Chilcott signed a letter of intent that eventually resulted in the Agreement.[44]

### A.  Summary of the Agreement

46.    Warner Chilcott paid $1 million for an option to a five-year exclusive license to Barr's Ovcon ANDA.  This license was exclusive even as to Barr, meaning that

---

[40] See WC00106049, OVC 00006091, Investigational Hearing Transcript of Roger Boissonneault, January 21, 2005, pp. 100-102.
[41] See FDA Orange Book,
http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=021490&TABLE1=OB_Rx
[42] See Government Exhibit 1057, Hume, Neil, "Market Forces:  Galen Drops on Fear of Generics," *The Guardian*, January 17, 2003, p. 29.
[43] See e-mail from Roger Boissonneault (CEO of Warner Chilcott) to Tamar Howson at BMS, July 24, 2003, WC00141378. See also, WC00120687.
[44] See Barr-29-00001-Barr-29-00010.

Barr itself could not independently sell the product that it developed. Once Barr received FDA approval for its ANDA, Warner Chilcott had 45 days within which to exercise its option on the exclusive license. If it chose to exercise the option, Warner Chilcott was obligated to pay Barr an additional $19 million.[45] In addition to the license, the Agreement includes supply provisions which give Warner Chilcott the right to purchase supply of Ovcon from Barr at a price equal to 200% of Barr's "fully loaded manufacturing costs" for trade units and a price equal to 125% of "fully loaded manufacturing costs" for samples.[46]

47.    The parties signed a letter of intent for the Agreement on September 10, 2003.[47] The Option and License Agreement was signed in March 2004, at which time Warner Chilcott paid Barr $1 million.[48] Barr received final FDA approval for its ANDA in April 2004. Warner Chilcott then exercised its option within the required 45-day period, paid Barr a further $19 million, and obtained an exclusive license to Barr's ANDA.[49]

### B.  Context of the Agreement

48.    At the time of the Agreement, Ovcon was a significant product for Warner Chilcott.[50] In the fiscal years ending September 2003 and September 2004, net sales of Ovcon were approximately 16 percent of Warner Chilcott's total net sales. During those periods, Warner Chilcott earned gross profit margins of 95 percent and operating profit margins of 66 percent and 56 percent on its sales of Ovcon, respectively.[51]

---

[45] See Agreement, p. 5, Barr-29-00015.
[46] See Finished Product Supply Agreement between Barr and Galen, Bates Nos. Barr-29-00040-Barr-29-00067, especially Article 6.1 on p. 11 (Barr-29-00050).
[47] See Barr-29-00003-Barr-29-00007.
[48] See Barr-29-00011-Barr-29-00039.
[49] See "Barr's Generic Ovcon-35(R) Tablets Approved," Barr Press Release, April 23, 2004, http://phx.corporate-ir.net/phoenix.zhtml?c=60908&p=irol-newsArticle&ID=518558&highlight=ovcon.
[50] Deposition of Roger Boissonneault, November 29, 2006, pp. 13-15.
[51] See WC00158492, WC00158509, WC00158402, WC00158417. These documents do not separate Ovcon 35 and Ovcon 50, however, IMS data indicate that Ovcon 50 was a small portion of overall Ovcon sales—less than 12 percent of Ovcon total dollars in 2003-2004.

18

49.    Internal Warner Chilcott documents suggest that there was significant concern about the prospect of the entry of an A-rated generic product. Warner Chilcott forecasted that generic entry would cause it to lose significant sales. One document suggests that if generic Ovcon entered before chewable Ovcon, Warner Chilcott could lose 50 percent of Ovcon sales by the third month, and as much as 65 percent within two years.[52] Warner Chilcott's CEO confirmed that he expected that Ovcon would lose about 50 percent of its sales if a generic entered.[53] Another forecast projected that Ovcon sales would fall from $58 million with initial generic entry to about $18 million within two years.[54] Indeed, Warner Chilcott executives characterized generic Ovcon entry as "the biggest risk to the Company."[55] In looking at Ovcon scenarios, Warner Chilcott personnel characterized the case in which generics entered before chewable Ovcon was on the market as a "Total Disaster" scenario.[56] Other Warner Chilcott personnel noted that the entry of generic Ovcon before the chewable product was ready "would impact the Company's plans to launch Ovcon Chewable and would significantly impair the future sales potential of the Ovcon 35 franchise.[57]

50.    Warner Chilcott documents indicate that an important rationale for the development of chewable Ovcon was that, if customers could be switched to this product, they would be unlikely to switch to an A-rated generic version of original Ovcon.[58] Throughout 2003, Warner Chilcott expressed concern that chewable Ovcon would not be ready before a generic version of regular Ovcon entered the market.[59]

---

[52] See WC00118594.
[53] See Deposition of Roger Boissennault, November 29, 2006, pp. 29-30.
[54] See WC00118592, WC00369269-70..
[55] See Galen Holdings PLC Director's Meeting, May 13, 2003, WC00140658.
[56] See WC00118594.
[57] See WC003033669.  See also, WC00126451; Investigational Hearing Transcript of Mitchell Lazar, December 7, 2004, p. 124.
[58] See OVC 00006091.  See also, Deposition of Roger Boissonneault, November 29, 2006, pp. 163-164. Barr also understood this. See also, Investigational Hearing Transcript of Bruce Downey, January 14, 2005, pp. 153-154.
[59] See WC00120687, WC00134193.

51.    Warner Chilcott claims that BMS was an inadequate supplier of Ovcon, and that the rationale for the Agreement was to improve the supply situation for Ovcon.[60] However, despite the presences of other potential suppliers, Warner Chilcott has stated that it did not seek out any other suppliers or manufacturers of hormonal contraceptives besides Barr.[61]  Further, BMS continued to supply Warner Chilcott for more than a year following the time that Warner Chilcott exercised the option to acquire an exclusive license to Barr's Ovcon ANDA.  Barr did not begin supplying Warner Chilcott until May 2005.  Indeed, at the time the parties entered into the letter of intent in September 2003, Barr could not have supplied Warner Chilcott since it had not yet received FDA approval, and would not do so until seven months after the parties signed the letter of intent.  Thus, at the time of the letter of intent, Warner Chilcott could not be certain that Barr would ever be able to supply any Ovcon.

52.    Finally, by the time it signed the Agreement, and certainly by the time it exercised the option, Warner Chilcott knew that generic entry was imminent.  Given the share of sales typically captured by generic firms and the fact that Warner Chilcott (as is typical for branded manufacturers) would cease to distribute samples after generic entry, it must have known that its supply needs were about to fall significantly.  Thus, whatever supply problems it had were likely to be alleviated even without the Agreement.[62]

## VII.    Relevant Market and Market Power

### A.  Did Warner Chilcott Possess Market Power at the Time of the Agreement?

53.    As discussed previously, market power is typically defined as the ability to maintain prices in excess of competitive levels for some period of time.  Central

---

[60] See Galen's Narrative Responses to the May 13, 2004 Civil Investigative Demand, Galen/Barr FTC File No. 0410034, Response 1; Investigational Hearing Transcript of Roger Boissonneault, January 21, 2005, pp. 107-108; WC00145536; WC00143096.
[61] See Galen's Narrative Responses to the May 13, 2004 Civil Investigative Demand, Galen/Barr FTC File No. 0410034, Response 5.  See Patheon Second Quarter 2006 Report to Investors, p. 17.
[62] See Deposition of Bruce Downey, October 17, 2006, pp. 173-177.  See also, Deposition of Roger Boissonneault, November 29, 2006, pp. 157-159.

20

to evaluating the market power issues in this case are: (1) the degree to which Ovcon faces competition from other contraceptive products, and (2) the degree to which entry from Barr's A-rated generic would increase the level of competition that Ovcon faces. It is frequently useful to define a relevant market or markets prior to evaluating the market power question. Defining a relevant market typically consists of identifying the set of products that are substitutes for the product in question from the perspective of consumers. In this particular case, however, defining the market is not necessary. The most direct evidence of Warner Chilcott's market power is the substantial and unique effect on Ovcon that would likely result from the entry of Barr's generic version of Ovcon. Economic evidence on pricing and competition in the pharmaceutical industry consistently shows that the introduction of generic products at lower prices than brand products causes rapid decline in sales of the corresponding brand-name products. Generic products usually enter the market at a substantial discount to branded products. Indeed, the relevant economics literature suggests that initial generic prices are typically about 70 percent or less of the branded price.[63] The literature also suggests that generic manufacturers typically capture up to 50 percent of the sales of the product within the first year after generic entry, and as much as 72 percent within the first 18 months.[64]

54. Evidence of generic entry in oral contraceptives is broadly consistent with this pattern. The most relevant evidence for this purpose is the sales data associated with the different instances of generic oral contraceptive entry that have occurred over the last five years. I have reviewed data collected by IMS Health, a third-party provider of pharmaceutical industry data. I note that the published

---

[63] See Grabowski and Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Act," *Journal of Law & Economics,* October 1992, Table 1, p. 336; Caves, Whinston, and Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity, Microeconomics,* 1991, Table 2, p. 19; Frank and Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics & Management Strategy,* Spring 1997, pp. 84-85; Viscusi, Vernon, and Harrington, *Economics of Regulation and Antitrust,* 3rd Edition, p. 823.

[64] See Grabowksi and Vernon, "Longer Patents for Increased Generic Competition in the U.S.: The Waxman-Hatch Act After One Decade," *Pharmacoeconomics,* 1996, pp. 113-114; Congressional Budget Office, "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, p. 28.

21

economic studies referenced previously generally relied on data from IMS for their analysis, and that pharmaceutical companies (including Warner Chilcott and Barr) also frequently rely on data from IMS for their internal forecasts, business decision–making, and in their public filings.

55.   Exhibits 5a through 5k illustrate the shift in prescriptions filled following the entry of the first A-rated generic for a particular brand-name oral contraceptive. The figures are based on data drawn from the IMS National Prescription Audit, which tracks prescriptions that are dispensed in retail pharmacies.[65]  I considered instances of generic entry for combined hormonal contraceptives that occurred between 2001 and 2004.  In each of these cases, a substantial number of consumers switched from the brand-name drug to the A-rated generic when the latter became available.

56.   In general, the generic version (or versions) of a particular contraceptive captured more than 50 percent of the total prescriptions for a particular brand and its A-rated generics within one year of the appearance of an A-rated generic in the marketplace.  Based on the evidence, I would expect to see a similar substitution pattern for Ovcon.[66]  This suggests that the entry of an A-rated generic version of Ovcon would have a unique effect on Ovcon sales.

57.   Furthermore, the evidence also suggests that other oral contraceptives are not close substitutes for Ovcon.

58.   The entry of generic versions of other branded oral contraceptives creates a set of natural experiments that are relevant to an evaluation of whether Ovcon competes with other oral contraceptive products.  As I noted above, generic products generally enter at a substantial discount to their branded counterparts.  Thus, generic entry for another oral contraceptive results in a decrease in that product's price relative to the price of Ovcon.  If Ovcon and other oral contraceptives were

---

[65] See Appendix 1 for further details.
[66] See, e.g., paragraph 49, supra (discussing the expectations of the parties regarding the effect of generic Ovcon entry).

22

part of the same relevant market, one would expect to see substantial switching from Ovcon to these other products as generic competitors entered. For instance, the branded oral contraceptive Ortho-Cyclen faced its first generic entrant, called Sprintec, in October 2002. If Ovcon and Ortho-Cyclen were close competitors and part of the same relevant market, one would expect to see switching from Ovcon to Ortho-Cyclen or Sprintec as generic entry provided a lower priced product that is therapeutically equivalent to Ortho-Cyclen.

59.    In fact, while Sprintec quickly gained sales from Ortho Cyclen, Sprintec's entry had no noticeable impact on the trend in Ovcon sales. The same is true regarding a host of other generic entrants for various oral contraceptives. Exhibit 6 graphs total prescriptions for Ovcon 35 over time, using data from IMS Health. As that graph shows, Ovcon sales have continued a steady upward trend since early 2001, and that trend has been virtually uninterrupted, despite the fact that there has been generic entry for a number of other branded contraceptives. Warner Chilcott's CEO also testified that generic entry for other products did not affect Ovcon, "Because there is no therapeutic substitution."[67]

60.    Econometric evidence confirms that the trend in Ovcon total prescriptions has been unaffected by generic entry events for other branded oral contraceptives. In order to assess whether generic entry for other branded products has affected Ovcon, I used IMS data on the number of total prescriptions for Ovcon by month from January 2000 to December 2005 to perform a regression analysis that showed whether entry by other generics affected the trend in the number of total prescriptions for Ovcon. In particular, I regressed the number of prescriptions by month for Ovcon on a time trend and a series of dummy variables indicating the entry of other generics. For instance, I created a dummy variable for the entry of generic Ortho Tri-Cyclen that is equal to zero before December 2003 (the date of first generic entry) and equal to 1 from December 2003 forward. In total, the regression included 22 separate dummy variables, representing 36 generic entry

---

[67] See Investigational Hearing Transcript of Roger Boissonneault, January 21, 2005, p. 49.

events.[68]  The regression results indicate that generic entry for other products has not affected the trend in Ovcon sales.  (See Exhibit 7)  In contrast, as the economic literature and Exhibits 5a through 5k suggest, generic entrants have dramatic effects on the sales of their A-rated branded counterparts.  This strongly suggests that Ovcon is not a particularly close substitute for other oral contraceptives, and that generic oral contraceptives are close substitutes for their A-rated branded counterparts.

61.     While the above analysis indicates that entry by generic alternatives to other branded oral contraceptives has not affected the growth of Ovcon's sales, there were numerous generic entry dates, some of which were very close together.  As a result, identifying the effect of any given entrant was difficult.  Thus, in addition to assessing whether the entry of generic versions of other contraceptives has affected overall sales for Ovcon, to help confirm my conclusions I also evaluated the rates at which patients switched from Ovcon to other specific alternatives and whether those rates have changed following the entry of new generic oral contraceptives.  For this analysis, I have been provided IMS data on patient switching behavior.  These data measure the number of patients that switch in a given month from one oral contraceptive to another.  Appendix 2 describes the IMS switching data, the method by which IMS collects the data, and the method by which IMS creates nationwide estimates from its sample.  Using these data, I assess whether the pattern of switches out of Ovcon to other products has been affected by generic entry for these other products.  For instance, has the entry of generic Ortho Cyclen (Sprintec) caused more people to switch out of Ovcon to Ortho Cyclen plus its generics than prior to Sprintec's entry?

62.     The results of my analysis indicate that the switching behavior of patients who use Ovcon has not been affected by generic entry for other oral contraceptives.  Exhibits 8a through 8ao graph the number of switches out of Ovcon to specific oral contraceptives and their A-rated generics (if any).  As those exhibits

---

[68] In some cases, multiple products experienced first generic entry in a given month.  In those cases, one dummy variable captures all first generic entry events.

demonstrate, there is no substantial difference in switching behavior between products that experienced generic entry and those that did not. In addition, the exhibits show that, for those products that did face generic entry, the trend in the number of Ovcon patients switching to those products is substantially the same before and after generic entry.

63.    Econometric analysis confirms this finding. I conducted an econometric test of whether more Ovcon patients switched into a given oral contraceptive group (a "group" consisting of a brand-name product and all its A-rated generics) after the entry of the first A-rated generic version in the group. The model includes time fixed effects to account for the fact that Ovcon's sales have been growing over time and a product group fixed effect. The general form of the regression model was

$$\log S_{jt} = \alpha_j + \delta_t + \beta_T X_T + \varepsilon_{jt}$$

where $S_{jt}$ are the switches from Ovcon to product group j at time t. $\alpha_j$ is the product group fixed effect and $\delta_t$ are a series of time dummies. The logarithmic form allows these time effects to have proportional effects on each product. Entry is coded as a series of dummies $X_T$ for each of the T periods after the entry event occurs for each product that experiences entry. The entry dummies are identified from the groups that experience entry and the time dummies are identified from the product groups that do not experience entry.

64.    The results, which are detailed in Exhibit 9, indicate that Ovcon switches into a given product group that had experienced generic entry were not affected by that entry. The analysis shows virtually no instances where entry of the first A-rated generic for a particular product led to a statistically significant increase in switches from Ovcon to that product and its A-rated generics. If all the entry events are pooled so that a single $\beta$ is estimated, the coefficient is small (-0.001) and not statistically significant (a t-statistic of -0.02). Thus, the data on the number of people switching from Ovcon to other products suggest that other oral contraceptive products are not particularly close substitutes for Ovcon, and thus,

25

these other products are likely not part of the same relevant market as Ovcon for the purpose of analyzing the Agreement.

65.    These results are not surprising, since the evidence produced in this case indicates that most switches occur for clinical reasons, and not because of price. For instance, Warner Chilcott provided data from ImpactRX, a third-party collector of pharmaceutical data, that follows a sample of physicians who record the reasons why they switched women from one oral contraceptive to another. The respondents indicate a host of clinical reasons for switching, including breakthrough bleeding, weight gain, acne control, etc. In contrast, economic reasons, such as price or insurance coverage are rarely mentioned. Similarly, Berlex, the manufacturer of the popular branded oral contraceptive Yasmin, conducted a survey of the reasons women switch oral contraceptives.[69] The most commonly cited reasons for switching oral contraceptives were side effects (35% of respondents), doctor's recommendation (19% of respondents), and a desire for a lower hormone dosage (7.9%). Only 3.2 percent of respondents cited price or cost as a reason for switching products, and a further 3 percent cited insurance reasons.

66.    The evidence that patients switch between products does not necessarily indicate that patients view the products to be interchangeable. Indeed, if a woman switches away from a product because of unacceptable side effects or other clinical issues, she may not view that product to be a clinical substitute, much less an economic substitute, for an alternative product that she can tolerate. Evidence that patients switch products may demonstrate only that patients must search to find products that are appropriate for their medical needs.

### B.  Conclusions Regarding Market Power

67.    As noted, the evidence described above indicates that Ovcon and other oral contraceptives are not particularly close economic substitutes, while branded oral contraceptive products and their A-rated generic counterparts are close

---

[69] See FTC-BLX-000001-000174.

substitutes. Thus, Warner Chilcott possessed market power. Barr's A-rated generic version of Ovcon was a sufficiently close substitute for Ovcon that its earlier entry would have significantly diminished Warner Chilcott's market power. Indeed, given the demonstrated cost savings that generic oral contraceptives provide, there is direct evidence that the Agreement harmed consumers by delaying the entry of generic Ovcon.

## VIII. Effect on Consumers of Exclusion from the Market of Barr's A-Rated Generic Version of Ovcon

68.   The prohibition on Barr's entry in the Agreement had the effect of preventing Barr from selling, or licensing its product for sale, in competition with Warner-Chilcott's Ovcon product. But for the prohibition on Barr's entry, Barr would likely have offered a competing generic version of Ovcon shortly after receiving FDA approval. Barr issued a press release on the day it received FDA approval to market generic Ovcon stating that it would enter if Warner-Chilcott did not exercise the option within 45 days.[70] Further, Barr's CEO testified that it could have launched generic Ovcon by August 1, 2004.[71]

69.   The delay of generic entry resulted in consumers paying higher prices. Evidence indicates that generic oral contraceptive products are priced substantially below branded products. Documents and testimony from both Warner Chilcott and Barr indicate that generic oral contraceptive products are priced 30 percent or more below branded prices at the wholesale level.[72] Barr traditionally prices its generic oral contraceptive products about 30 percent below branded products.[73] Both Barr and Warner Chilcott expected that Barr would price its generic Ovcon at about that level.[74]

---

[70] See "Barr's Generic Ovcon-35 Tablets Approved," Barr Pharmaceuticals, Inc. News Release, April 23, 2004.

[71] See Deposition of Bruce Downey, October 17, 2006, pp. 281-282.

[72] See Investigational Hearing Transcript of Roger Boissonneault, January 21, 2005, pp. 95-96; Investigational Hearing Transcript of Bruce Downey, January 14, 2006, p. 139.

[73] See Investigational Hearing Transcript of Bruce Downey, January 14, 2005, pp. 132, 139.

[74] See Investigational Hearing Transcript of Roger Boissennault, January 21, 2005, p. 95; Investigational Hearing Transcript of Bruce Downey, January 14, 2005, p. 139.

70.    Barr manufactures and sells a number of other generic oral contraceptives.  Using IMS data, I assessed Barr's generic pricing at the wholesale level relative to the branded counterparts.  Since 2000, Barr has become the single generic entrant for five oral contraceptives—Alesse, Cyclessa, Levlite, Mircette, and Ortho Cyclen.[75]  One month after entry, Barr's generic products were priced between 21 percent and 49 percent less than the branded prices one month before entry.

| Brand | Single Generic Entrant | Percentage Discount |
|---|---|---|
| Alesse-28 | Aviane-28 | 48.7% |
| Cyclessa-28 | Velivet-28 | 21.1% |
| Levlite-28 | Lessina-28 | 31.5% |
| Mircette-28 | Kariva-28 | 34.3% |
| Ortho Cyclen-28 | Sprintec-28 | 32.2% |

*Prices are calculated using IMS National Sales Perspective data on revenue and units.*

71.    Thus, the evidence suggests that once Barr launched generic Ovcon, consumers who purchased generic Ovcon would have experienced substantial savings.[76]

IX.    **Evaluation of Possible Justifications for the Agreement**

      *A. The Agreement Does Not Provide Pro-competitive Benefits*

72.    As described above, the Agreement contains a supply provision that enables Warner Chilcott to obtain trade supply of Ovcon from Barr at a cost equal to two times its fully loaded manufacturing cost.  The defendants have argued that this supply provision was needed to address Warner Chilcott's supply problems with BMS.  They further argue that the prohibition on Barr's entry with generic Ovcon was necessary in order to give Barr an incentive to perform its obligations under the supply provisions of the Agreement.[77]

73.    For the purposes of my analysis of the economic effect of the supply provisions of the Agreement, I will assume that Warner Chilcott did face continuing uncertainty about the amount of Ovcon that it could obtain from BMS.  While I will maintain

[75] For OrthoCyclen, Barr was the sole generic for only three months.
[76] For some individual patients, the cost advantage of generic Ovcon over its branded counterpart could have been offset to some degree by the loss of sampling.
[77] See Parties' White Paper, "The Ovcon Agreements Between Warner Chilcott and Barr Pharmaceuticals (The "Deal"):  Presentation to the Federal Trade Commissioners Against Any Enforcement Action," p. 27.

this assumption in the following analysis, I point out that Warner Chilcott's Ovcon supply needs likely would have declined substantially had Barr entered with its generic Ovcon, and any supply problems that might have existed likely would have diminished, perhaps significantly. (See the discussion below).

74.    The first step in the analysis is to make an assessment of whether there exists any likely pro-competitive effect of the supply provision of the Agreement and, if so, the magnitude of the effect. If the analysis indicates that such an effect exists, the next step in the analysis is to weigh the pro-competitive effect against the anticompetitive effect of the restriction on Barr's entry, which was discussed in the preceding sections.

75.    Economists generally consider conduct to be pro-competitive if it tends to expand the output available to the market, e.g., by reducing the cost of supply or increasing capacity, or if it improves the quality of the supply that is available. An exclusive supply agreement can be pro-competitive if, for example, it creates an incentive for firms to invest in new capacity or the development of new products.

76.    As noted above, Warner Chilcott claims that it had a number of difficulties with BMS's ability to supply it with Ovcon. The supply provision of the Agreement enables Warner Chilcott to source its supply of Ovcon from an additional source besides BMS. While Warner Chilcott and Barr entered into the supply agreement in May 2004 when Warner Chilcott exercised its option, Barr did not begin supplying Warner Chilcott until about a year later. From that time until October 2006, Barr exclusively supplied Warner Chilcott.[78]

77.    The supply provision resulted in the development of a new source of supply for Warner Chilcott, but it did not result in the development of a new source of supply for consumers. The supply provision gave Warner Chilcott the right to sell the product that Barr developed for its ANDA. Barr was seeking final FDA approval of this product independently of the Agreement. Upon receiving final

---

[78] I understand that Barr continues to supply Warner Chilcott on a non-exclusive basis.

FDA approval for its ANDA, the evidence indicates that Barr would have sold its own product in the absence of the Option and License Agreement. Therefore, the supply provision of the Agreement does not create a new source of supply of Ovcon for consumers. Instead, it merely results in product being sold under Warner Chilcott's brand rather than under the label that Barr would have chosen. Thus, absent the Agreement, consumers would have had two sources of supply— Warner Chilcott product supplied by BMS and Barr product.

78.    Further evidence suggests that the Agreement had other purposes besides solving supply issues. At the time the parties entered into the letter of intent, Barr did not have an FDA approved product. Under the Agreement, Warner Chilcott would not have received any supply from Barr unless Barr received final FDA approval for its ANDA. Therefore, the supply provision of the Agreement could not solve any of Warner Chilcott's supply problems unless Barr could also have sold its product independently, absent the restriction on its entry contained in the Agreement.

79.    A purchaser generally benefits from competition among multiple potential suppliers, all of whom are bidding for the right to become a supplier, even an exclusive supplier. Therefore, it is typical for firms to identify a range of potential suppliers before reaching an agreement with a particular one. If Warner Chilcott actually faced supply problems from BMS, economic theory would lead me to expect that the company would attempt to identify a range of potential suppliers. The available evidence does not suggest any effort by Warner Chilcott to find or develop other possible alternative suppliers, which potentially could have increased the supply of Ovcon available to the market. (See Section VI.B).

80.    Because merely transferring supply from Barr to Warner Chilcott does not itself create any pro-competitive effect, the supply provision of the Agreement does not provide any benefits to consumers that could potentially offset the anticompetitive effect of the restriction on Barr's entry that is contained in the Agreement.

Therefore, taken as a whole, the Agreement is anticompetitive and harms consumers.

81.   If, contrary to the facts in this case, the supply provision of the Agreement did have a pro-competitive effect, it would be necessary to assess whether this benefit more than offset the loss of competition that the restriction on Barr's entry causes. An exclusive supply relationship can be efficient in certain circumstances. For instance, exclusivity in a vertical economic relationship can encourage parties to make investments in their relationships that ultimately benefit consumers.

82.   But the present case does not correspond to that type of situation. The prohibition on Barr's entry eliminated a horizontal rival without improving any incentive to invest in the relationship, or more generally without permitting the defendants to do something that they could not accomplish separately.

### B. The Exclusive Was Not Necessary to Address Supply Difficulties

83.   The defendants have argued that the restriction that Barr could not supply others or make generic Ovcon on its own behalf was necessary to give Barr an incentive to perform its obligations under the supply provision of the Agreement. Taken on its face, the Agreement does not appear to contain the necessary guarantees to ensure performance. For instance, one might expect the Agreement to specify a guaranteed allocation of time on a production line, but it contains no such language.

84.   Finally, I note that recent developments indicate that an exclusive was not necessary. After Warner Chilcott launched chewable Ovcon in September 2006, Barr announced that Warner Chilcott was releasing it from the requirement that it only supply Warner Chilcott.[79] Barr has since launched its generic Ovcon, and is now producing on its own behalf. I understand that Warner Chilcott has recently asked Barr to continue to supply it with regular Ovcon on a non-exclusive basis.

---

[79] See "Barr Announces Warner Chilcott Waives Exclusive License for OVCON(R) 35," Barr Press Release, September 26, 2006, http://phx.corporate-ir.net/phoenix.zhtml?c=60908&p=irol-newsArticle_Print&ID=909303&highlight=.

In addition, Watson Pharmaceuticals is apparently going to launch an authorized generic version of Ovcon.[80] I understand that Warner Chilcott has also asked Barr to supply Watson on a non-exclusive basis.[81] Thus, even without the exclusive, Warner Chilcott currently has no concerns about supply assurance from Barr.

Daniel L. Rubinfeld

December 11, 2006

---

[80] An authorized generic is chemically identical to a particular brand-name drug, but the brand-name manufacturer authorizes it to be marketed in a generic version.

[81] See Deposition of Bruce Downey, October 17, 2006, pp. 169-70.

## APPENDIX 1

Figures 1 through 11 describe instances of entry by A-rated generic versions of the following combined hormonal contraceptives (CHCs):[82]

1. *Alesse-28*

Alesse-28 is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 0.10 mg of levonorgestrel and 0.02 mg of ethinyl estradiol, and the last 7 pills are placebos. Barr's A-rated generic version, sold as Aviane, entered in May 2001. Watson's A-rated generic, sold as Lutera, entered in December 2004.

2. *Cyclessa*

Cyclessa is a CHC that consists of a regimen of 28 pills. The first 7 pills each contain 0.10 mg of desogestrel and 0.025 mg of ethinyl estradiol, the next 7 pills each contain 0.125 mg of desogestrel and 0.025 mg of ethinyl estradiol, the next 7 pills each contain 0.15 mg of desogestrel and 0.025 mg of ethinyl estradiol, and the last 7 pills are placebos. Barr's A-rated generic version, sold as Velivet, entered in March 2004. Prasco's authorized generic, sold as Cesia, entered in November 2004.

3. *Levlite-28*

Levlite-28 is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 0.10 mg of levonorgestrel and 0.02 mg of ethinyl estradiol, and the last 7 pills are placebos. Barr's A-rated generic version, sold as Lessina, entered in April 2002.

4. *Loestrin 1/20*

Loestrin 1/20 is a CHC that consists of a regimen of 21 pills, each of which contains 1 mg of norethindrone acetate and 0.02 mg of ethinyl estradiol. Watson's A-rated generic

---

[82] Descriptive information about each brand-name contraceptive is drawn from the *Physician's Desk Reference*, 2006 edition. The A-rated generic versions were identified from Barr's Response to Narrative Specifications 1 – 3, dated May 17, 2004, Barr's product guide at http://www.barrproductguide.com/, Watson Pharmaceutical's product guide at http://www.watsonpharm.com/products/pdatabase.asp, Tea Pharmaceuticals USA's product information at http://www.tevausa.com/default.aspx?pageid=70, and the FDA Orange Book. The entry date of each generic product corresponds to the first month in which prescriptions for that product appear in the IMS Health National Prescription Audit.

version, sold as Microgestin 1/20, entered in April 2003. Barr's A-rated generic version, sold as Junel 1/20, entered in October 2003.

### 5. *Loestrin 1.5/30*

Loestrin 1.5/30 is a CHC that consists of a regimen of 21 pills, each of which contains 1.5 mg of norethindrone acetate and 0.03 mg of ethinyl estradiol. Watson's A-rated generic version, sold as Microgestin 1.5/30, entered in April 2003. Barr's A-rated generic version, sold as Junel 1.5/30, entered in October 2003.

### 6. *Loestrin Fe 1/20*

Loestrin Fe 1/20 is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 1 mg of norethindrone acetate and 0.02 mg of ethinyl estradiol, and the last 7 pills are placebos. Watson's A-rated generic version, sold as Microgestin Fe 1/20, entered in September 2001. Barr's A-rated generic version, sold as Junel Fe 1/20, entered in October 2003.

### 7. *Loestrin Fe 1.5/30*

Loestrin Fe 1.5/30 is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 1.5 mg of norethindrone acetate and 0.03 mg of ethinyl estradiol. Watson's A-rated generic version, sold as Microgestin Fe 1.5/30, entered in September 2001. Barr's A-rated generic version, sold as Junel Fe 1.5/30, entered in October 2003.

### 8. *Mircette*

Mircette is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 0.15 mg of desogesterel and 0.02 mg of ethinyl estradiol, the next 2 pills are placebos, and the last 5 pills each contain 0.01 mg of ethinyl estradiol. Barr's A-rated generic version, sold as Kariva, entered in April 2002.

### 9. *Ortho-Cyclen*

Ortho-Cyclen is a CHC that consists of a regimen of 28 pills. The first 21 pills each contain 0.25 mg of norgestimate and 0.035 mg of ethinyl estradiol, and the last 7 pills are placebos. Barr's A-rated generic version, sold as Sprintec, entered in September 2002. Watson's A-rated generic version, sold as MonoNessa, entered in February 2003. Teva's A-rated generic version, sold as Previfem, entered in April 2004.

10. *Ortho Novum 7/7/7*

Ortho Novum 7/7/7 is a CHC that consists of a regimen of 28 pills. The first 7 pills each contain 0.5 mg of norethindrone and 0.035 mg of ethinyl estradiol, the next 7 pills each contain 0.75 mg of norethindrone and 0.035 mg of ethinyl estradiol, the next 7 pills each contain 1 mg of norethindrone and 0.035 mg of ethinyl estradiol, and the last 7 pills are placebos. Both Barr's A-rated generic version, sold as Nortrel 7/7/7, and Watson's A-rated generic version, sold as Necon 7/7/7, entered in January 2003.

11. *Ortho Tri-Cyclen*

Ortho Tri-Cyclen is a CHC that consists of a regimen of 28 pills. The first 7 pills each contain 0.18 mg of norgestimate and 0.035 mg of ethinyl estradiol, the next 7 pills each contain 0.215 mg of norgestimate and 0.035 mg of ethinyl estradiol, the next 7 pills each contain 0.25 mg of norgestimate and 0.035 mg of ethinyl estradiol, and the final 7 pills are placebos. Both Barr's A-rated generic version, sold as Tri-Sprintec, and Watson's A-rated generic version, sold as TriNessa, entered in December 2003. Teva's A-rated generic, sold as Tri-Previfem, entered in April 2004.

The analysis is based on data from IMS Health covering new and total prescriptions for combined hormonal oral contraceptives for the period from January 2001 through December 2004.

35

## APPENDIX 2

The data that I use to analyze the pattern of consumer switching among different contraceptives were provided by IMS Health, a third-party provider of data to the pharmaceutical industry. Since 2001, IMS has collected detailed information from numerous pharmacies about the prescriptions that their customers fill. In this database, consumers are assigned a unique patient identifier that enables IMS to track the prescriptions that they fill over time and, thus, identify when a consumer switches from one product to another. Because the identifier is based on 12 data fields that are specific to the consumer, rather than the pharmacy, IMS is able to track an individual consumer's prescriptions even if he or she changes pharmacies.

IMS used data on prescriptions filled between January 2002 and June 2006 to construct a panel of patient-level data. In the dataset, each patient prescription is classified as a new start, a continuation prescription, or a switch between products. A prescription is a new start if the associated customer had not filled a prescription for another product in the defined group during the preceding 6 months.[83] The defined group consists of oral contraceptives and non-oral combined hormonal contraceptives, i.e., the Evra patch and Nuvaring. A prescription is a continuation prescription if it followed a prescription for the same contraceptive within the preceding 6 months. A prescription is a switch from another product if it followed a prescription for another contraceptive in the defined group within the preceding 6 months. IMS provided monthly counts of new starts, continuation prescriptions, and switches between products. IMS further segmented the monthly counts by the "switched from" product and the "switched to" product.

For each product switch that occurred between January 2005 and June 2006, IMS also calculated an estimate of the length of time that the associated consumer had used the product that she consumed before switching to a different product. This estimate is derived from the number of days of continuous therapy that the consumer received in prescriptions for the product that she used prior to switching. Using these estimates, IMS

---

[83] Because of the 6 month "look-back" period, data on prescriptions filled between July 2001 and December 2001 were used to classify prescriptions in the first 6 months of the panel.

calculated measures of consumers' tenure on the contraceptives that they used prior to switching to different products.

The pharmacies represented in the panel are a large subset of pharmacies in the United States; the number of pharmacies in the sample has generally increased over time, rising from 12,049 pharmacies in January 2002 to 42,036 pharmacies in June 2006. When a pharmacy joins the sample, IMS requires it to provide data for the preceding 12 month period. This historical data permits the pharmacy's prescriptions to be appropriately classified as new starts, continuations, or switches at the time that the pharmacy joins the sample. Because the number of pharmacies in the sample has changed over time, the monthly counts of new, continuing, and switch prescriptions in the sample have been projected to the national level to obtain national estimates of the numbers of prescriptions in each category. IMS calculated the ratio of total prescription (TRx) data from the National Prescription Audit to the total prescriptions in the panel for each product at each point in time and then used these ratios to project the number of new starts, continuations, and switches to the national level. I have used these projected data in my analysis.