## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF COLORADO, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:05-cv-2182-CKK |
| ) | |
| WARNER CHILCOTT HOLDINGS COMPANY ) | |
| III, LTD., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO BARR'S MOTION FOR SUMMARY JUDGMENT

**FOR PUBLIC RELEASE**

Devin M. Laiho
Assistant Attorney General
Consumer Protection Section
1525 Sherman Street, 5th Floor
Denver, Colorado 80203
(303) 866-5079

Elinor R. Hoffmann
Margaret D. Martin
Assistant Attorneys General
Antitrust Bureau
New York State Office of the
        Attorney General
120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8262

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................ .................. 1

ARGUMENT ............................................................................... .................. 2

I.     THE AGREEMENT IS A *PER SE* VIOLATION OF THE
       SHERMAN ACT ............................................................. .................. 2

       A.     Horizontal Market-allocation Agreements Are Illegal *Per Se* ..... .................. 3

       B.     Barr's Arguments Are Without Merit ........................... .................. 3

II.    WHETHER THE AGREEMENT IS UNLAWFUL UNDER
       THE RULE OF REASON MUST BE DECIDED BY THE
       FINDER OF FACT ............................................................ .................. 6

       A.     Applicable Law ......................................................... .................. 6

       B.     The Agreement Is Presumptively Unlawful under *Polygram* ....... .................. 8

       C.     The Agreement Caused Actual Anticompetitive Effects ............. .................. 9

       D.     There Are Disputed Issues of Fact as to Barr's Definition
              of Relevant Market ................................................... .............. 12

       E.     Barr's Output and Sampling Arguments Are Legally Flawed
              and Ignore Contrary Evidence ................................... .............. 16

              1.     Barr's metric for "output reduction" is incorrect ............. .............. 16

              2.     The evidence contradicts  Barr's argument concerning
                     the "benefits" of free samples ................................ .............. 18

              3.     Plaintiff States seek injunctive relief under federal law ... .............. 21

       F.     The Question of Whether the Agreement's Alleged
              Procompetitive Benefits Outweigh its Substantial Harm
              Is a Jury Question .............................................................. .............. 22

CONCLUSION ........................................................................................ .............. 26

# Table of Authorities

**Cases**                                                                                      **Pages**

*Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982) ....................................... 4, 5

*Broadcast Music Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) ................... 23

*California Dental Association v. FTC*, 526 U.S. 756 (1999) ....................................... 5

*Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998) ................................. 22

*Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .................... 18

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) ........................... 7

*Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979) ................................ 6, 24

*Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) ...... 9, 18, 22

*Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439 (1945) .................................... 22

*Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977) .............................. 12

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005)  15

*In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp.2d 74 (D.D.C. 2006) ........... 14

*In re Terazosin Hydrochloride Litigation*, 352 F. Supp.2d 1279 (2005) .............................. 14, 15

*In the Matter of Schering-Plough Corp.*, 2003 FTC LEXIS 187 ................................. 15

*Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*, 201 F. Supp. 2d 236 (S.D.N.Y. 2002)   6

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ......................................................... 23

*Leegin Creative Leather Products v. PSKS, Inc.*, 127 S. Ct. 2705 (2007)  ............................. 3, 4

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484 (9th Cir. 1991) .............. 12

*National Collegiate Athletic Assoc. v. Board of Regents*, 468 U.S. 85 (1984) .......... 1, 7, 8, 22, 23

*Nat'l Society of Professional Engineers v. United States*, 435 U.S. 679 (1978) .............. 8, 17, 18

*Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) ..................................................... 1, 3, 5, 24

*Polygram Holding, Inc. v. Federal Trade Commission*, 416 F.3d 29 (D.C. Cir. 2005) .... 8, 17, 23

*Standard Oil Co. of Calif. v. United States*, 337 U.S. 293 (1949) ................................................. 6

*T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816 (11th Cir. 1991) .......... 12

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................................... 7

*United States v. Microsoft Corp.*, 1998 WL 614485 (D.D.C. Sept. 14, 1998) ....................... 8, 12

*United States v. Topco Associates*, 405 U.S. 596 (1972) ............................................................. 4

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) .................................................................... 12

## Statutes

15 U.S.C. § 1 ............................................................................................................... 3, 4, 18
15 U.S.C. § 26 .................................................................................................................... 21

## Other Authorities

VII P. Areeda, ANTITRUST LAW ¶ 1511 (1986) ........................................................................ 9

XI H. Hovenkamp, ANTITRUST LAW ¶ 1910b (2d ed. 2005) ....................................................... 5

## INTRODUCTION

Defendant Barr Pharmaceuticals, Inc.'s ("Barr") motion for summary judgment misstates relevant principles of federal antitrust law and ignores the record evidence, much of it contained in Barr's own Appendix, that contradicts its statement of the facts. The motion is meritless and should be denied.[1]

1.    For the reasons explained in Plaintiffs' affirmative motion for summary judgment, the Agreement[2] between Barr and Warner Chilcott is a *per se* illegal horizontal market allocation agreement. Contrary to Barr's argument, Plaintiffs are not asking the Court to create a *new per se* rule; rather, they urge the Court to apply the long-standing *per se* rule against horizontal market-allocation agreements. That Defendants also agreed to *other* terms does not save their agreement from *per se* illegality. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (horizontal market-allocation agreement in exclusive trademark and copyright license was illegal *per se*).

2.    Even if the Court declines to apply the *per se* rule, and instead applies a rule of reason analysis, Barr would not be entitled to summary judgment. Apart from any consideration of relevant market, a horizontal restraint should be condemned if there is evidence that it had anticompetitive effects and defendants do not meet their "heavy burden" of proving a procompetitive justification that outweighs the anticompetitive effects. *National Collegiate Athletic Association (NCAA) v.*

---

[1]    Based on the number of times it is repeated, Barr's principal argument in favor of summary judgment appears to be the FTC's alleged decision not to challenge the Agreement when it was presented to the Commission in 2003. As explained in the June 21, 2006 FTC Statement to Correct Misrepresentations in Defendants' Opposition to Plaintiff States' Motion for Leave to File Summary Judgment Motion, this is a misrepresentation of the facts. *See* Plaintiffs' Appendix ("Pl. Appx.") Ex. 51. It is also irrelevant given that (I) the FTC ultimately chose to charge Barr with a violation of the Sherman Act; and (ii) the legality of challenged conduct is decided by the courts, not the FTC.

[2]    Plaintiffs will use the term "Agreement" to refer to the two written agreements between Barr and defendant Warner Chilcott (collectively "Defendants") dated March 24, 2004.

*Board of Regents*, 468 U.S. 85, 107-114 (1984).  There is ample evidence in the record that the Agreement caused significant anticompetitive effects.[3]

3.      Barr's definition of a relevant market to include all oral contraceptives, not just Ovcon 35 Products,[4] is contradicted by the evidence. The record shows that generic Ovcon, the drug that Warner Chilcott paid to keep off the market, was the only oral contraceptive that threatened Warner Chilcott with the loss of substantial sales due to price competition.

4.      Barr's arguments that the Agreement was not anticompetitive or had procompetitive benefits are not legally cognizable and are factually disputed.  To begin with, Congress has decided that generic competition should occur, and Barr is not free to ignore that determination. Moreover, Barr's "sampling" defense is legally insufficient because it ignores the obvious harm to direct purchasers, who do not receive free samples, and to the consumers who do not receive free samples. In addition, consumer benefits, price- and non-price-related, outweigh any harm caused by the loss of free samples.

## ARGUMENT

## I.    THE AGREEMENT IS A *PER SE* VIOLATION OF THE SHERMAN ACT

As explained in Plaintiffs' affirmative motion for summary judgment, the Agreement is a horizontal market allocation agreement and therefore, under settled antitrust precedent, illegal *per*

---

[3]      Redacted  Plaintiff States' expert has calculated that as a result of the Agreement, Barr and Warner Chilcott shared between  Redacted  in excess profits, not including the time value of money. Rubinfeld Disgorgement Report (12/11/06) at ¶ 18.

[4]      "Ovcon 35 Products" refers to Warner Chilcott's non-chewable brand-name drug Ovcon 35, an oral contraceptive containing 0.035 mg ethinyl estradiol and 0.4 mg norethidrone, and its AB-rated generic equivalents ("generic Ovcon 35"), including Barr's generic version, Balziva, and Zenchent, the generic version sold by Watson Pharmaceuticals under a license from Warner Chilcott.

*se*.

## A.    Horizontal Market-allocation Agreements Are Illegal *Per Se*

As Barr itself acknowledges, market allocation agreements between actual or potential competitors are *per se* violations of Section 1 of the Sherman Act.  Barr Br. at 21.  *See, e.g., Leegin Creative Leather Products v. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007) ("Restraints that are *per se* unlawful include horizontal agreements . . . to divide markets").  The *per se* rule applies whenever actual or potential competitors agree that they will not compete with one another in particular geographic areas for some period of time.  *See Palmer*,  498 U.S. at 49-50 (applying rule where "[e]ach [conspirator] agreed not to compete in the other's territories").  In this case, the undisputed facts show: (1) that Barr and Warner Chilcott were potential competitors in the spring of 2004, and (2) that they agreed that Barr would not compete with Warner Chilcott by selling generic Ovcon in the United States for five years.  Plaintiffs have addressed these issues fully in their affirmative brief, and incorporate those arguments here.[5]

## B.    Barr's Arguments Are Without Merit

The arguments put forward by Barr in an effort to avoid application of the *per se* rule (I) wrongly suggest that Plaintiffs are asking the Court to create a *new per se* rule; (ii) depend on legally irrelevant procompetitive justifications; or (iii) are based on the unsound proposition that a horizontal agreement not to compete that contains additional terms is no longer a horizontal agreement not to compete.

1.    Barr argues at length that rule of reason treatment is the presumptive standard for

---

[5]    Plaintiffs' affirmative motions for summary and partial summary judgment are pending before the Court.  Plaintiffs' Memorandum in Support (Plaintiffs' Aff. Mem.) of those motions is Doc. No. 131.

3

assessing collective conduct under Section 1 of the Sherman Act, and that the courts depart from that standard and create a new *per se* rule only if long judicial experience shows that such restraints will always, or almost always, tend to restrict competition.  Barr Br. at 1-2, 20-27.  These principles are inapposite here.  Plaintiffs are not asking the Court to create a new *per se* rule, but simply to apply the existing 110-year-old prohibition against horizontal market allocation agreements.  Once the Supreme Court has held that a particular class of restraint is illegal *per se*, the lower federal courts are not free to disregard that holding by applying the rule of reason.  *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 336 n.2 (1982); *United States v. Topco Associates*, 405 U.S. 596, 608 (1972) (reversing lower court's application of the rule of reason because horizontal market-allocation agreements are a "classic example" of a *per se* violation).

2.    Barr's alternative argument is that, because *per se* rules are reserved for conduct that is always or almost always anticompetitive, and because (according to Barr) the Agreement was not anticompetitive, the Court should not apply the *per se* rule.  As explained in Plaintiffs' motion for summary judgment, this argument "indicates a misunderstanding of the *per se* concept."  *Maricopa County*, 457 U.S. at 351.  Claims of procompetitive benefits, whether plausible or implausible, are irrelevant to deciding whether a particular restraint is illegal *per se*.  The very purpose of *per se* rules is to provide "business certainty and litigation efficiency" by creating a conclusive presumption that certain categories of conduct are anticompetitive.  *Id.* at 344.  An antitrust defendant may not obtain an exemption from a *per se* rule by arguing that a particular agreement is not anticompetitive or that the procompetitive benefits of the agreement outweigh its anticompetitive effects.  *See Leegin*, 127 S. Ct. at 2712 (Court of Appeals "correct[ly]" affirmed exclusion of proffered expert testimony

4

showing alleged procompetitive effects of defendant's pricing policy).[6]

Barr contends that the Supreme Court's 1999 decision in *California Dental Association v. FTC*, 526 U.S. 756 (1999) somehow overruled *Maricopa County*, and that an antitrust defendant is now permitted to avoid application of a *per se* rule simply by articulating "plausible" procompetitive justifications for its conduct. Barr is mistaken. None of the parties before the Supreme Court in *California Dental* asserted that the challenged restraint was illegal *per se*. The Court did not, therefore, reject *per se* treatment, as Barr contends (Br. at 27).

3.    Barr also argues that, because the Agreement established a back-up supply relationship, the *per se* rule does not apply. Barr is mistaken. The existence of a supply relationship does not save an anticompetitive agreement from *per se* treatment.

In *Palmer*, for example, the agreement between HBJ and BRG included an exclusive license permitting BRG to market and use HBJ's trademarked and copyrighted bar-review materials in Georgia—a quintessentially vertical relationship. 498 U.S. at 47. The Eleventh Circuit declined to apply the *per se* rule because it accepted the defendants' contention that the relationship between them was vertical, rather than horizontal. *See Palmer*, 874 F.2d at 1423. The Supreme Court reversed, finding that BRG and HBJ were actual competitors in Georgia and potential competitors in the rest of the country, and thus that the *per se* rule applied. 498 U.S. at 49. As Professor Hovenkamp explained:

> The lower courts were incorrect, being misled by the "vertical" nature of the transaction at issue, which was a license arrangement governing intellectual property rights. . . . But the challenge in

---

[6]    As Professor Hovenkamp explains in his treatise: "The per se rule is based on the premise that particular restraints are unreasonable *as a class*. As a result, once the tribunal concludes that the restraint at issue is within the class, further inquiry into the merits of that particular restraint is unwarranted." XI H. Hovenkamp, ANTITRUST LAW ¶ 1910b at 281 (2d ed. 2005).

> [*Palmer*] was not to the vertical transfer of the right to use another's copyrighted bar review materials; it was to an agreement between *competing* bar review schools dividing the entire United States into exclusive territories.

ANTITRUST LAW ¶ 1908, at 269 (emphasis in original).

Likewise, this court should not be misled by Barr's claim of a vertical supply agreement. The challenge in this case is not to Barr's agreement to supply Warner Chilcott, which is still in effect, but to Barr's agreement not to compete with Warner Chilcott. It is no answer to an allegation that one provision of a horizontal agreement is illegal to say that the agreement also includes other provisions that are not illegal.[7] *See, e.g., Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979) (an agreement between potential competitors which eliminates that potential competition is illegal *per se* whether or not it establishes a vertical relationship between the parties).

## II.    WHETHER THE AGREEMENT IS UNLAWFUL UNDER THE RULE OF REASON MUST BE DECIDED BY THE FINDER OF FACT

### A.    Applicable Law

Even if the Court concluded that the Agreement is not illegal *per se*, Barr is not entitled to summary judgment because there are genuine issues of material fact with regard to all elements of

---

[7]    Barr's citation of cases involving "exclusive supply contracts" is misleading. Several involve mere "requirements contracts," *i.e.*, contracts requiring the buyer to buy all of its requirements of a particular product from the seller. *See, e.g., Standard Oil Co. of Calif. v. United States*, 337 U.S. 293, 296 (1949). Requirements contracts do not restrain the seller from competing with its customers and are not remotely analogous to market-allocation agreements. Other cases cited by Barr involve "output contracts," *i.e.*, contracts by a seller to sell all of its output of a particular product to a particular buyer. So long as the contracting parties are *solely* in a vertical relationship (that is, are not actual or potential competitors), such output contracts are evaluated under the rule of reason. *See, e.g., Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*, 201 F. Supp. 2d 236 (S.D.N.Y. 2002).

the rule of reason analysis.[8]

The rules governing application of the rule of reason are well established. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001) (*en banc*) (rule of reason standards are identical in Section 1 and Section 2 cases). First, Plaintiffs must produce sufficient evidence for a jury to find that the Agreement between Barr and Warner Chilcott had an "anticompetitive effect." *Id.* at 59. Plaintiffs describe below some of the compelling record evidence demonstrating anticompetitive effects.

Once Plaintiffs meet their burden of production on the issue of anticompetitive effect, either relying on a presumption or on facts in the record, the burden shifts to Barr to demonstrate a cognizable, non-pretextual, procompetitive justification for the Agreement. *NCAA*, 468 U.S. at 113 ("Under the rule of reason, these hallmarks of anticompetitive behavior place upon [petitioner] a heavy burden of establishing an affirmative defense that competitively justifies this apparent deviation from the operations of a free market"). Thereafter, Plaintiffs can win in two ways: either the factfinder can determine that Plaintiffs have rebutted Barr's asserted "procompetitive justification" or the factfinder can find that, on balance, the anticompetitive effect of Barr's conduct outweighs the asserted procompetitive justification. *Id.*

Barr seeks to short-circuit this entire process simply by asserting that it had good reasons to enter into the Agreement and therefore, should prevail as a matter of law. The Supreme Court has rejected this approach to antitrust analysis. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 483-86 (1992) (existence of factual questions concerning the defendant's asserted procompetitive justifications precludes summary judgment). If the record contains cognizable,

---

[8]     Plaintiff States' complaint was not limited to a *per se* theory, as Barr asserts. *See* Plaintiff States' Second Amended Complaint ¶¶ 63-71 (Pl. Appx. Ex. 141).

plausible evidence on both sides of the issue, the weighing of anticompetitive harms and purported procompetitive benefits is the responsibility of the factfinder. *E.g., United States v. Microsoft Corp.*, 1998 WL 614485, *22 (D.D.C. Sept. 14, 1998).

**B.    The Agreement Is Presumptively Unlawful under *Polygram***

In *Polygram Holding, Inc. v. Federal Trade Commission*, 416 F.3d 29 (D.C. Cir. 2005), the Court of Appeals for this Circuit articulated a quick test for anticompetitive effect in cases where the agreement in question is, if not *per se* unlawful, very close to it. The court held that if there is a "close family resemblance between the suspect practice and another practice that already stood convicted in the court of consumer welfare" the conduct is presumptively unlawful. A court must summarily condemn such an "inherently suspect" practice unless the defendant identifies a procompetitive justification that plausibly offsets the apparent harm. *Id.* at 36-38. Barr's Agreement with Warner Chilcott bears, at a minimum, a "close family resemblance" to a *per se* unlawful market allocation agreement. Under *Polygram*, the Agreement should be presumed unlawful without a complex, lengthy examination of market definition. *Id.; see also NCAA*, 468 U.S. at 103-04 ("A conclusion that a restraint of trade is unreasonable may be 'based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.'") (*quoting Nat'l Society of Professional Engineers v. United States*, 435 U.S. 679, 690 (1978)).[9]

---

[9]      *Polygram* did not reject the application of the *per se* rule to a horizontal restraint of trade between independent entities. *Polygram* involved a joint venture among competitors, where there were arguably some integrative efficiencies that required a degree of collective conduct. In contrast, Barr and Warner Chilcott are entirely independent competitors: ▓▓▓▓▓ Redacted ▓▓▓▓▓ and ▓▓▓▓▓ Redacted ▓▓▓▓▓ ▓▓▓▓▓ Redacted ▓▓▓▓▓ *See* Boisseneault Investigational Hearing (1/21/05) at 65:14-25 (Pl. Appx. Ex. 88); Downey Dep. (10/17/06) at 149:18-22 (Pl. Appx. Ex. 96).

8

C.      **The Agreement Caused Actual Anticompetitive Effects**

The presence of market power within a defined market is a well-recognized surrogate for proof that a restraint will cause actual competitive effects, but it is only that.  *Federal Trade Commission v. Indiana Federation of Dentists*,  476 U.S. 447, 460-61 (1986) ("'proof of actual detrimental effects. . .' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (quoting VII P. Areeda, ANTITRUST LAW  ¶ 1511 at 429 (1986)).  In addition to the legal presumption of anticompetitive effects that applies in this case, there is compelling evidence of *actual* anticompetitive effect.

The evidence shows that the  Agreement caused direct purchasers to overpay for Ovcon 35 Products and prevented consumers from purchasing a generic alternative, exactly as Defendants had predicted.  Warner Chilcott executives, for example, based on [Redacted]

[Redacted]

Warner Chilcott's CEO testified that [Redacted]

[Redacted]

[Redacted]

[Redacted]  Boisseneault Dep. at 29-30 (Pl. Appx. Ex. 89).  Others at the company

[Redacted]

[Redacted]  *See* WC00118594 (Pl. Appx. Ex. 18).[10]   Nor do we have to rely on

---

[10]      Plaintiffs have adduced substantial additional evidence that Warner Chilcott viewed competition from generic Ovcon as a uniquely significant market event.  *See* Rubinfeld Rebuttal Report (1/8/07) ¶ 32 [Redacted] [Redacted] (Barr Appx. Ex. 9); Leitzinger Report (5/18/07) at 23-24 [Redacted] [Redacted] (Pl. Appx. Ex.73). [Redacted] [Redacted] *See* Hausman
(continued...)

9

predictions.  As a result of Warner Chilcott's waiver of the exclusivity provision in the Agreement, we know that generic entry was even better for customers and worse for branded Ovcon revenues than Warner Chilcott had predicted.  In fact, Warner Chilcott reported in its most recent SEC filing that, as a result of generic competition, the company lost more than 82% in Ovcon net sales in the nine months ending September 30, 2007, compared with the prior period.  Warner Chilcott Ltd. Form 10Q Quarterly Report at 31, filed November 9, 2007 (Pl. Appx. Ex. 57).

Price competition is the reason for the dramatic decline in  Warner Chilcott's Ovcon  sales. In October 2006, Barr began marketing Balziva at a discount ranging from **Redacted** from the brand.  In February 2007, when Watson launched an authorized generic pursuant to a license from Warner Chilcott, the discount from the pre-generic entry Ovcon price was **Redacted**  Leffler Report  ¶ 66 (Barr Appx. Ex. 6).[11] **Redacted**, and **Redacted** **Redacted** demonstrates that purchasers would have switched substantial amounts of their purchases to the lower priced generic but for the Agreement.  Leffler Report ¶¶ 66-72 and data cited therein (Barr Appx. Ex. 6); *see also* Barr 00-0226-38, (Pl. Appx. Ex. 139),  Barr 12-1444 (Pl. Appx. Ex.140); Vucurevich Dep. at 145 (Barr Appx. Ex. 26); Nailor Dep. at 219 (Pl. Suppl. Appx. Ex. 1). Barr has cited no contrary evidence: it simply ignores the uncontradicted facts

---

[10](...continued)
Dep (1/31/07) at 220:24-221:12 **Redacted** **Redacted** (Pl. Appx. Ex.79).

[11]     A generic typically is launched at a 25%-30% discount from the brand price.  Leffler Report ¶¶ 42, 66 (Barr Appx. Ex. 6).  This is a conservative estimate, based on the entry of only one generic.  Barr's and Warner Chilcott's CEOs **Redacted** **Redacted** Downey Dep. (10/17/06) at 65-66 (Pl. Appx. Ex. 96). *See also* Rubinfeld Rep. ¶ 34 (Barr Appx. Ex. 8); Leffler Rep. ¶¶ 66, 43 n.47 (Barr Appx. Ex. 6).

that refute its position.[12]

Moreover, Plaintiffs have adduced compelling evidence that consumers at every level of the distribution chain  paid  higher average prices for Ovcon 35 Products than they would have in the absence of the Agreement, and discuss that evidence in Part IIE below.[13]   Barr's own expert, Dr. Bell, ████████████████ Redacted ████████████████

████████ Redacted ████████[14] and conceded at his deposition ████ Redacted ████

████████████ Redacted ████████████

██ Redacted ██ Barr's other experts, Drs. Hausman and Mishell, also testified ████ Redacted ████

██ Redacted ██[15] Such evidence  renders Barr's contentions about market power wholly unnecessary to the court's analysis of the Agreement.  They also create a genuine factual dispute as to Barr's claims of a  relevant product market encompassing more than Ovcon and its generic equivalents.

---

[12]    Barr's own expert, Dr. Bell, opined that, ████████ Redacted ████████

████████ Redacted ████████. Bell Report (6/29/07) at 31 (Barr Appx. Ex. 11).

[13]    SOF ¶ 34. *See also* Part IIE below.

[14]    Bell Report (6/29/07) at 31 (Barr Appx. Ex. 11); Bell Dep. (8/15/05) at 60:14-61:4; *see also id.* at 53:16-54:13 ████████ Redacted ████████

████ Redacted ████ (Pl. Appx. Ex. 75).

[15]    Hausman Dep. (1/31/07) at 161:19-162:15 ████████ Redacted ████████

████ Redacted ████ (Pl. Appx. Ex. 79); Mishell Dep. (8/22/07) at 7:1-20 ████ Redacted ████

████████ Redacted ████████ (Pl. Appx. Ex. 82).

**D.     There Are Disputed Issues of Fact as to Barr's Definition of Relevant Market**[16]

The  presumption of anticompetitive effect, as well as evidence of actual anticompetitive effect (both present here) are each sufficient to establish that the Agreement resulted in anticompetitive effects without a factually intensive market inquiry.  But in any event, the facts create disputed issues with regard to Barr's definition of a relevant market.

Barr argues that the existence of non-Ovcon oral contraceptive products that function similarly to Ovcon 35 means that those other drug products are in the same relevant antitrust product market as Ovcon 35 Products.  That argument is inconsistent with the facts and legal precedent.  First, Plaintiffs have adduced substantial evidence that Ovcon 35 is *not* reasonably interchangeable with non-Ovcon oral contraceptive products.[17]  Some of that evidence comes from Barr's own experts.[18]

---

[16]     The definition of the relevant product market is typically a question of fact for the jury. *E.g., United States v. Microsoft Corp.*, 1998 WL 614485, *3 n.3 (D.D. C. Sept. 14, 1998); *accord T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979-81 (5th Cir. 1977); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984).



[17]     *See, e.g.,* Dickey Report (1/5/07) ¶ 13 ███ Redacted ███ and ¶ 20 ███ Redacted ███ (Barr Appx. Ex. 2) .
     *See also* Derman Report (5/16/07) ¶ 8A ███ Redacted ███ *id.* ¶ 25 ███ Redacted ███ *id.* ¶ 12 ███ Redacted ███ *id.* at 92:23-93:10 ███ Redacted ███ ███ Redacted ███ *id.* at 94:3-17 ███ Redacted ███ *id.* at 95:5-9 ███ Redacted ███ (Barr Appx. Ex. 1).

[18]     *E.g.,* Hausman Dep. (1/31/07) at 132:9-14 ███ Redacted ███

(continued...)

Plaintiffs' experts explained ▮Redacted▮

▮Redacted▮ Dr. Richard Dickey, a medical doctor

with long expertise in oral contraceptives, detailed in his report and testimony ▮Redacted▮

▮Redacted▮

▮Redacted▮

Dickey Report ¶ 12-13 (Barr Appx. Ex. 2) .

In addition to different levels of hormones in oral contraceptives, side effects can range

widely and affect individual women differently. *See* Dickey Report at ¶ 20 ▮Redacted▮

▮Redacted▮ (Barr Appx.

Ex. 2).  For example, ▮Redacted▮

▮Redacted▮ (*id.* at ¶ 17), ▮Redacted▮

▮Redacted▮ *Id.* at ¶ 18.[19]

Because oral contraceptives, unlike many prescription drugs, are largely elective, ▮Redacted▮

---

[18](...continued)
▮Redacted▮ ; *id.* at 137:25-139:4 ▮Redacted▮
▮Redacted▮
▮Redacted▮ (Pl. Appx. Ex. 79); Mishell Dep. (8/22/07)
at 12:10-25 ▮Redacted▮
▮Redacted▮
▮Redacted▮ *id.* at 14:3-16:10 ▮Redacted▮
▮Redacted▮ (Pl. Appx. Ex. 82).

[19]  *See also id.* ¶ 17b ▮Redacted▮
▮Redacted▮ *id.* ¶ 20 ▮Redacted▮
▮Redacted▮ *id.* ¶ 21 ▮Redacted▮
▮Redacted▮ (Barr Appx. Ex. 2); Dickey Dep. (4/13/07) at 91:15-93:15 ▮Redacted▮
▮Redacted▮ *id.* at 94:4-95:8 ▮Redacted▮
▮Redacted▮ *id.* at 117:19-22
▮Redacted▮ *id.* at 126:20-128:12 ▮Redacted▮
▮Redacted▮ *id.* at 159:14-160:20 ▮Redacted▮
▮Redacted▮ (Pl. Appx. Ex. 77).



*Id.* at ¶ 22. *Id.; see also id.* ¶ 31 Rubinfeld Rebuttal Report (1/8/07) ¶¶ 6, 26 (Barr Appx. Ex. 9).

Second, Barr's argument confuses *treatment alternatives* with *economic substitutes* and is thus erroneous as a matter of law. Therapeutic similarities between Ovcon 35 and non-Ovcon oral contraceptive products are insufficient to define a relevant antitrust product market of all oral contraceptive products. Such products could constitute economic substitutes for Ovcon 35 only if they prevented Barr and Warner Chilcott from maintaining the price of Ovcon 35 Products above the levels that would obtain in a competitive market (*i.e.*, the average pricing levels reached for Ovcon 35 Products after generic Ovcon competition began). In prescription pharmaceutical products cases, courts defining a market have concluded that, at most, a relevant market consists of the brand and AB-rated generics, despite the existence of treatment alternatives. *See, e.g., In re Terazosin Hydrochloride Litigation*, 352 F. Supp.2d 1279, 1319 n.40 (2005) (relevant market properly limited to branded and generic terazosin hydrochloride).[20]

---

[20]    *See, e.g. In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp.2d 74, 81-82 (D.D.C. 2006) (though identical, the branded and generic lorazepam were not in same relevant market, and the branded and generic clorazepate were not in same relevant market, because "[t]he (continued...)

That Warner Chilcott <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> as Barr's own expert has explained.[21]  Warner Chilcott did not <span style="color:red">Redacted</span>[22]  Moreover, <span style="color:red">Redacted</span> <span style="color:red">Redacted</span>[23] as Barr's experts concede, [24] and <span style="color:red">Redacted</span> Barr's experts admitted that <span style="color:red">Redacted</span> <span style="color:red">Redacted</span>.[25]  Barr's medical expert, Dr. Mishell, nicely illustrated this point when <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> Mishell Dep. (8/22/07) at 45:8-57:9 (Pl. Appx. Ex.



---

[20](...continued)
fact that products are just functionally interchangeable does not compel a finding that they belong in the same market"; the relevant markets were limited to the drugs' generic versions); *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514, 522-23 (E.D.N.Y. 2005) (relevant market limited to drug product ciprofloxacin, excluding other flouroquinolone antibiotics); *In re Terazosin Hydrochloride Litigation*, 352 F. Supp. 2d at 1319 n.40 (relevant market properly limited to branded and generic terazosin hydrochloride); *In the Matter of Schering-Plough Corp.*, 2003 FTC LEXIS 187, *57-58 (brand and its generic equivalents "define[] the area of trade we need to focus on").

[21]    Hausman Dep. (1/31/07) at 97:8-98:13 (Pl. Appx. Ex. 79).  *See also* Rubinfeld Rebuttal Report (1/8/07) ¶ 34 <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> (Barr Appx. Ex. 9); Leffler Rebuttal Report (7/20/07) ¶ 13 n.23 (same) (Barr Appx. Ex. 7).

[22]    SOF ¶¶ 23, 113.

[23]    *E.g.*, Rubinfeld Rebuttal Report (1/8/07) ¶¶ 16-29 (Barr Appx. Ex. 9); Leffler Report (5/18/07) ¶ 34 & n.37 (Barr Appx. Ex. 6); Leffler Dep. (7/25/07) at 305:6-12; *id.* at 306:12-15 (Pl. Appx. Ex. 80); Dickey Report (1/5/07) ¶ 29 (Barr Appx. Ex. 2).

[24]    SOF ¶ 114.

[25]    SOF ¶ 114.  *See, e.g.* Rubinfeld Rep. (12/11/06) ¶ 65 <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> <span style="color:red">Redacted</span> (Barr Appx. Ex. 8).

82).[26]

**E.    Barr's Output and Sampling Arguments Are Legally Flawed and Ignore Contrary Evidence**

Barr argues that, because the Agreement purportedly "preserve[d] or expand[ed] output," and maintained Warner Chilcott's incentive to provide free samples, anticompetitive effects of the Agreement are absent.  Barr Br. at 35-37.  These arguments are contradicted by the facts and are not legally cognizable.

1.    Barr's metric for "output reduction" is incorrect

Barr argues that "as a result of the Agreement, output of Ovcon 35 products was higher than it would have been. . . the antithesis of anticompetitive harm."  Barr. Br. at 25.  Barr is wrong. Generic competition did not cause reduction of any relevant measure of output.

Generic competition sometimes (but not always) causes a downward trend over time in the consumption of a particular drug product subject to generic competition (*i.e.*, the sum of the particular brand and its AB-rated generics).  *E.g.*,  Rubinfeld Rebuttal Report (1/8/07) ¶ 81 (Barr Appx. Ex. 9); Leffler Rebuttal Report (7/20/07) ¶ 34 (Barr Appx. Ex. 7).  Substantial factual and expert economic evidence in the record demonstrates that such effects are an improper metric for gauging anticompetitive effects in the pharmaceutical industry.[27]

---

[26]    Consequently, ▇▇▇▇ Redacted ▇▇▇▇
▇ Redacted ▇  Leffler Dep. (7/25/07) at 305:25-306:3 (Pl. Appx. Ex. 80); SOF ¶ 114.

[27]    *See, e.g.* Leffler Report (5/18/07) ¶¶ 53-54, 60 (Barr Appx. Ex. 6); Leffler Rebuttal Report (7/20/07) ¶ 33 ▇▇▇▇ Redacted ▇▇▇▇
Redacted
Redacted
▇ Redacted ▇   (Barr Appx. Ex. 7). Barr's expert conceded that ▇ Redacted ▇
▇ Redacted ▇  Hausman Dep. (1/31/07) at 47:15-24 (Pl. Appx. Ex.
(continued...)

Warner Chilcott, [Redacted]

[Redacted]

Boisseneault Dep. at 46-47 (Pl. Appx. Ex. 89); Frick Dep. at 22, 29-30 (Pl. Appx. Ex. 97); Lin Dep. at 60-63 (Pl. Appx. Ex. 98); *see also* Leffler Report, ¶ 60 (Barr Appx. Ex. 6).  Sampling [Redacted]

[Redacted]

[Redacted]  The primary effect of reduced sampling for a brand oral contraceptive [Redacted]  Rubinfeld Rebuttal Report, ¶ 84 (Barr Appx. Ex. 9); Boisseneault Dep. (11/29/06) at 48-49 (Pl. Appx. Ex. 89).  When Ovcon samples are not available, [Redacted]

[Redacted].  *See id.* at 49; *see also* Leffler Rebuttal Rep. ¶ 37 (Barr Appx. Ex. 7).

Such effects are not determinative of the presence of an anticompetitive effect.[28]  That conclusion is consistent with the facts demonstrating that actual detrimental effects resulted from the Agreement (see Part IIC above) and with the law.  Indeed, accepting Barr's argument that generic entry leads to an anticompetitive reduction in output, means accepting the faulty premise that generic competition is nearly always anticompetitive.  This is equivalent to arguing that "competition itself is unreasonable, [a defense that] the rule of reason does not support." *Nat'l Society of Professional Engineers* 435 U.S. at 696.

Barr's "output" argument also is fundamentally flawed for the reason that output is not the only measure of anticompetitive effects.  *Polygram Holding,* 416 F.3d at 38 (D.C. Cir. 2005) (cognizable anticompetitive effects include higher prices, reduced output, reduced quality, or

---

[27](...continued)
); SOF ¶ 33.

[28]     SOF ¶ 33.  *See also* Leffler Report ¶¶ 53-54, 60 (Barr Appx. Ex. 6).

reduced consumer choice); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 789 (6th Cir.

2002) (although output rose, evidence of higher prices and reduced consumer choice were each

sufficient to support jury finding of anticompetitive effect).[29]

In the Sherman Act, Congress adopted competition in the commercial marketplace as the

national economic policy.  In the Hatch-Waxman Act, Congress made the determination  that

generic entry, because it lowers the price of pharmaceuticals, is good for competition, good for

consumers and good for end-payers.  Barr may not lawfully agree with its competitor to deprive

customers, at every level of the distribution chain, of competition to which those customers are

entitled by law and which has been facilitated by Congress.  *See Indiana Federation of Dentists,* 476

U.S. at 462 ("The Federation is not entitled to pre-empt the working of the market by deciding for

itself that its customers do not need that which they demand*"); Nat'l Society of Professional

Engineers*, 435 U.S. at 692 ("the purpose of the analysis is to form a judgment about the competitive

significance of the restraint; [it is] not to decide whether a policy favoring competition is in the

public interest . . . . that policy decision has been made by Congress").

2.     The evidence contradicts  Barr's argument concerning the "benefits" of free samples

Barr asserts that consumers were not harmed by the Agreement because the Agreement

preserved Warner Chilcott's incentive to continue providing free samples to some physicians.  This

is contradicted by the facts and expert opinion in the record. The Agreement imposed no obligation

on Warner Chilcott to continue to promote Ovcon 35 ▮▮▮▮▮▮Redacted▮▮▮▮▮▮

---

[29]     *See also Indiana Federation of Dentists*, 476 U.S. at 461-64 ("a concerted and effective effort to withhold . . . information desired by consumers . . . is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices . . . than would occur in its absence").

[Redacted][30] All the Agreement accomplished was the preservation of Warner Chilcott's monopoly. Warner Chilcott engaged in sampling to maximize its profits from that monopoly.

Barr conveniently ignores the reason for dispensing free samples. As its own CEO testified, [Redacted] Downey Dep. at 131-32 (Pl. Appx. Ex. 96). Warner Chilcott's sampling is a discretionary, promotional activity, [Redacted] [Redacted] Boisseneault Dep. (11/29/06) at 49:17-19 [Redacted] [Redacted] (Pl. Appx. Ex. 89).[31] Doctors, not patients, receive free samples, and Barr concedes that "the factual record varies in terms of how many samples patients actually receive." Barr Memorandum at 40. The only evidence in the record is that [Redacted] [Redacted], a fact that Barr ignores in claiming that "free samples constituted a discount to consumers." *Id.* *See* Bell Report ¶ 39 (Barr Appx. Ex. 11); MacFarlane Dep. at 89, 111-112 (Pl. Appx. Ex. 106); Rubinfeld Rebuttal Report ¶ ¶ 73-77 (Barr Appx. Ex. 9). Samples that were never distributed to patients do not represent discounts.

Even assuming that some Ovcon samples were given to patients, [Redacted] [Redacted] Rubinfeld Rebuttal Report ¶¶ 58, 61 (Barr Appx. Ex. 9). [Redacted] [Redacted] *Id.* Sample packs that are not consumed cannot represent

---

[30]     Boisseneault Dep. (11/29/06) at 81 (Pl. Appx. Ex. 89).

[31]     *See also* MacFarlane Dep. at 36, 68 [Redacted] [Redacted] (Pl. Appx. Ex. 106) .

a discount, and a patient who does not fill an Ovcon prescription after trying a sample does not receive an effective discount. If Ovcon sampling stopped, a doctor choosing an oral contraceptive for a new patient could choose among products for which samples are available. The patient would not lose the benefit of a free sample.[32] Frick Dep. at 30, 46, 110 (Pl. Appx. Ex. 97). Continuing Ovcon patients could fill their prescriptions for Ovcon with the cheaper AB-rated generic. The Agreement unlawfully deprived them of that choice. Vucurevich Dep. at 41-42 (Barr Appx. Ex. 26).

The expert evidence likewise refutes Barr's argument that the samples Warner Chilcott gave to physicians yielded lower average consumer prices for Ovcon 35 than would have resulted from generic competition. Plaintiff States' economic expert, Dr. Rubinfeld, performed calculations that showed, contrary to Barr's experts' claims, that ███████ Redacted ███████

███ Redacted ███[33] One of Direct Purchaser Plaintiffs' economic experts, Dr. Leffler, asserts that

███████████████ Redacted ███████████████

███ Redacted ███[34] He performed his own calculation, and found that, contrary to Barr's

---

[32]  *See also* MacFarlane Dep. at 68, 125-26 (Pl. Appx. Ex. 106); Nichols Dep. at 31-32,105 (Barr Appx. Ex. 35); Downey Dep. at 79 (Pl. Appx. Ex. 96); Hausman Rep. ¶¶ 29-30 (Barr Appx. Ex. 12); Rubinfeld Rebuttal Rep. ¶ 63 (Barr Appx. Ex. 9). Not surprisingly, Barr does not rely on its own experts in arguing that free samples provided an effective discount, because their premise— ███████ Redacted ███████
███ Redacted ███—is baseless. Rubinfeld Rebuttal Rep. ¶¶ 73-79 (Barr Appx. Ex. 9) .

[33]  Rubinfeld Rebuttal Rep. ¶¶ 73-79 (Barr Appx. Ex. 9).

[34]  *See* Leffler Rep. (5/18/07) ¶ 61, 34 n.63 ███████ Redacted ███████
█████████ Redacted █████████
█████████ Redacted █████████
█████████ Redacted █████████
█████████ Redacted █████████
█████████ Redacted █████████

(continued...)

experts' conclusions, 

**Redacted** Leffler Rebuttal Report (7/20/07) ¶¶ 38-50 (Barr

Appx. Ex. 7).

Another of the Direct Purchaser Plaintiffs' economic experts, Dr. Karp, performed a set of

calculations that revealed that, **Redacted**

**Redacted**

**Redacted**

**Redacted** .[35] Moreover, Dr. Karp also observed that **Redacted**

**Redacted**

**Redacted**

**Redacted** [36]

3.    <u>Plaintiff States seek injunctive relief under federal law</u>[37]

The Plaintiff States have brought this action under federal law for injunctive relief only. The

evidence in the record demonstrates that there was injury at every level of the distribution chain, and

that it was caused by Defendants' anticompetitive agreement. It is undisputed that, but for the

---

[34](...continued)
**Redacted** (Barr Appx. Ex. 6); Leffler Rebuttal Report ¶ 20 **Redacted**
**Redacted**
**Redacted** (Barr Appx. Ex. 7).

[35]    Karp Report (7/20/07) at 5 (Barr Appx. Ex. 5).

[36]    Boisseneault Dep. (11/29/06) at 81:6-20 (Pl. Appx. Ex. 89).

[37]    15 U.S.C. § 26. Pursuant to this Court's order, the parties limit their instant motion to a
request for summary judgment on the pending federal antitrust claims. However, evidence of actual
damage to end-payers is equally irrelevant to Plaintiff States' claims under state law, because
Plaintiff States have only brought enforcement actions for civil penalties, and are not seeking
damages under state law.

21

Agreement, the vast majority of customers at every level of the distribution chain would have

switched, and ultimately did switch, to the lower-cost generic Ovcon.[38]   It is uncontroverted that

**Redacted**

**Redacted**[39]  It is also  uncontroverted that    **Redacted**

**Redacted**[40]

Barr confuses proof of injury and damage that are necessary to a consumer's damage claim

with proof of an antitrust violation and threatened harm. *See Georgia v. Pennsylvania Railroad Co.*,

324 U.S. 439 (1945); *see also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998)

(pointing out that while indirect purchasers might not have standing to seek damages, "*Illinois Brick*

has not therefore barred an indirect purchaser's suit for an injunction").  The evidence demonstrates

that the Agreement threatened injury to competition and in fact injured competition, making it, at

the very least, presumptively unlawful.  Unless Barr carries its burden of proving a plausible pro-

competitive benefit to offset that harm, the Agreement was a violation of the antitrust laws.  *See e.g.*,

*Indiana Federation of Dentists*, 476 U.S. 447; *NCAA*, 468 U.S. 85 (1984).

**F.    The Question of Whether the Agreement's Alleged Procompetitive Benefits Outweigh
       its Substantial Harm Is a Jury Question**

As discussed in Part II.A. above, because Plaintiffs have adduced massive evidence of

anticompetitive effect, the burden shifts to Barr to demonstrate a cognizable procompetitive

---

[38]    Warner Chilcott Form 10-Q Quarterly Report, filed November 9, 2007, available at
http://ir.wcrx.com. (Ovcon prescriptions declined by more than 82% due to generic entry for the
nine months through September 30, 2007 over the prior year period.) (Pl. Appx. Ex. 57).

[39]    Barr Laboratories Letter to Brooks/Eckerd dated October 17, 2006 (BRK 000086-87) (Pl.
Appx. Ex. 50); Warner Chilcott Price Increase Notice dated March 1, 2006 (KGR 003) (Pl. Appx.
Ex. 49).

[40]    Rubinfeld Rebuttal Rep. ¶¶ 40, 77 (Barr Appx. Ex. 9).

justification for the restraint created by the Agreement. It is up to the finder of fact to balance Barr's asserted justification against the anticompetitive effects of the restraint. *See* Part II.A, *ante*.

A restraint enhances competition by increasing output, creating operating efficiencies, making a new product available, enhancing service or quality, or widening consumer choice. *Polygram*, 416 F.3d at 38 (*quoting Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998)). The Supreme Court readily condemned a collusive restraint on television broadcasts by the NCAA when it found that the restraint was not necessary to the marketing of competitive team sports. *NCAA,* 468 U.S. 85. In contrast, in *Broadcast Music Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979), the Court found that literal price-fixing should be analyzed using a rule of reason when collaborative pricing was necessary to market a blanket license for the works of a large number of individual composers that could not be efficiently licensed separately..

Like the agreement in *NCAA,* and unlike the agreement in *Broadcast Music Inc.*, the Agreement was not necessary for Ovcon to be offered; indeed, it required that one product *not* be offered. The Agreement did not increase competition, but eliminated it. Rather than enhance competition, the Agreement guaranteed Warner Chilcott's ability to continue marketing Ovcon free from generic competition. A restraint does not enhance competition because it assists an individual competitor. *See Polygram* at 38 ("mere profitability or costs savings have not qualified as a defense under the antitrust laws") (*quoting Law*, 134 F.3d at 1023).

At various points in its Memorandum, Barr asserts that a principal procompetitive justification for the Agreement was that the Agreement "ensured a safe, stable and reliable supply of Ovcon 35 to consumers" and "enabled Ovcon 35 to compete aggressively against the numerous

other hormonal contraceptives in the marketplace." *E.g.*, Barr Memorandum at 28.[41]  Even assuming, without conceding, that Warner Chilcott did have supply problems, a supply arrangement between two competitors is not a cognizable justification for a restraint that is otherwise illegal.  *Palmer*, 498 U.S. at 49-50 (exclusive license to market competitor's material was illegal); *Engine Specialties*, 605 F. 2d 1 (rejecting the claim that an exclusive dealership justified the arrangement).

The facts demonstrate that Barr's supply argument is a sham.  Warner Chilcott's CEO testified that ███████████ Redacted ██████████████ ███ Redacted ███[42]  Moreover, Warner Chilcott ███████ Redacted ████████ ███████████████ Redacted ████████████ ██████████ Redacted ██████████[43]  Thus, at the time the parties executed the Agreement, they could not be sure that Barr would be able to supply Warner Chilcott with generic Ovcon, or when Barr would be able to do so.  When Barr and Warner Chilcott announced the Agreement in March, 2004, they did not even acknowledge the existence of a supply agreement. (Def. Appx. Ex. 72).

The idea that Warner Chilcott's need for a more reliable supply required that Barr and Warner Chilcott enter into an <u>exclusive</u> arrangement is implausible on its face.  Barr could have supplied Warner Chilcott as a contract manufacturer using Warner Chilcott's manufacturing process, just as BMS had done.  Moreover, Barr was fully capable of manufacturing its own and Warner Chilcott's product under its ANDAs, as it has demonstrated.  Barr currently makes Ovcon, its own

---

[41]    *See also id.* at 8, 25, 27.  Barr's other principal justification, that the sampling allegedly preserved by the Agreement was procompetitive, is refuted in Part II.E. above.

[42]    Boisseneault Dep. at 117-123  (Pl. Appx. Ex. 89).

[43]    *Id.* at 87-89.

generic Balziva, and Zenchent, the authorized generic that Watson now sells under license from Warner Chilcott. The critical objective of the Agreement was to keep Barr's approved generic off the market, in exchange for a payment of $20 million. The supply provisions were window dressing.[44]

Apart from evidence of pretext, the exclusivity provision was certainly not the least restrictive means of securing supply. Warner Chilcott had other options that would have been competitively neutral, but pursued none of them. Warner Chilcott **Redacted** **Redacted**, although alternative sources of reliable supply were available.[45] For example, **Redacted** **Redacted** **Redacted** [46] **Redacted** **Redacted** [47]

Thus, the evidence flatly contradicts Barr's argument that the supply agreement between

---

[44]    A Warner Chilcott email **Redacted** **Redacted** **Redacted**" (Pl. Appx. Ex. 45) *see also* SOF ¶ 8; Rubinfeld Rep. ¶ 15 (Barr Appx. Ex. 8); Leffler Report ¶ 45-50, 63 (Barr Appx. Ex. 6).

[45]    Boisseneault Dep. at 144-45 (Pl. Appx. Ex. 89).

[46]    *Id.* at 104-107; Rak Dep. (9/6/07) at 18, 20, 34-35 (Pl. Appx. Ex. 110).

[47]    Ecock Report at ¶ 72-73 (Pl. Appx. Ex. 114) **Redacted** **Redacted** **Redacted** **Redacted** **Redacted** **Redacted** **Redacted** Boisseneault Dep. at 109:6-21 (Pl. Appx. Ex. 89).



Warner Chilcott and Barr enhanced competition. The Agreement did not expedite Barr's entry into the market - ▮Redacted▮[48] Significantly, ▮Redacted▮—the very event precluded by the Agreement—▮Redacted▮[49] Absent the Agreement, Barr would have been selling its cheaper generic Ovcon, manufactured by Barr, in competition with Warner Chilcott. Instead, only Warner Chilcott sold Ovcon, reaping monopoly profits that it split with Barr.

Accordingly, to the extent that Barr has met its burden of production and advanced a cognizable procompetitive justification, Plaintiff States have rebutted Barr's assertions. If a jury is permitted to hear Barr's asserted justifications, it will have to consider them in light of Plaintiff States' substantial rebuttal, and weigh them against the anticompetitive harm that the Agreement caused. Balancing under the rule of reason is not appropriate for summary judgment.

## CONCLUSION

For the reasons stated above, Barr's Motion for Summary Judgment should be denied.

---

[48]    Bruce Downey, Barr's CEO, testified ▮Redacted▮ ▮Redacted▮ Downey Dep. at 278: 12-22, 282: 2-6 (Pl. Appx. Ex. 96).

[49]    Boisseneault Dep. at 81-82 (Pl. Appx. Ex. 89).

DATED: December 19, 2007

Respectfully submitted,

PLAINTIFF STATES

STATE OF COLORADO
JOHN W. SUTHERS
Attorney General

/s/ Devin M. Laiho

_____

DEVIN M. LAIHO                         Elinor Hoffmann
Assistant Attorney General            Margaret D. Martin
Consumer Protection Section           Assistant Attorneys General
Attorneys for the State of Colorado   Antitrust Bureau
1525 Sherman Street, 5th Floor        New York State Office of the Attorney
Denver, Colorado 80203                General
Telephone: 303-866-5079               120 Broadway, 26th Floor
Devin.Laiho@state.co.us               New York, New York 10271
                                      Telephone: (212) 416-8288

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December 2007, I caused an unredacted copy of

Plaintiff States' Opposition to Barr's Motion for Summary Judgment and Supplemental

Appendix of Exhibits to be served by e-mail and first-class mail upon the parties listed on the

service list below.

Margaret B. Martin


Karen N. Walker
Mark. L. Kovner
Chong S. Park
Kirkland & Ellis, LLP
Suite 1200
655 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 879-5000